UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

| | |
|---|---|
| JEANETTE ALLEYNE, individually and as next friend and guardian of T.J., ALLEN DATOUSH and KIM DATOUSH, individually and as next friends and guardians of T.D., LINDA DOHERTY, individually and as next friend and guardian of M.D., SUSAN HANDON, individually and as next friend and guardian of C.C., LESLIE JOYNER and LASHARON JOYNER, individually and as next friends and guardians of C.J., MITCHELL SHEAR and MARCIA SHEAR, individually and as next friends and guardians of S.S., LORRAINE BIGGS, individually and as next friend and guardian of D.B., JAMES BAILEY, individually and as next friend and guardian of D.B.2, MARIO CASTELLON and ESPERANZA CASTELLON, individually and as next friends and guardians of A.C., INEZ DOUGLAS, individually and as next friend and guardian of A.D., MARCELLUS EVANS, individually and as next friend and guardian of J.A., LICETTE FERNANDEZ, individually and as next friend and guardian of D.T.1, ANITA HARRISON, individually and as next friend and guardian of R.H., LORETTA HARRISON, individually and as next friend and guardian of M.H.,  LYDIA HERNANDEZ, individually and as next friend and guardian of S.F., PAULINE HIGGINS, individually and as next friend and guardian of C.H., LISA HUGHES, individually and as next friend and guardian of J.H., ANITA JIMINEZ, individually and as next friend and guardian of J.P., JULIA LANDOR, individually and as next friend and guardian of P.P., CHERYL LLOYD, individually and as next friend and guardian of C.L., QUILVIO LOPEZ, individually and as next friend and guardian of T.L., CAROLYN MCCALL, individually and as next friend and guardian of W.S., TRISHA MOEDER, individually and as next friend and guardian of J.B., NOORALI NASSER and SURAIYA NASSER, individually and as next friends and guardians of A.N., ALI NASRALLAH and HADIYA NASRALLAH, individually and as next friends and guardians of H.N., ERMITHE PAYOUTE, individually and as next friend and guardian of S.P., CLAUDE QUARTLBAUM, individually and as next | **AMENDED COMPLAINT**<br><br>06-CV-994<br>(GLS-RFT) |

friend and guardian of S.Q., YACHIJAMA REYES, individually and as next friend and guardian of T.M., KAYLOR ROBINSON, individually and as next friend and guardian of R.R.1, MARIE ROGERS, individually and as next friend and guardian of T.E., MELODY SHEPARD, individually and as next friend and guardian of Y.J., AMJAD SIDDIQI and ROBINA SIDDIQI, individually and as next friends and guardians of H.S., PATTY SNYDER, individually and as next friend and guardian of P.L., VICTORINE STEWART, individually and as next friend and guardian of T.R., MATTHEW SWENSON and HOLLY SWENSON, individually and as next friends and guardians of R.S., ERROL SYLVESTER, individually and as next friend and guardian of C.S., JACOB TAMBOR and SHIRLEY TAMBOR, individually and as next friends and guardians of D.T., JUAN TANGUI, SR., individually and as next friend and guardian of J.T., CARMEN TORRES, individually and as next friend and guardian of A.G., HAZEL TORRES, individually and as next friend and guardian of R.T., JORGE VADI and DESIREE VADI, individually and as next friends and guardians of D.V., MARIE WASHINGTON, individually and as next friend and guardian of R.R.2, WANDA WASHINGTON, individually and as next friend and guardian of J.G., LINDA WILLIAMS, individually and as next friend and guardian of M.W., RONNIE WILSON, individually and as next friend and guardian of B.W., and THE JUDGE ROTENBERG EDUCATIONAL CENTER, INC.,

Plaintiffs,

-against-


NEW YORK STATE EDUCATION DEPARTMENT, RICHARD P. MILLS, in his capacity as Commissioner of Education of the New York State Education Department, and THE NEW YORK STATE BOARD OF REGENTS,

Defendants.

2

Parent Plaintiffs and the Judge Rotenberg Educational Center, Inc. ("JRC") (collectively, the "Plaintiffs"), by their counsel, hereby file this Complaint for injunctive and declaratory relief. As grounds for this action, the Plaintiffs state as follows:

## I.        SUMMARY OF THIS ACTION

1.        The student plaintiffs J.A., D.B.2, D.B., J.B., A.C., C.C., T.D., M.D., A.D., T.E., S.F., J.G., A.G., M.H., R.H., C.H., J.H., Y.J., T.J., C.J., C.L., T.L., P.L., T.M., A.N., H.N., J.P., S.P., P.P., S.Q., T.R., R.R.2, R.R.1, S.S., H.S., W.S., R.S., C.S., D.T., J.T., D.T.1, R.T., D.V., M.W., and B.W. (collectively, the "Students") attend JRC.  The Students suffer severe behavior disorders that, prior to their treatment at JRC, caused them to inflict severe physical harm to themselves and others, and were so destructive and disruptive that they could not be educated.

2.        Each of the Students withstood years of unsuccessful treatment, including, but not limited to, special education, counseling, psychiatric hospitalizations, and the prescription of heavy dosages of anti-psychotic medications.  None of these methods properly treated their severe behavior disorders, putting their health, safety, and education in jeopardy.  Each of the Students was then admitted to JRC, where he or she has enjoyed substantial improvement in education and overall quality of life, including a dramatic reduction in violent and self-injurious behavior.

3.        Without providing the Students' guardians and family any due process or opportunity to be heard, and without consulting with the clinicians and teachers at JRC who are currently managing the Students' education and critical treatment, the Defendants have implemented emergency regulations (the "Emergency Regulations").  The Emergency Regulations effectively eliminate critical Court-approved "aversive" treatment for these students'

severely destructive, disruptive, non-compliant, and other problematic behaviors that have been approved for each of them by a Massachusetts Court on an individual basis.  These behaviors seriously interfere with the Students' receipt of a free appropriate public education, as well as put them and those around them in danger of harm.  The Defendants terminated this treatment by promulgating the Emergency Regulations without regard for whether the cessation of treatment is in the Students' best interests and to the detriment of the Students.

4.      This cessation is against the express advice and wishes of the Students' guardians, families, treating clinicians, and JRC staff and to the detriment of the Students.

5.      The Plaintiffs bring this action to enjoin the Defendants from causing them immediate and irreparable harm through acts in violation of the federal Individuals with Disabilities Education Act, the Rehabilitation Act, the United States and New York Constitutions, the New York State Administrative Procedure Act, and other state laws.

## II.      PARTIES

6.      Plaintiff Jeanette Alleyne, who resides at 3956 Amundson Avenue, Apt. P.H., Bronx, New York, is the mother and guardian of T.J.  T.J. is a 16 year old resident of New York who has been identified by his local school district, the New York City Department of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.

7.      Plaintiffs Allen and Kim Datoush, who reside at 23 Church Street, Phoenicia, New York, are the parents and guardians of T.D.  T.D. is a 20 year old resident of New York who has been identified by her local school district, Onteora School District, as disabled and in need of residential special education services to receive a free appropriate public education.

8.      Plaintiffs Richard and Linda Doherty, who reside at 50 Arbour Street, West Islip, New York, are the parents and guardians of M.D.  M.D. is a 20 year old resident of New York who has been identified by his local school district, the West Islip Public School District, as disabled and in need of residential special education services to receive a free appropriate public education.

9.      Plaintiff Susan Handon, who resides at 153-29 118th Avenue, Jamaica, New York, is the mother and guardian of C.C.  C.C. is a 19 year old resident of New York who has been identified by her local school district, the New York City Board of Education, as disabled and in need of residential special education services to receive a free appropriate public education.

10.     Plaintiffs Leslie and LaSharon Joyner, who reside at 31 Brittany Drive, Middletown, New York, are the parents and guardians of C.J.  C.J. is a 19 year old resident of New York who has been identified by her local school district, the Middletown Enlarged City School District, as disabled and in need of residential special education services to receive a free appropriate public education.

11.     Plaintiffs Mitchell and Marcia Shear, who reside at 2 Hayloft Drive, Roslyn Heights, New York, are the parents and guardians of S.S.  S.S. is a 13 year old resident of New York who has been identified by her local school district, East Williston Union Free School District, as disabled and in need of residential special education services to receive a free appropriate public education.

12.     Plaintiff JRC is a not-for-profit Massachusetts corporation.  It provides residential, respite, and day services to over 230 children and adults with severe behavior disorders.  JRC's principal place of business is at 250 Turnpike Street, Canton, Massachusetts.

13.    Defendant New York State Education Department ("NYSED"), whose principal offices are located at 89 Washington Avenue, Albany, New York, is an agency of the State of New York and is responsible for regulating educational services and programs for residents of the State of New York.

14.    Defendant Richard P. Mills is the Commissioner of Education of NYSED in the State of New York, and has a principal place of business located at 89 Washington Avenue, Albany, New York.

15.    Defendant The New York State Board of Regents, whose principal offices are located at the State Education Department, Room 110 Education Building, Albany, New York, has oversight and responsibility for NYSED, including the promulgation of regulations.  The Board of Regents was initially created in 1784 to oversee Columbia University.  In 1904, a department under the Board of Regents was created with responsibility for all education in New York.  The Board of Regents, in conjunction with NYSED, is responsible for setting educational policies, standards, and rules.

### III.    ADDITIONAL PLAINTIFFS[1]

16.    Plaintiffs Mario and Esperanza Castellon, who reside at 73-60 Woodhaven Boulevard, Glendale, New York, are the parents and guardians of A.C.  A.C. is an 18 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  A.C.'s

---

[1] The additional parent plaintiffs (the "Additional Parent Plaintiffs") are the parent(s) and/or guardian(s) of J.A., D.B.2, D.B., J.B., A.C., A.D., T.E., S.F., J.G., A.G., M.H., R.H., C.H., J.H., Y.J., C.L., T.L., P.L., T.M., A.N., H.N., J.P., S.P., P.P., S.Q., T.R., R.R.2, R.R.1, H.S., W.S., R.S., C.S., D.T., J.T., D.T.1, R.T., D.V., M.W., and B.W. (collectively the "Additional Student Plaintiffs").

Individualized Education Program ("IEP")  specifies JRC as the recommended placement for A.C.  *See* A.C.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 54.  The IEP provides for "Level III Interventions to include the GED (Graduated Electronic Decelerator) and Movement Limitation to treat…[A.C.'s] major inappropriate behaviors including aggression, destruction, major disruptive, health dangerous, and noncompliant behaviors."  A.C. was admitted to JRC on or about March 8, 2004.  On or about October 6, 2004, the Massachusetts Probate Court approved treatment of A.C. with aversives, including the GED device.  True and accurate copies of A.C.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 55, 56 and 57 respectively.  A.C. was receiving very effective treatment with the GED device for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Mr. and Mrs. Castellon want A.C.'s treatment with aversives, including the GED device, to continue as set forth in his IEP and court-approved treatment plan.  Mr. and Mrs. Castellon are aware of the Emergency Regulations and do not want them to apply to A.C.  A.C. will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved treatment plan.

17.     Plaintiff Inez Douglas, who resides at 2541 Yates Avenue, Bronx, New York, is the mother and guardian of A.D.  A.D. is a 17 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  A.D.'s IEP specifies JRC as the recommended placement

for A.D.  *See* A.D.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as

Exhibit 58.  The IEP provides for "Level III Interventions to include the GED (Graduated

Electronic Decelerator) and Movement Limitation to treat…[A.D.'s] major inappropriate

behaviors including aggression, destruction, major disruptive, health dangerous, and

noncompliant behaviors."  A.D. was admitted to JRC on or about March 13, 2005.  On or about

February 7, 2006, the Massachusetts Probate Court approved treatment of A.D. with aversives,

including the GED device.  True and accurate copies of A.D.'s most recent treatment plan as

well as findings of fact and decree from the Massachusetts Probate Court are attached to the

Exhibits Binder as Exhibits 59, 60 and 61 respectively.  A.D. was receiving very effective

treatment with the GED device for his aggressive, self-injurious, destructive, disruptive, and non-

compliant behaviors, as well as successful education services, when the Emergency Regulations

went into effect on June 23, 2006.  Ms. Douglas wants A.D.'s treatment with aversives,

including the GED device, to continue as set forth in his IEP and court-approved treatment plan.

Ms. Douglas is aware of the Emergency Regulations and does not want them to apply to A.D.

A.D. will suffer irreparable harm if he does not receive treatment as set forth in his IEP and

court-approved treatment plan.

      18.     Plaintiff Marcellus Evans, who resides at 173 Bainbridge Street, Brooklyn, New

York, is the uncle and guardian of J.A.  J.A. is an 18 year old resident of New York, who has a

severe behavior disorder and has been identified by her local school district, the New York City

Board of Education, as disabled and in need of residential special education services in order to

receive a free appropriate public education.  J.A.'s IEP specifies JRC as the recommended

placement for J.A.  *See* J.A.'s IEP, a true and accurate copy of which is attached to the Exhibits

Binder as Exhibit 62.  The IEP provides for "Level III Interventions to include the GED

(Graduated Electronic Decelerator) and Movement Limitation to treat…[J.A.'s] major

inappropriate behaviors including aggression, destruction, major disruptive, health dangerous,

and noncompliant behaviors."  J.A. was admitted to JRC on or about April 17, 2003.  On or

about October 27, 2003, the Massachusetts Probate Court approved treatment of J.A. with

aversives, including the GED device.  True and accurate copies of J.A.'s most recent treatment

plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to

the Exhibits Binder as Exhibits 63, 64 and 65 respectively.  J.A. was receiving very effective

treatment with the GED device for her aggressive, self-injurious, destructive, disruptive, and

non-compliant behaviors, as well as successful education services, when the Emergency

Regulations went into effect on June 23, 2006.  Mr. Evans wants J.A.'s treatment with aversives,

including the GED device, to continue as set forth in her IEP and court-approved treatment plan.

Mr. Evans is aware of the Emergency Regulations and does not want them to apply to J.A.  J.A.

will suffer irreparable harm if she does not receive treatment as set forth in her IEP and court-

approved treatment plan.

       19.     Plaintiff Licette Fernandez, who resides at 22 E. Garfield Street, Apartment 1A,

Bay Shore, New York, is the mother and guardian of D.T.1.  D.T.1 is a 17 year old resident of

New York, who has a severe behavior disorder and has been identified by his local school

district, the Bay Shore Union Free School District, as disabled and in need of residential special

education services in order to receive a free appropriate public education.  D.T.1's IEP specifies

JRC as the recommended placement for D.T.1.  *See* D.T.1's IEP, a true and accurate copy of

which is attached to the Exhibits Binder as Exhibit 66.  The IEP provides for "Level III

interventions to include Movement Limitation Procedures and the Graduated Electronic Decelerator to treat…[D.T.1's] major problematic behaviors to include aggression, health dangerous, destructive, major disruptive, and non-compliant behaviors."  D.T.1 was admitted to JRC on or about July 17, 2001.  On or about March 17, 2005, the Massachusetts Probate Court approved treatment of D.T.1 with aversives, including the GED device.  True and accurate copies of D.T.1's most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 67, 68 and 69 respectively.  D.T.1 was receiving very effective treatment with the GED device for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Ms. Fernandez wants D.T.1's treatment with aversives, including the GED device, to continue as set forth in his IEP and court-approved treatment plan.  Ms. Fernandez is aware of the Emergency Regulations and does not want them to apply to D.T.1.  D.T.1 will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved treatment plan.

20.     Plaintiff Anita Harrison, who resides at 97-22 104th Street, 2nd Floor, Ozone Park, Queens, New York, is the mother and guardian of R.H.  R.H. is a 17 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  R.H.'s IEP specifies JRC as the recommended placement for R.H.  *See* R.H.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 70.  The IEP provides for "Level III Interventions Procedures to

include Movement Limitation Procedures and the Graduated Electronic Decelerator to treat…[R.H.'s] major problematic behaviors to include aggression, destruction, health dangerous, major disruptive, and noncompliant behaviors."  R.H. was admitted to JRC on or about July 11, 2000.  On or about September 24, 2001, the Massachusetts Probate Court approved treatment of R.H. with aversives, including the GED device.  True and accurate copies of R.H.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 71, 72 and 73 respectively.  R.H. was receiving very effective treatment with the GED device for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Ms. Harrison wants R.H.'s treatment with aversives, including the GED device, to continue as set forth in his IEP and court-approved treatment plan.  Ms. Harrison is aware of the Emergency Regulations and does not want them to apply to R.H.  R.H. will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved treatment plan.

21.    Plaintiff Loretta Harrison, who resides at 117-24 147th Street, Jamaica, New York, is the mother and guardian of M.H.  M.H. is a 20 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  M.H.'s IEP specifies JRC as the recommended placement for M.H.  *See* M.H.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 74.  The IEP provides for "Level III Interventions Procedures to include Movement Limitation and the Graduated Electronic Decelerator (GED) to

treat…[M.H.'s] major problematic behaviors to include aggression, destructive, health

dangerous, major disruptive, and noncompliant behaviors."  M.H. was admitted to JRC on or

about July 6, 1999.  On or about January 18, 2000, the Massachusetts Probate Court approved

treatment of M.H. with aversives, including the GED device.  True and accurate copies of

M.H.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts

Probate Court are attached to the Exhibits Binder as Exhibits 75, 76 and 77 respectively.  M.H.

was receiving very effective treatment with the GED device for his aggressive, self-injurious,

destructive, disruptive, and non-compliant behaviors, as well as successful education services,

when the Emergency Regulations went into effect on June 23, 2006.  Ms. Harrison wants M.H.'s

treatment with aversives, including the GED device, to continue as set forth in his IEP and court-

approved treatment plan.  Ms. Harrison is aware of the Emergency Regulations and does not

want them to apply to M.H.  M.H. will suffer irreparable harm if he does not receive treatment as

set forth in his IEP and court-approved treatment plan.

22.     Plaintiff Lydia Hernandez, who resides at 246 Pacific Street, Apartment 8,

Brooklyn, New York, is the mother and guardian of S.F.  S.F. is a 15 year old resident of New

York, who has a severe behavior disorder and has been identified by his local school district, the

New York City Board of Education, as disabled and in need of residential special education

services in order to receive a free appropriate public education.  S.F.'s IEP specifies JRC as the

recommended placement for S.F.  *See* S.F.'s IEP, a true and accurate copy of which is attached

to the Exhibits Binder as Exhibit 78.  The IEP provides for "Level III Interventions to include the

GED (Graduated Electronic Decelerator) and Movement Limitation to treat…[S.F.'s] major

inappropriate behaviors including aggression, destruction, major disruptive, health dangerous

and noncompliant behaviors."  M.H. was admitted to JRC on or about September 23, 2004.  On

or about December 16, 2005, the Massachusetts Probate Court approved treatment of S.F. with

aversives, including the GED device.  True and accurate copies of S.F.'s most recent treatment

plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to

the Exhibits Binder as Exhibits 79, 80 and 81 respectively.  S.F. was receiving very effective

treatment with the GED device for his aggressive, self-injurious, destructive, disruptive, and non-

compliant behaviors, as well as successful education services, when the Emergency Regulations

went into effect on June 23, 2006.  Ms. Hernandez wants S.F.'s treatment with aversives,

including the GED device, to continue as set forth in his IEP and court-approved treatment plan.

Ms. Hernandez is aware of the Emergency Regulations and does not want them to apply to S.F.

S.F. will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-

approved treatment plan.

   23. Plaintiff Pauline Higgins, who resides at 2110 Wallance Avenue, Apartment 4A,

Bronx, New York, is the mother and guardian of C.H.  C.H. is a 16 year old resident of New

York, who has a severe behavior disorder and has been identified by her local school district, the

New York City Board of Education, as disabled and in need of residential special education

services in order to receive a free appropriate public education.  C.H.'s IEP specifies JRC as the

recommended placement for C.H.  *See* C.H.'s IEP, a true and accurate copy of which is attached

to the Exhibits Binder as Exhibit 82.  The IEP provides for "Level III Interventions to include the

GED (Graduated Electronic Decelerator) and Movement Limitation to treat…[C.H.'s] major

inappropriate behaviors including aggression, destruction, major disruptive, health dangerous,

and noncompliant behaviors."  C.H. was admitted to JRC on or about December 11, 2003.  On or

about May 12, 2004, the Massachusetts Probate Court approved treatment of C.H. with aversives, including the GED device.  True and accurate copies of C.H.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 83, 84 and 85 respectively.  C.H. was receiving very effective treatment with the GED device for her aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Ms. Higgins wants C.H.'s treatment with aversives, including the GED device, to continue as set forth in her IEP and court-approved treatment plan.  Ms. Higgins is aware of the Emergency Regulations and does not want them to apply to C.H.  C.H. will suffer irreparable harm if she does not receive treatment as set forth in her IEP and court-approved treatment plan.

24.     Plaintiff Lisa Hughes, who resides at 419 East 93rd Street, Apartment 18F, New York, New York, is the mother and guardian of J.H.  J.H. is a 17 year old resident of New York, who has a severe behavior disorder and has been identified by her local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  J.H.'s IEP specifies JRC as the recommended placement for J.H.  *See* J.H.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 86.  The IEP provides for "Level III Interventions to include the GED (Graduated Electronic Decelerator) and Movement Limitation to treat…[J.H.'s] major inappropriate behaviors including aggression, destruction, major disruptive, health dangerous, and noncompliant behaviors."  J.H. was admitted to JRC on or about December 1, 2004.  On or about June 16, 2005, the Massachusetts Probate Court approved treatment of J.H. with aversives,

including the GED device.  True and accurate copies of J.H.'s most recent treatment plan as well

as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits

Binder as Exhibits 87, 88 and 89 respectively.  J.H. was receiving very effective treatment with

the GED device for her aggressive, self-injurious, destructive, disruptive, and non-compliant

behaviors, as well as successful education services, when the Emergency Regulations went into

effect on June 23, 2006.  Ms. Hughes wants J.H.'s treatment with aversives, including the GED

device, to continue as set forth in her IEP and court-approved treatment plan.  Ms. Hughes is

aware of the Emergency Regulations and does not want them to apply to J.H.  J.H. will suffer

irreparable harm if she does not receive treatment as set forth in her IEP and court-approved

treatment plan.

25.    Plaintiff Anita Jimenez, who resides at 20 Richmond Plaza, 14J, Bronx, New

York, is the mother and guardian of J.P.  J.P. is an 18 year old resident of New York, who has a

severe behavior disorder and has been identified by her local school district, the New York City

Department of Education, as disabled and in need of residential special education services in

order to receive a free appropriate public education.  J.P.'s IEP specifies JRC as the

recommended placement for J.P.  *See* J.P.'s IEP, a true and accurate copy of which is attached to

the Exhibits Binder as Exhibit 90.  The IEP provides for "Level III Interventions to include

Movement Limitation and the Graduated Electronic Decelerator (GED) to treat…[J.P.'s] major

problematic behaviors to include aggression, destruction, health dangerous, major disruptive, and

non-compliant behaviors."  J.P. was admitted to JRC on or about August 1, 2000.  On or about

March 29, 2002, the Massachusetts Probate Court approved treatment of J.P. with aversives,

including the GED device.  True and accurate copies of J.P.'s most recent treatment plan as well

as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 91, 92 and 93 respectively.  J.P. was receiving very effective treatment with the GED device for her aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Ms. Jimenez wants J.P.'s treatment with aversives, including the GED device, to continue as set forth in her IEP and court-approved treatment plan.  Ms. Jimenez is aware of the Emergency Regulations and does not want them to apply to J.P.  J.P. will suffer irreparable harm if she does not receive treatment as set forth in her IEP and court-approved treatment plan.  .

26.     Plaintiff Julia Landor, who resides at 252 East 4th Street, Apartment 1D, New York, New York, is the mother and guardian of P.P.  P.P. is an 18 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  P.P.'s IEP specifies JRC as the recommended placement for P.P.  *See* P.P.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 94.  The IEP provides for "Level III Interventions to include the GED (Graduated Electronic Decelerator) and Movement Limitation to treat…[P.P.'s] major inappropriate behaviors including aggression, destruction, major disruptive, health dangerous, and noncompliant behaviors."  P.P. was admitted to JRC on or about March 17, 2005.  On or about November 10, 2005, the Massachusetts Probate Court approved treatment of P.P. with aversives, including the GED and GED-4 devices.  True and accurate copies of P.P.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate

Court are attached to the Exhibits Binder as Exhibits 95, 96 and 97 respectively.  P.P. was receiving very effective treatment with the GED-4 device for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Ms. Landor wants P.P.'s treatment with aversives, including the GED and GED-4 devices, to continue as set forth in his IEP and court-approved treatment plan.  Ms. Landor is aware of the Emergency Regulations and does not want them to apply to P.P.  P.P. will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved treatment plan.

27.     Plaintiff Cheryl Lloyd, who resides at 1740 2nd Avenue, Apartment 1B, New York, New York, is the mother and guardian of C.L.  C.L. is a 14 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  C.L.'s IEP specifies JRC as the recommended placement for C.L.  *See* C.L.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 98.  The IEP provides "Level III interventions to include Movement Limitation Procedures.  [C.L.'s] major problematic behaviors include aggression, destruction, health dangerous, major disruptive, and non-compliant behaviors."  C.L. was admitted to JRC on or about February 6, 2001.  On or about November 1, 2001, the Massachusetts Probate Court approved treatment of C.L. with aversives, including the GED device.  True and accurate copies of C.L.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 99, 100 and 101 respectively.  C.L. was receiving very effective treatment with the GED device

for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Ms. Lloyd wants C.L.'s treatment with aversives, including the GED device, to continue as set forth in his IEP and court-approved treatment plan.  Ms. Lloyd is aware of the Emergency Regulations and does not want them to apply to C.L.  C.L. will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved treatment plan.

28.     Plaintiff Quilvio Lopez, who resides at 106-14 160th Street, Apartment 2A, Jamaica, New York, is the father and guardian of T.L.  T.L. is a 13 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  T.L.'s IEP specifies JRC as the recommended placement for T.L.  *See* T.L.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 102.  The IEP provides for "Level III physical aversive interventions to include Movement Limitation and the Graduated Electronic Decelerator (GED) to treat…[T.L.'s] major problematic behaviors to include aggression, health dangerous, major disruptive, and noncompliant behaviors."  T.L. was admitted to JRC on or about June 11, 2002.  On or about March 12, 2003, the Massachusetts Probate Court approved treatment of T.L. with aversives, including the GED device.  True and accurate copies of T.L.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 103, 104 and 105 respectively.  T.L. was receiving very effective treatment with the GED device for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations

went into effect on June 23, 2006.  Mr. Lopez wants T.L.'s treatment with aversives, including

the GED device, to continue as set forth in his IEP and court-approved treatment plan.  Mr.

Lopez is aware of the Emergency Regulations and does not want them to apply to T.L.  T.L. will

suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved

treatment plan.

29.     Plaintiff Carolyn McCall, who resides at 758 Dumont Avenue, Apartment 1,

Brooklyn, New York, is the great grandmother and guardian of W.S.  W.S. is a 13 year old

resident of New York, who has a severe behavior disorder and has been identified by his local

school district, the New York City Board of Education, as disabled and in need of residential

special education services in order to receive a free appropriate public education.  W.S.'s IEP

specifies JRC as the recommended placement for W.S.  *See* W.S.'s IEP, a true and accurate copy

of which is attached to the Exhibits Binder as Exhibit 106.  The IEP provides for "Level III

Interventions to include Movement Limitation and the Graduated Electronic Decelerator (GED)

to treat…[W.S.'s] major problematic behaviors to include aggression, destruction, health

dangerous, major disruptive, and noncompliant behaviors."  W.S. was admitted to JRC on or

about August 26, 2003.  On or about August 11, 2004, the Massachusetts Probate Court

approved treatment of W.S. with aversives, including the GED device.  True and accurate copies

of W.S.'s most recent treatment plan as well as findings of fact and decree from the

Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 107, 108 and 109

respectively.  W.S. was receiving very effective treatment with the GED device for his

aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as

successful education services, when the Emergency Regulations went into effect on June 23,

2006.  Ms. McCall wants W.S.'s treatment with aversives, including the GED device, to continue as set forth in his IEP and court-approved treatment plan.  Ms. McCall is aware of the Emergency Regulations and does not want them to apply to W.S.  W.S. will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved treatment plan.

30.     Plaintiff Trisha Moeder, who resides at 1030 Regent Street, Schenectady, New York, is the mother and guardian of J.B.  J.B. is a 16 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the Schenectady City School District, as disabled and in need of residential special education services in order to receive a free appropriate public education.  J.B.'s IEP specifies JRC as the recommended placement for J.B.  *See* J.B.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 110.  The IEP provides for "Level III Interventions to include Movement Limitation Procedures and the Graduated Electronic Decelerator to treat…[J.B.'s] major problematic behaviors to include aggression, health dangerous, destructive, major disruptive, and non-compliant behaviors."  J.B. was admitted to JRC on or about April 6, 2005.  On or about February 9, 2006, the Massachusetts Probate Court approved treatment of J.B. with aversives, including the GED and GED-4 devices.  True and accurate copies of J.B.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 111, 112 and 113 respectively.  J.B. was receiving very effective treatment with the GED-4 device for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Ms. Moeder wants J.B.'s treatment with aversives, including the GED and GED-4 devices, to continue as set forth in his IEP and court-

approved treatment plan.  Ms. Moeder is aware of the Emergency Regulations and does not want them to apply to J.B.  J.B. will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved treatment plan.

31.     Plaintiffs Noorali and Suraiya Nasser, who reside at 108 Cardinal Road, Levittown, New York, are the parents and guardians of A.N.  A.N. is an 18 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the Island Trees Union Free School District, as disabled and in need of residential special education services in order to receive a free appropriate public education.  A.N.'s IEP specifies JRC as the recommended placement for A.N.  *See* A.N.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 114.  The IEP provides for "Level III Interventions to include Movement Limitation Procedures and the Graduated Electronic Decelerator to help…[A.N.] manage his aggressive, destructive, health dangerous, major disruptive and noncompliant behaviors."  A.N. was admitted to JRC on or about October 25, 2000.  On or about March 9, 2001, the Massachusetts Probate Court approved treatment of A.N. with aversives, including the GED device.  True and accurate copies of A.N.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 115, 116 and 117 respectively.  A.N. was receiving very effective treatment with the GED device for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Mr. and Mrs. Nasser want A.N.'s treatment with aversives, including the GED device, to continue as set forth in his IEP and court-approved treatment plan.  Mr. and Mrs. Nasser are aware of the Emergency Regulations and do

not want them to apply to A.N.  A.N. will suffer irreparable harm if he does not receive treatment

as set forth in his IEP and court-approved treatment plan.

32.     Plaintiffs Ali and Hadiya Nasrallah, who reside at 23-57 38th Street, Apartment 2,

Astoria, New York, are the parents and guardians of H.N.  H.N. is a 13 year old resident of New

York, who has a severe behavior disorder and has been identified by his local school district, the

New York City Board of Education, as disabled and in need of residential special education

services in order to receive a free appropriate public education.  H.N.'s IEP specifies JRC as the

recommended placement for H.N.  *See* H.N.'s IEP, a true and accurate copy of which is attached

to the Exhibits Binder as Exhibit 118.  The IEP provides for "Level III interventions to include

Movement Limitation Procedures and the Graduated Electronic Decelerator to treat…[H.N.'s]

major problematic behaviors to include aggression, health dangerous, major disruptive, and

noncompliant behaviors."  H.N. was admitted to JRC on or about June 24, 2003.  On or about

July 20, 2004, the Massachusetts Probate Court approved treatment of H.N. with aversives,

including the GED device.  True and accurate copies of H.N.'s most recent treatment plan as

well as findings of fact and decree from the Massachusetts Probate Court are attached to the

Exhibits Binder as Exhibits 119, 120 and 121 respectively.  H.N. was receiving very effective

treatment with the GED device for his aggressive, self-injurious, destructive, disruptive, and non-

compliant behaviors, as well as successful education services, when the Emergency Regulations

went into effect on June 23, 2006.  Mr. and Mrs. Nasrallah want H.N.'s treatment with aversives,

including the GED device, to continue as set forth in his IEP and court-approved treatment plan.

Mr. and Mrs. Nasrallah are aware of the Emergency Regulations and do not want them to apply

to H.N.  H.N. will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved treatment plan.

33.     Plaintiff Ermithe Payoute, who resides at 86-06 208th Street, Apartment 2A, Queens Village, New York, is the mother and guardian of S.P.  S.P. is an 18 year old resident of New York, who has a severe behavior disorder and has been identified by her local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  S.P.'s IEP specifies JRC as the recommended placement for S.P.  *See* S.P.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 122.  The IEP provides "Level III physical aversive intervention procedures to include Movement Limitation Procedures and the Graduated Electronic Decelerator to treat…[S.P.'s] major problematic behaviors to include aggression, health dangerous, major disruptive, and noncompliant behaviors."  S.P. was admitted to JRC on or about June 28, 2001.  On or about November 8, 2001, the Massachusetts Probate Court approved treatment of S.P. with aversives, including the GED device.  True and accurate copies of S.P.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 123, 124 and 125 respectively.  S.P. was receiving very effective treatment with the GED device for her aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Ms. Payoute wants S.P.'s treatment with aversives, including the GED device, to continue as set forth in her IEP and court-approved treatment plan.  Ms. Payoute is aware of the

Emergency Regulations and does not want them to apply to S.P.  S.P. will suffer irreparable

harm if she does not receive treatment as set forth in her IEP and court-approved treatment plan.

34.     Plaintiff Claude Quartlbaum, who resides at 40 Morningside Avenue, Apartment

65, c/o Slater, New York, New York, is the father and guardian of S.Q.  S.Q. is a 15 year old

resident of New York, who has a severe behavior disorder and has been identified by his local

school district, the New York City Board of Education, as disabled and in need of residential

special education services in order to receive a free appropriate public education.  S.Q.'s IEP

specifies JRC as the recommended placement for S.Q.  *See* S.Q.'s IEP, a true and accurate copy

of which is attached to the Exhibits Binder as Exhibit 126.  The IEP provides for "Level III

interventions to include the GED (Graduated Electronic Decelerator) and Movement Limitation

to treat…[S.Q.'s] major inappropriate behaviors including aggression, destruction, major

disruptive, health dangerous and noncompliant behaviors."  S.Q. was admitted to JRC on or

about January 10, 2005.  On or about July 10, 2006, the Massachusetts Probate Court approved

treatment of S.Q. with aversives, including the GED device.  Mr. Quartlbaum wants S.Q.'s

treatment with aversives, including the GED device, to continue as set forth in his IEP.  Mr.

Quartlbaum is aware of the Emergency Regulations and does not want them to apply to S.Q.

S.Q. will suffer irreparable harm if he does not receive treatment as set forth in his IEP.

35.     Plaintiff Yachijama Reyes, who resides at 1055 Findley Avenue, Bronx, New

York, is the mother and guardian of T.M.  T.M. is a 15 year old resident of New York, who has a

severe behavior disorder and has been identified by her local school district, the New York City

Department of Education, as disabled and in need of residential special education services in

order to receive a free appropriate public education.  T.M.'s IEP specifies JRC as the

recommended placement for T.M.  *See* T.M.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 127.  The IEP provides for "Level III Interventions, including the GED (graduated electronic decelerator) and Movement Limitation to treat…[T.M.'s] major inappropriate behaviors including aggression, destruction, major disruptive, health dangerous, and noncompliant behaviors."  T.M. was admitted to JRC on or about June 21, 2004.  On or about March 30, 2005, the Massachusetts Probate Court approved treatment of T.M. with aversives, including the GED device.  T.M. was receiving very effective treatment with the GED device for her aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Ms. Reyes wants T.M.'s treatment with aversives, including the GED device, to continue as set forth in her IEP.  Ms. Reyes is aware of the Emergency Regulations and does not want them to apply to T.M.  T.M. will suffer irreparable harm if she does not receive treatment as set forth in her IEP.

36.     Plaintiff Kaylor Robinson, who resides at 14 Hunterfly Place, Apartment 1B, Brooklyn, New York, is the mother and guardian of R.R.1.  R.R.1 is an 18 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  R.R.1's IEP specifies JRC as the recommended placement for R.R.1.  *See* R.R.1's IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 128.  The IEP provides for "Level III Interventions to include the GED (Graduated Electronic Decelerator) and Movement Limitation to treat…[R.R.1's] major inappropriate behaviors including aggression, destruction, major

disruptive, health dangerous and noncompliant behaviors."  R.R.1 was admitted to JRC on or about May 20, 2005.  On or about May 9, 2006, the Massachusetts Probate Court approved treatment of R.R.1 with aversives, including the GED and GED-4 devices.  True and accurate copies of R.R.1's most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 129, 130 and 131 respectively.  R.R.1 was receiving very effective treatment with the GED-4 device for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Ms. Robinson wants R.R.1's treatment with aversives, including the GED and GED-4 devices, to continue as set forth in his IEP and court-approved treatment plan.  Ms. Robinson is aware of the Emergency Regulations and does not want them to apply to R.R.1.  R.R.1 will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved treatment plan.

37.    Plaintiff Marie Rogers, who resides at 1455 Harrod Avenue, Apartment 3C, Bronx, New York, is the grandmother and guardian of T.E.  T.E. is a 19 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  T.E.'s IEP specifies JRC as the recommended placement for T.E.  *See* T.E.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 132.  The IEP provides for "Level III Interventions to include Movement Limitation and the Graduated Electronic Decelerator (GED) to treat…[T.E.'s] major problematic behaviors to include aggression, health dangerous, major disruptive, destructive, and

noncompliant behaviors."  T.E. was admitted to JRC on or about February 1, 1999.  On or about

May 5, 1999, the Massachusetts Probate Court approved treatment of T.E. with aversives,

including the GED device.  True and accurate copies of T.E.'s most recent treatment plan as well

as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits

Binder as Exhibits 133, 134 and 135 respectively.  T.E. was receiving very effective treatment

with the GED device for his aggressive, self-injurious, destructive, disruptive, and non-compliant

behaviors, as well as successful education services, when the Emergency Regulations went into

effect on June 23, 2006.  Ms. Rogers wants T.E.'s treatment with aversives, including the GED

device, to continue as set forth in his IEP and court-approved treatment plan.  Ms. Rogers is

aware of the Emergency Regulations and does not want them to apply to T.E.  T.E. will suffer

irreparable harm if he does not receive treatment as set forth in his IEP and court-approved

treatment plan.

       38.    Plaintiff Melody Shepard, who resides at 1133 Morrison Avenue, #1L, Bronx,

New York, is the guardian of Y.J.  Y.J. is a 13 year old resident of New York, who has a severe

behavior disorder and has been identified by her local school district, the New York City Board

of Education, as disabled and in need of residential special education services in order to receive

a free appropriate public education.  Y.J.'s IEP specifies JRC as the recommended placement for

Y.J.  *See* Y.J.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as

Exhibit 136.  The IEP provides for "Level III Interventions to include the GED (Graduated

Electronic Decelerator) and Movement Limitation to treat…[Y.J.'s] major inappropriate

behaviors including aggression, destruction, major disruptive, health dangerous, and

noncompliant behaviors."  Y.J. was admitted to JRC on or about November 8, 2004.  On or

about November 15, 2005, the Massachusetts Probate Court approved treatment of Y.J. with aversives, including the GED device.  True and accurate copies of Y.J.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 137, 138 and 139 respectively.  Y.J. was receiving very effective treatment with the GED device for her aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Ms. Shepard wants Y.J.'s treatment with aversives, including the GED device, to continue as set forth in her IEP and court-approved treatment plan.  Ms. Shepard is aware of the Emergency Regulations and does not want them to apply to Y.J.  Y.J. will suffer irreparable harm if she does not receive treatment as set forth in her IEP and court-approved treatment plan.  .

39.     Plaintiffs Amjad and Robina Siddiqi, who reside at 14B Hunters Lane, Huntington Station, New York, are the parents and guardians of H.S.  H.S. is a 10 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the South Huntington School District, as disabled and in need of residential special education services in order to receive a free appropriate public education.  H.S.'s IEP specifies JRC as the recommended placement for H.S.  *See* H.S.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 140.  The IEP provides for "Level III Interventions to include Movement Limitation Procedures and the Graduated Electronic Decelerator to treat…[H.S.'s] major problematic behaviors to include aggression, health dangerous, destructive, major disruptive, and non-compliant behaviors."  H.S. was admitted to JRC on or about September 12, 2005.  On or about January 9, 2006, the Massachusetts Probate

Court approved treatment of H.S. with aversives, including the GED device.  True and accurate copies of H.S.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 141, 142 and 143 respectively.  H.S. was receiving very effective treatment with the GED device for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Mr. and Mrs. Siddiqi want H.S.'s treatment with aversives, including the GED device, to continue as set forth in his IEP and court-approved treatment plan.  Mr. and Mrs. Siddiqi are aware of the Emergency Regulations and do not want them to apply to H.S.  H.S. will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved treatment plan.

40.      Plaintiff Patty Snyder, who resides at 8085 County Road 129, Ovid, New York, is the mother and guardian of P.L.  P.L. is a 20 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the South Seneca Central School District, as disabled and in need of residential special education services in order to receive a free appropriate public education.  P.L.'s IEP specifies JRC as the recommended placement for P.L.  *See* P.L.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 144.  The IEP provides for "Level III Interventions to include Movement Limitation and the Graduated Electronic Decelerator to treat…[P.L.'s] major problematic behaviors to include aggression, health dangerous, destructive, major disruptive, and non-compliant behaviors."  P.L. was admitted to JRC on or about August 28, 2001.  On or about March 29, 2002, the Massachusetts Probate Court approved treatment of P.L. with aversives,

including the GED device.  P.L. was receiving very effective treatment with the GED device for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Ms. Snyder wants P.L.'s treatment with aversives, including the GED device, to continue as set forth in his IEP.  Ms. Snyder is aware of the Emergency Regulations and does not want them to apply to P.L.  P.L. will suffer irreparable harm if he does not receive treatment as set forth in his IEP.

41.     Plaintiff Victorine Stewart, who resides at 221 West 121st Street, Apartment 2E, New York, New York, is the grandmother and guardian of T.R.  T.R. is a 14 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  T.R.'s IEP specifies JRC as the recommended placement for T.R.  *See* T.R.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 145.  The IEP provides for "Level III Interventions to include the GED (Graduated Electronic Decelerator) and Movement Limitation to treat…[T.R.'s] major inappropriate behaviors including aggression, destruction, major disruptive, health dangerous and noncompliant behaviors."  T.R. was admitted to JRC on or about January 30, 2003.  On or about February 3, 2005, the Massachusetts Probate Court approved treatment of T.R. with aversives, including the GED device.  True and accurate copies of T.R.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 146, 147 and 148 respectively.  T.R. was receiving very effective treatment with the GED device for his

aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Ms. Stewart wants T.R.'s treatment with aversives, including the GED device, to continue as set forth in his IEP and court-approved treatment plan.  Ms. Stewart is aware of the Emergency Regulations and does not want them to apply to T.R.  T.R. will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved treatment plan.

      42.     Plaintiffs Matthew and Holly Swenson, who reside at 104 Monhangen Avenue, Middletown, New York, are the parents and guardians of R.S.  R.S. is a 14 year old resident of New York, who has a severe behavior disorder and has been identified by her local school district, the Middletown Enlarged City School District, as disabled and in need of residential special education services in order to receive a free appropriate public education.  R.S.'s IEP specifies JRC as the recommended placement for R.S.  *See* R.S.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 149.  The IEP provides for "Level III Interventions to include Movement Limitation Procedures and the Graduated Electronic Decelerator to treat…[R.S.'s] major problematic behaviors to include aggression, health dangerous, destructive, major disruptive, and non-compliant behaviors."  R.S. was admitted to JRC on or about May 23, 2005.  On or about August 17, 2005, the Massachusetts Probate Court approved treatment of R.S. with aversives, including the GED device.  True and accurate copies of R.S.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 150, 151 and 152 respectively.  R.S. was receiving very effective treatment with the GED device for her aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as

successful education services, when the Emergency Regulations went into effect on June 23,

2006.  Mr. and Mrs. Swenson want R.S.'s treatment with aversives, including the GED device, to

continue as set forth in her IEP and court-approved treatment plan.  Mr. and Mrs. Swenson are

aware of the Emergency Regulations and do not want them to apply to R.S.  R.S. will suffer

irreparable harm if she does not receive treatment as set forth in her IEP and court-approved

treatment plan.

43.     Plaintiff Errol Sylvester, who resides at 222-33 141st Road, Laurelton, New York,

is the father and a guardian of C.S.  C.S. is a 19 year old resident of New York, who has a severe

behavior disorder and has been identified by his local school district, the New York City Board

of Education, as disabled and in need of residential special education services in order to receive

a free appropriate public education.  C.S.'s IEP specifies JRC as the recommended placement for

C.S.  *See* C.S.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as

Exhibit 153.  The IEP provides for "Level III Interventions to include Movement Limitation and

the Graduated Electronic Decelerator (GED) to treat…[C.S.'s] major problematic behaviors to

include aggression, health dangerous, major disruptive, and noncompliant behaviors."  C.S. was

admitted to JRC on or about May 15, 2003.  On or about December 18, 2003, the Massachusetts

Probate Court approved treatment of C.S. with aversives, including the GED device, and on or

about April 5, 2004, the Massachusetts Probate Court approved the addition of the GED-4 to

C.S.'s treatment plan.  True and accurate copies of C.S.'s most recent treatment plan as well as

findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits

Binder as Exhibits 154, 155 and 156 respectively.  C.S. was receiving very effective treatment

with the GED-4 device for his aggressive, self-injurious, destructive, disruptive, and non-

compliant behaviors, as well as successful education services, when the Emergency Regulations

went into effect on June 23, 2006.  Mr. Sylvester wants C.S.'s treatment with aversives,

including the GED and GED-4 devices, to continue as set forth in his IEP and court-approved

treatment plan.  Mr. Sylvester is aware of the Emergency Regulations and does not want them to

apply to C.S.  C.S. will suffer irreparable harm if he does not receive treatment as set forth in his

IEP and court-approved treatment plan.

44.     Jacob and Shirley Tambor, who reside at 164 Beach 14th Street, Neponset, New

York, are the parents and guardians of D.T..  D.T. is an 18 year old resident of New York, who

has a severe behavior disorder and has been identified by her local school district, the New York

City Board of Education, as disabled and in need of residential special education services in

order to receive a free appropriate public education.  D.T.'s IEP specifies JRC as the

recommended placement for D.T.  *See* D.T.'s IEP, a true and accurate copy of which is attached

to the Exhibits Binder as Exhibit 157.  The IEP provides for "Level III Interventions to include

the GED (Graduated Electronic Decelerator) and Movement Limitation to treat…[D.T's] major

inappropriate behaviors including aggression, destruction, major disruptive, health dangerous,

and noncompliant behaviors."  D.T. was admitted to JRC on or about October 9, 2003.  On or

about March 11, 2004, the Massachusetts Probate Court approved treatment of D.T with

aversives, including the GED device.  True and accurate copies of D.T.'s most recent treatment

plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to

the Exhibits Binder as Exhibits 158, 159 and 160 respectively.  D.T. was receiving very effective

treatment with the GED device for her aggressive, self-injurious, destructive, disruptive, and

non-compliant behaviors, as well as successful education services, when the Emergency

Regulations went into effect on June 23, 2006.  Mr. and Mrs. Tambor want D.T.'s treatment with aversives, including the GED device, to continue as set forth in her IEP and court-approved treatment plan.  Mr. and Mrs. Tambor are aware of the Emergency Regulations and do not want them to apply to D.T.  D.T. will suffer irreparable harm if she does not receive treatment as set forth in her IEP and court-approved treatment plan.

45.     Plaintiff Juan Tangui, Sr., who resides at 200 West 131st Street, New York, New York, is the father and guardian of J.T.  J.T. is a 14 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  J.T.'s IEP specifies JRC as the recommended placement for J.T.  *See* J.T.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 161.  The IEP provides for "Level III Interventions to include the GED (Graduated Electronic Decelerator) and Movement Limitation to treat…[J.T.'s] major inappropriate behaviors including aggression, destruction, major disruptive, health dangerous, and noncompliant behaviors."  J.T. was admitted to JRC on or about February 9, 2004.  On or about May 25, 2006, the Massachusetts Probate Court approved treatment of J.T. with aversives, including the GED device.  True and accurate copies of J.T.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 162, 163 and 164 respectively.  J.T. was receiving very effective treatment with the GED device for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Mr. Tangui wants J.T.'s treatment with aversives, including the GED

device, to continue as set forth in his IEP and court-approved treatment plan.  Mr. Tangui is aware of the Emergency Regulations and does not want them to apply to J.T.  J.T. will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved treatment plan.

46.     Plaintiff Carmen Torres, who resides at 2860 Creston Avenue, Bronx, New York, is the mother and guardian of A.G.  A.G. is an 11 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Department of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  A.G.'s IEP specifies JRC as the recommended placement for A.G.  *See* A.G.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 165.  The IEP provides for "Level III Interventions Procedures to include Movement Limitation Procedures and the Graduated Electronic Decelerator to treat…[A.G.'s] major problematic behaviors to include aggression, destruction, health dangerous, major disruptive, and non-compliant behaviors."  A.G. was admitted to JRC on or about June 20, 2003.  On or about December 18, 2003, the Massachusetts Probate Court approved treatment of A.G. with aversives, including the GED device, and on or about September 29, 2005 the Massachusetts Probate Court approved the addition of the GED-4 to A.G.'s treatment plan.  True and accurate copies of A.G.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 166, 167 and 168 respectively.  A.G. was receiving very effective treatment with the GED-4 device for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations

went into effect on June 23, 2006.  Ms. Torres wants A.G.'s treatment with aversives, including the GED and GED-4 devices, to continue as set forth in his IEP and court-approved treatment plan.  Ms. Torres is aware of the Emergency Regulations and does not want them to apply to A.G.  A.G. will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved treatment plan.

47.     Plaintiff Hazel Torres, who resides at 460 Grand Street, Apartment 21H, New York, New York, is the aunt and guardian of R.T.  R.T. is a 9 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  R.T.'s IEP specifies JRC as the recommended placement for R.T.  *See* R.T.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 169.  The IEP provides for "Level III Interventions Procedures to include GED (Graduated Electronic Decelerator) and Mvmt Limitation to treat…[R.T.'s] major behaviors including aggression, destruction, major disruptive, health dangerous and noncompliant behaviors."  R.T. was admitted to JRC on or about March 3, 2005.  On or about March 2, 2006, the Massachusetts Probate Court approved treatment of R.T. with aversives, including the GED device.  Ms. Torres wants R.T.'s treatment with aversives, including the GED device, to continue as set forth in his IEP.  Ms. Torres is aware of the Emergency Regulations and does not want them to apply to R.T.  R.T. will suffer irreparable harm if he does not receive treatment as set forth in his IEP.

48.     Plaintiffs Jorge and Desiree Vadi, who reside at 135 Prospect Street, Middletown, New York, are the parents and guardians of D.V.  D.V. is an 18 year old resident of New York,

who has a severe behavior disorder and has been identified by her local school district, the

Middletown Enlarged City School District, as disabled and in need of residential special

education services in order to receive a free appropriate public education.  D.V.'s IEP specifies

JRC as the recommended placement for D.V.  *See* D.V.'s IEP, a true and accurate copy of which

is attached to the Exhibits Binder as Exhibit 170.  The IEP provides for "Level III Interventions

to include Movement Limitation Procedures and the Graduated Electronic Decelerator to

treat…[D.V.'s] major problematic behaviors to include aggression, health dangerous,

destructive, major disruptive, and non-compliant behaviors."  D.V. was admitted to JRC on or

about August 30, 2001.  On or about December 26, 2001, the Massachusetts Probate Court

approved treatment of D.V. with aversives, including the GED device.  D.V. was receiving very

effective treatment with the GED device for her aggressive, self-injurious, destructive,

disruptive, and non-compliant behaviors, as well as successful education services, when the

Emergency Regulations went into effect on June 23, 2006.  Mr. and Mrs. Vadi want D.V.'s

treatment with aversives, including the GED device, to continue as set forth in her IEP.  Mr. and

Mrs. Vadi are aware of the Emergency Regulations and do not want them to apply to D.V.  D.V.

will suffer irreparable harm if she does not receive treatment as set forth in her IEP.

49.     Plaintiff Marie Washington, who resides at 937 East 172nd Street, Apartment 1A,

Bronx, New York, is the adoptive mother and guardian of R.R.2.  R.R.2 is a 17 year old resident

of New York, who has a severe behavior disorder and has been identified by his local school

district, the New York City Board of Education, as disabled and in need of residential special

education services in order to receive a free appropriate public education.  R.R.2's IEP specifies

JRC as the recommended placement for R.R.2.  *See* R.R.2's IEP, a true and accurate copy of

which is attached to the Exhibits Binder as Exhibit 171.  The IEP provides for "Level III Interventions to include the GED (Graduated Electronic Decelerator) and Movement Limitation to treat…[R.R.2's] major inappropriate behaviors including aggression, destruction, major disruptive, health dangerous, and noncompliant behaviors."  R.R.2 was admitted to JRC on or about November 15, 2002.  On or about April 8, 2004, the Massachusetts Probate Court approved treatment of R.R.2 with aversives, including the GED device.  True and accurate copies of R.R.2's most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 172, 173 and 174 respectively.  R.R.2 was receiving very effective treatment with the GED device for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Ms. Washington wants R.R.2's treatment with aversives, including the GED device, to continue as set forth in his IEP and court-approved treatment plan.  Ms. Washington is aware of the Emergency Regulations and does not want them to apply to R.R.2.  R.R.2 will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved treatment plan.

50.    Plaintiff Wanda Washington, who resides at 366 Clifton Place, Apartment 4C, Brooklyn, New York, is the adoptive mother and guardian of J.G.  J.G. is a 17 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  J.G.'s IEP specifies JRC as the recommended placement for J.G.  *See* J.G.'s IEP, a true and accurate copy of which is

attached to the Exhibits Binder as Exhibit 175.  The IEP provides for "Level III Interventions to include the GED (Graduated Electronic Decelerator) and Movement Limitation to treat…[J.G.'s] major inappropriate behaviors including aggression, destruction, major disruptive, health dangerous, and noncompliant behaviors."  J.G. was admitted to JRC on or about September 29, 2004.  On or about February 23, 2006, the Massachusetts Probate Court approved treatment of J.G. with aversives, including the GED and GED-4 devices.  True and accurate copies of J.G.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 176, 177 and 178 respectively.  J.G. was receiving very effective treatment with the GED-4 device for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Ms. Washington wants J.G.'s treatment with aversives, including the GED and GED-4 devices, to continue as set forth in his IEP and court-approved treatment plan.  Ms. Washington is aware of the Emergency Regulations and does not want them to apply to J.G.  J.G. will suffer irreparable harm if he does not receive treatment as set forth in his IEP and court-approved treatment plan.

51.     Plaintiff Linda Williams, who resides at 20 Paladino Avenue, #1B, New York, New York, is the mother and guardian of M.W.  M.W. is a 20 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  M.W.'s IEP specifies JRC as the recommended placement for M.W.  *See* M.W.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 179.  The IEP provides for "Level III interventions to

include Movement Limitation and the Graduated Electronic Decelerator (GED) to

treat…[M.W.'s] major problematic behaviors to include aggression, health dangerous, major

disruptive, and noncompliant behaviors."  M.W. was admitted to JRC on or about June 3, 2003.

On or about December 8, 2003, the Massachusetts Probate Court approved treatment of M.W.

with aversives, including the GED device.  True and accurate copies of M.W.'s most recent

treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are

attached to the Exhibits Binder as Exhibits 180, 181 and 182 respectively.  M.W. was receiving

very effective treatment with the GED device for his aggressive, self-injurious, destructive,

disruptive, and non-compliant behaviors, as well as successful education services, when the

Emergency Regulations went into effect on June 23, 2006.  Ms. Williams wants M.W.'s

treatment with aversives, including the GED device, to continue as set forth in his IEP and court-

approved treatment plan.  Ms. Williams is aware of the Emergency Regulations and does not

want them to apply to M.W.  M.W. will suffer irreparable harm if he does not receive treatment

as set forth in his IEP and court-approved treatment plan.

52.    Plaintiff Ronnie Wilson, who resides at 175-15 Rockaway Boulevard, Room

212M, Jamaica, New York, is the father and guardian of B.W.  B.W. is a 15 year old resident of

New York, who has a severe behavior disorder and has been identified by his local school

district, the New York City Board of Education, as disabled and in need of residential special

education services in order to receive a free appropriate public education.  B.W.'s IEP specifies

JRC as the recommended placement for B.W.  *See* B.W.'s IEP, a true and accurate copy of

which is attached to the Exhibits Binder as Exhibit 183.  The IEP provides for "Level III

Interventions to include Movement Limitation and the Graduated Electronic Decelerator (GED)

to treat...[B.W.'s] major problematic behaviors to include aggression, destruction, health

dangerous, major disruptive, and noncompliant behaviors."  B.W. was admitted to JRC on or

about October 10, 2003.  On or about November 10, 2004, the Massachusetts Probate Court

approved treatment of B.W. with aversives, including the GED device.  True and accurate copies

of B.W.'s most recent treatment plan as well as findings of fact and decree from the

Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 184, 185 and 186

respectively.  B.W. was receiving very effective treatment with the GED device for his

aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as

successful education services, when the Emergency Regulations went into effect on June 23,

2006.  Mr. Wilson wants B.W.'s treatment with aversives, including the GED device, to continue

as set forth in his IEP and court-approved treatment plan.  Mr. Wilson is aware of the Emergency

Regulations and does not want them to apply to B.W.  B.W. will suffer irreparable harm if he

does not receive treatment as set forth in his IEP and court-approved treatment plan.

     53.     Plaintiff Lorraine Biggs, who resides at 1800 Davidson Avenue #4B, Bronx, New

York, is the mother and guardian of D.B.  D.B. is a 13 year old resident of New York, who has a

severe behavior disorder and has been identified by his local school district, the New York City

Board of Education, as disabled and in need of residential special education services in order to

receive a free appropriate public education.  D.B.'s IEP specifies JRC as the recommended

placement for D.B.  *See* D.B.'s IEP, a true and accurate copy of which is attached to the Exhibits

Binder as Exhibit 187.  The IEP provides for "Level III Interventions to include the GED

(Graduated Electronic Decelerator) and Mvmt Limitation to treat…[D.B.'s] major behaviors

including aggression, destruction, major disruptive, health dangerous, and noncompliant

behaviors."  D.B. was admitted to JRC on or about October 31, 2005.  On or about July 13, 2006, the Massachusetts Probate Court approved treatment of D.B. with aversives, including the Graduated Electronic Decelerator ("GED") device.  Ms. Biggs wants D.B.'s treatment with aversives, including the GED device, to continue as set forth in his IEP.  Ms. Biggs is aware of the Emergency Regulations and does not want them to apply to D.B.  D.B. will suffer irreparable harm if he does not receive treatment as set forth in his IEP.

54.     Plaintiff James Bailey, who resides at 525 West 151st Street, Apartment 52, New York, New York, is the father and guardian of D.B.2.  D.B.2 is a 12 year old resident of New York, who has a severe behavior disorder and has been identified by his local school district, the New York City Board of Education, as disabled and in need of residential special education services in order to receive a free appropriate public education.  D.B.2's IEP specifies JRC as the recommended placement for D.B.2.  *See* D.B.2's IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 188.  The IEP provides for "Level III Interventions to include the GED (Graduated Electronic Decelerator) and Movement Limitation to treat…[D.B.2's] major inappropriate behaviors including aggression, destruction, major disruptive, health dangerous, and noncompliant behaviors."  D.B.2 was admitted to JRC on or about April 3, 2004.  On or about January 26, 2006, the Massachusetts Probate Court approved treatment of D.B.2 with aversives, including the GED device.  D.B.2 was receiving very effective treatment with the GED device for his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, as well as successful education services, when the Emergency Regulations went into effect on June 23, 2006.  Mr. Bailey wants D.B.2's treatment with aversives, including the GED device, to continue as set forth in his IEP.  Mr. Bailey is aware of

42

the Emergency Regulations and does not want them to apply to D.B.2.  D.B.2 will suffer

irreparable harm if he does not receive treatment as set forth in his IEP.

## IV.    JURISDICTION AND VENUE

55.    This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331

and over the state law claims under the principle of supplemental jurisdiction.

56.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because all

Defendants reside within the Northern District of New York and a substantial part of the events

giving rise to Plaintiffs' claims have occurred in the Northern District of New York.

## V.    FACTS

### A.    Background of JRC and its Treatment Program.

57.    JRC provides special education and behavioral treatment services to children and

adults with severe behavior disorders who engage in self-abusive, aggressive, and other

problematic behaviors that threaten their life and limb and substantially interfere with their

education and social development.  JRC often acts as a placement of last resort for children and

adults who have been resistant to all other forms of psychological and psychiatric treatment and

for whom there is no other placement that can educate them and keep them safe.

58.    JRC's policy is to use a highly consistent application of behavior modification

treatment as an alternative to the use of ineffective and dangerous psychotropic medication.

Psychotropic medication has typically been used with JRC students at previous placements only

as a powerful sedative and has exposed the child to the temporary and permanent side effects of

these drugs, including lethargy, substantial weight gain, Tardive Dyskinesia (permanent tremor

condition), and damage to internal organs, such as the liver, which can lead to organ failure and death.

59.     JRC offers intensive behavioral treatment based on peer-reviewed and accepted methods of behavioral psychology, which has been extremely effective and life-saving for a small population of severely afflicted students who cannot be effectively treated with psychotropic medication, positive behavioral programming alone, or traditional psychotherapy. The typical JRC student engages in severe problematic behaviors such as self-mutilation, aggressive behaviors, and extremely destructive and disruptive behaviors such as eye gouging, head hitting, smearing feces, throwing furniture, and indiscriminate screaming and yelling. These behaviors have often caused life-threatening injuries including blindness and brain injury, and rendered the students unable to receive a free appropriate public education.  JRC's extremely effective behavior modification treatment suppresses the behaviors to zero or near zero levels, removes the sedating drugs, and gives the student the opportunity to be educated and learn positive skills to replace the dangerous and maladaptive behaviors.

60.     JRC's entire treatment program is based on the generally accepted principles of behavioral psychology.  In sum, the treatment plans are individually designed by the assigned JRC clinician to give the student carefully designed rewards (e.g., treats, videogames, music, field trips) for engaging in targeted positive behaviors (e.g., academics) and for refraining from targeted negative behaviors (e.g., self-mutilation, overturning desks), and to give carefully designed negative consequences (e.g., token fines, loss of a privilege) for engaging in specifically targeted, problematic behaviors.  JRC establishes a point/token reward system, pursuant to which points or tokens can be earned by the display of positive target behaviors and

the points or tokens can be spent to purchase the student's favorite rewards.  Positive

reinforcement (rewards) and non-intrusive negative consequences (e.g., token fines) are tried

first at JRC to determine if they can be sufficiently effective in treating a student's severe

behavior disorders so that he will not be a danger to himself and others and so that he may

progress academically and socially.

61.     Since the 1970's, JRC's intensive behavioral modification treatment program has

successfully treated hundreds of New York special education students for whom all previous

placements and treatments had failed.  For approximately half of those students, JRC's treatment

was successful without the need to supplement the treatment plan with aversives.

**B.      JRC's Use of Aversives is Safe, Effective, and Carefully-Controlled.**

62.     JRC is referred the toughest cases of behavior disorders in the nation.  After a

student's admission, JRC tries to achieve the student's educational and treatment goals with

rewards and non-intrusive negative consequences (e.g., token fines).  JRC's reward program is

unequalled in any other program.  JRC's positive reward procedures alone have proven to be

effective in treating approximately half of its students.  When they are not effective, JRC

supplements the positive procedures with "aversive" behavior modification techniques

("aversives") based on peer-reviewed and accepted methods of behavioral psychology.

"Aversives" are carefully designed negative consequences that are safe and effective and are

only used on specifically defined individual behaviors that risk harm or significantly interfere

with education or other appropriate behavior and are likely to cause serious harm to the student

or others.  Aversives are only used when approved by the students' parents, school district,

physician, JRC's Peer Review Committee, JRC's Human Rights Committee, and when approved, after an individual hearing, by a Massachusetts Probate Court.

63.     Behavior modification techniques involving the use of physical aversives are regulated and closely monitored in Massachusetts by the Massachusetts Department of Mental Retardation ("MA DMR") and Massachusetts Department of Early Education and Care ("MA EEC").  *See* 115 C.M.R. 5.14 *et. seq*., a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 2.

64.     Aversives that JRC employs include, but are not limited to: 1) skin shock, 2) contingent food program/specialized food program; 3) helmet; and 4) mechanical movement limitation and manual restraint.  None of these procedures have any substantial adverse side effects.

65.     JRC uses the Graduated Electronic Decelerator device (the "GED") and GED-4 device in its implementation of skin shock treatment.  The GED device consists of a transmitter operated by the JRC staff and a receiver/stimulator worn by the JRC student.  The receiver/stimulator delivers a low-level surface application of electrical current to a small area of the student's skin only upon command from the transmitter.  The GED device has the following factory-fixed settings: a current of 15 milliamperes RMS; a duration of 2 seconds; a rectangular, unipolar waveform with a duty cycle of 25%; and a pulse repetition frequency of 80 per second (80 hz).  The GED-4 device has the same settings except that the current is 45 milliamperes RMS.  The GED or GED-4 is used only one time per week in the average case and is eventually removed entirely from the program of many students when their behavior improves sufficiently.  Possible side effects of skin shock treatment may be a temporary reddening or dark mark on the

skin, both of which clear up within a few days.  On rare occasions, a small blister may appear if the device is not making full contact with the skin.  No student has ever been harmed by the GED or GED-4 devices.

66.    Under the contingent food program, a student earns staple food in the form of "mini-meals" that are eaten throughout the day and that are earned by exhibiting certain desired behaviors, or by passing behavior contracts by not exhibiting certain undesired behaviors for a specified period of time.  Menu food is categorized as staple food (the basic menu food offered to all students) or make-up food (bland food consisting of mashed potatoes, meat, and spinach garnished with liver powder).  The daily minimum target of calories is offered to the student in the form of preferred staple food that the student earns by displaying certain desired behaviors and/or by completing all of his behavioral contracts.  If the student has failed to earn the minimum target of calories in the form of preferred staple food, his diet is supplemented with make-up food at the end of the day.  The Specialized Food program is the same as the Contingent Food program except that the make-up food is offered at the end of the day only if a student has not earned a minimum of 20% of his or her targeted daily caloric intake.  A nutritionist, in consultation with JRC's medical staff, determines the student's caloric requirements.  JRC also provides all necessary medical safeguards to ensure the student's health and well-being and employs numerous medical safeguarding procedures to insure that students do not lose any weight or suffer any significant nutritional detriment while on either of the food programs, including regular weighing of the student and keytone testing.  The food programs are terminated by JRC's medical staff at the first sign of unhealthy weight loss or at any time a physician so orders.  No JRC student has ever been harmed by JRC's food programs.  The

typical student progresses so well that he or she passes all of the food contracts, the food program is eventually terminated, and the student receives three regularly scheduled meals per day.

67.     As a consequence for specifically targeted inappropriate behavior, JRC, with the approval of a physician, uses a specially designed helmet that is placed onto a student's head for a specified period of time.  The helmet may be equipped with a Plexiglas or grid-type face guard and/or a mechanism that prevents removal.  JRC also uses manual or mechanical movement limitation for treatment purposes, when approved by a physician.  With manual movement limitation, the student is physically held by a staff member using state-of-the-art, safe restraint techniques.  With mechanical movement limitation, the student is placed in arm and/or leg mechanical restraints in a restraint chair or on a plastic restraint platform for a pre-specified period of time.

68.     When needed, JRC uses aversives to treat all of the students' serious problematic behaviors including aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors in order to protect the safety of the student and to allow the student safe access to a classroom and peers so that the student can learn how to function and thrive in an educational environment.  Safe and functional access to a teacher, other students, teaching materials, and a classroom, allows the student to learn skills such as listening, reading, class participation, math, English, and social studies.  These behaviors and skills replace the aggressive, self-abusive, destructive, disruptive, and other serious problematic behaviors to the point where no further intrusive treatment (drugs or aversives) is necessary to suppress the students' behaviors.  This is truly treatment success for a child with a severe behavior disorder and avoids the commonly

employed alternatives of sedating psychotropic drugs, "time-out" and seclusion procedures, subjecting the student to frequent take-downs and extended periods of manual restraint, onerous 1:1 staffing hovering over the student all day, or simply "warehousing" the student without real treatment and education.  These commonly employed techniques are usually what the student was subjected to prior to coming to JRC and the reason why the parents and school district chose placement at JRC.

69.     The aversive treatment procedures and the specific behaviors to be treated are incorporated into a written behavior modification treatment plan that is developed and implemented by the student's qualified, doctoral-level treating clinician.  The clinician specifically designs and signs off on the treatment plan and authorizes any change in a treatment procedure before it is implemented.  The clinician also sets the numeric limits for administration of an aversive treatment before the clinician must be notified and supervises its use.

70.     Typically, almost immediately after JRC supplements a behavioral plan with skin shock treatment, a student who was otherwise too disruptive to make academic progress will begin making substantial progress.

71.     Failure to treat a student's destructive, disruptive, and non-compliant behaviors will likely render the student unable to function adequately in a classroom or other educational environment and can prevent the effective teaching of new skills to replace the problematic behaviors under treatment.  The result may be a constant and potentially life-long need for intrusive, undesirable, and ineffective treatments (such as manual restraint, psychotropic drugs, seclusion, and/or constant one-to-one coverage) to try to cope with the student's continually re-occurring aggressive, self-abusive, disruptive, non-compliant, or destructive behaviors.

72.     JRC is licensed by MA DMR and MA EEC and approved by the Massachusetts
Department of Education ("MA DOE"), NYSED, and the New Jersey Department of Education.
The MA DMR has promulgated detailed regulations requiring skin shock and other aversive
treatment techniques to be used in a safe, well-documented manner, and programs must
specifically be certified by the MA DMR to use aversive techniques.  *See* 115 C.M.R. 5.14 *et
seq*.  JRC is so certified.

73.     Comprehensive due process procedures, including detailed consent procedures,
regulate JRC's implementation of skin shock and other aversive techniques to protect the
student's health and safety.  A written behavior modification plan detailing a treatment's
rationale, duration, conditions and goals, as well as a detailed monitoring plan for evaluating the
treatment's efficacy, must be created.  *See* 115 C.M.R § 5.14(4)(c).  The plan must be approved
by both a Human Rights Committee and a Peer Review Committee under procedures outlined by
the MA DMR.  *See id*., § 5.14(4)(d).

74.     In addition, a guardian/family member must sign detailed aversive therapy
consent forms before JRC will incorporate such techniques into a student's treatment plan and
the aversive treatments are included and made part of a student's IEP by the local school district.
The parent/guardian may withdraw this consent at any time and JRC will cease using the
aversive treatment at that point.

75.     Aversive techniques cannot be implemented until a state court, specifically the
Massachusetts Probate Court, approves their use, on an individualized case-by-case basis, under
"substituted judgment" criteria designed to protect the interests of people not able to make
informed treatment decisions on their own behalf.  The court process involves assigning an

attorney to represent the student's interests and the attorney hires an expert to carefully review the proposed treatment plan.  *See* Settlement Agreement between JRC and the Commonwealth of Massachusetts, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 48.   The Massachusetts Supreme Judicial Court has affirmed the Massachusetts Probate Court's authority to approve the skin shock treatment, including both the GED device and the GED-4 device.  *See Guardianship of Brandon*, 677 N.E.2d 114 (Mass. 1997); *Judge Rotenberg Educational Center, Inc. v. Commissioner of the Department of Mental Retardation*, 677 N.E. 2d 127 (Mass. 1997), true and accurate copies of which are attached to the Exhibits Binder as Exhibits 3 and 4 respectively.

76.     Registration of the GED and GED-4 by the FDA is not required.  *See* February 14, 2004 letter from Gail T. Costello of the FDA to Dr. Matthew Israel, a copy of which is attached to the Exhibits Binder as Exhibit 5.  Both the GED and GED-4 are types of "assistive technology devices" that must be considered as part of the IEP process.  *See* 20 U.S.C. §§ 1401(1); 1414(d)(3)(B)(V).

77.     JRC's aversive treatment has afforded the opportunity to receive a free appropriate public education to individuals with severe behavior disorders and other disabilities who, prior to enrollment at JRC, lived in psychiatric hospitals and/or in constant physical and drug-induced confinement, too sedated to be educated or learn skills.

78.     Instruction at JRC is individualized so that each student learns at his or her own optimal rate.  The selected subject matter is based on the student's current grade level, special education needs, and other requirements of his/her IEP.  Most of the educational instructional materials are presented through software on a personal computer under the supervision of a

certified teacher.  JRC's educational program is approved by the MA DOE, the New Jersey

Department of Education, and NYSED and meets all of their requirements for student/teacher

ratios and core curriculum.  On September 13-14, 2005, a team from NYSED's Office of

Vocational and Educational Services for Individuals with Disabilities ("VESID") evaluated

JRC's treatment program, which resulted in a final report ("Final Report"), dated November 17,

2005, concluding that JRC is doing an excellent job treating and educating New York students

and meeting all of NYSED's educational requirements.  A true and accurate copy of the

November 17, 2005 Final Report is attached to the Exhibits Binder as Exhibit 6.

79.    JRC's effective treatment has also afforded students the opportunity to enjoy

activities in the community and, most importantly, the opportunity to safely bond and spend time

with their family.

**C.    The Defendants Ban the Use of Aversive Treatment.**

*1.    New York Consistently Approved JRC and its Use of Aversives for Decades.*

80.    New York courts have consistently recognized JRC as an appropriate out-of-state

residential facility for students with severe behavior disorders and on a number of occasions

enjoined NYSED's attempts to change these students' placements.  *See Joseph P., et al. v.*

*Ambach*, *et al*., 1986-87 EHLR Dec. 558:473; *Behavior Research Institute, et al. v. Ambach*,

(Albany County Sup. Ct. October 30, 1986); *Stanger, et al. v. Ambach et al.*, 501 F.Supp. 1237

(S.D.N.Y. 1980), true and accurate copies of which are attached to the Exhibits Binder as

Exhibits 7, 8, and 9 respectively.

81.     JRC has been approved by NYSED as an out-of-state placement since the 1970s. NYSED has always closely monitored JRC's behavioral treatment program and it conducts regularly scheduled quality assurance reviews.

82.     As recently as November 2005, NYSED gave JRC an outstanding review, after conducting a "Special Education Quality Assurance Program Review" in September 2005.  *See* November 17, 2005 Final Report.  NYSED's November 17, 2005 Final Report described the significance and breadth of the "Special Education Quality Assurance" review conducted as JRC in September, 2005 as follows:

> The goal of the quality assurance review is to ensure that areas of greatest significance to the health and safety and provision of special education programs and services to New York State students with disabilities are in compliance with current federal and New York State special education laws and regulations.

> Records for a representative sample of special education students and other pertinent documents were reviewed.  The Department review team met with school staff and administrators and visited classrooms and other educational facilities as a means of assessing health and safety, program and administrative compliance.  The Department review team also conducted a walk-through of the residential facilities affiliated with the educational program.

*Id.* at 1.  One of the many strengths of the JRC program cited in the Final Report was:

> Security system and procedures provide ongoing monitoring of staff and students in the educational facility and residential homes[.]

*Id.*  NYSED's November 17, 2005 transmittal letter to JRC described the report as "final" and advised JRC that a copy of the November 17, 2005 Final Report will be sent to JRC's "Board of Education/Directors and other State Agencies which certify or license portions of your agency."

*Id*.  The November 17, 2005 Final Report on JRC leaves no doubt that JRC meets all of NYSED's program standards, including "health and safety."

> **2.    *After Giving JRC a Glowing Report, NYSED Abruptly Changes Course in March 2006.***

83.    On March 20, 2006, apparently in response to recent negative media attention on aversives spawned by one frivolous claim by one parent of a former New York student, Dr. Rebecca Cort, the Deputy Commissioner of VESID, issued a report to the New York Board of Regents (the "March 20, 2006 Report") recommending a draft rule banning all aversives and the removal of any school using aversives from the NYSED approved school list.  Dr. Cort and NYSED took this precipitous action without investigating that one complaint and without consulting with JRC or with any of the parents from New York whose children were receiving extremely effective and life-saving treatment at JRC.  A true and accurate copy of the March 20, 2006 Report is attached to the Exhibits Binder as Exhibit 10.

84.    NYSED never sent JRC a copy of the March 20, 2006 Report.  JRC learned of its existence only through a reporter who faxed a copy of it to JRC.  Prior to JRC's receipt of the March 20, 2006 Report, JRC had never received a single communication, orally or in writing, indicating that NYSED had any problems with JRC or its use of aversives.

85.    Dr. Cort's March 20, 2006 report proposing the banning of aversives was obviously inconsistent with NYSED's most recent, very favorable evaluation of JRC and its safe and effective treatment program for New York students, as described in NYSED's November 17, 2005 Final Report.  To deal with this, NYSED hastily assembled a new team (the "Review Team") to "review" the JRC program.  This new Review Team was biased, unqualified, and created with the intent to make negative findings about JRC to be used as support for banning the

behavioral treatment used at JRC.  A true and accurate copy of a letter, dated May 19, 2006, from JRC's counsel to the Commissioner detailing the Review Team's visits to JRC is attached to the Exhibits Binder as Exhibit 11.

86.     The Review Team was comprised of the following: three NYSED Regional Associates; three consultant psychologists, at least two of whom had no experience with aversive treatment and at least two of whom were supporters of the Positive Behavior Support movement, an anti-aversive philosophy of treatment; and a nutritionist.

87.     The Review Team made two visits to JRC, one in April and one in May.  One psychologist consultant, Dr. Carol Magyar, participated in the April visit but not in the May visit. Two psychologist consultants, Dr. David Roll and Dr. Daniel Crimmins, participated in the May visit but not the April visit.  NYSED refused to give out the names of any of the April visitors to JRC staff members until told that the names were required for security purposes.  Even after giving out the names, NYSED misrepresented the affiliation of one of the April team members. Dr. Magyar was falsely represented to be a Regional Associate, not a psychologist consultant member of the team.  JRC has since learned that Dr. Magyar was known to be a strong supporter of the anti-aversive philosophy known as Positive Behavior Support.

88.     The Review Team visited JRC for parts of only five days.  Dr. Magyar visited for three days in April while Drs. Roll and Crimmins visited for less than a day and a half in May. Yet the Review Team claimed to be informed and qualified to make conclusions about the quality and efficacy of the treatment and IEPs of over 140 New York students at JRC, 70 of whom receive effective treatment with the use of supplementary aversives, and all of whom suffer from the severest forms of behavior disorders that exist in New York State.

89.     The Review Team's biases were also evidenced through their refusal to accept information about the JRC treatment program offered by JRC administrators.  The Review Team members refused JRC's many offers to give them a detailed tour and explanation of the school as well as other important background information about JRC's treatment program and the disorders and progress of the JRC students.  JRC offered to arrange a question and answer session between NYSED and JRC's Department Heads, but NYSED declined.  The Review Team was blatant in its effort to avoid any information from JRC that would put what the Review Team observed at JRC into a reasonable context.

90.     On May 19, 2006, JRC's counsel faxed a letter (the "May 19, 2006 Letter") to the Commissioner which informed the Commissioner about the biased and unprofessional conduct of NYSED's re-review of JRC including:

- The timing of NYSED's new review of JRC which immediately followed NYSED's recommendation to ban aversives;

- NYSED's refusal to answer JRC's questions to NYSED about the purpose of NYSED's new review of JRC;

- NYSED's refusal to give JRC any information about the standards and criteria the new Review Team was using to evaluate JRC;

- The completeness of NYSED's November 17, 2005 Final Report and the notable absence of any statement in the November 17, 2005 Final Report that the previous NYSED review team experienced any difficulty evaluating the safety of JRC's behavioral interventions;

- NYSED's refusal to give JRC a copy of the reports of the Review Team which deprived JRC of any opportunity to respond to any aspect of the report issued by the Review Team; and

- JRC's concern that the two psychologists on the Review Team had no experience with aversive procedures and appeared to be philosophically opposed to their use.

91.     JRC's counsel concluded the May 19, 2006 letter with a request for answers to all of the aforementioned requests for information and a request for JRC to meet with the Commissioner.  The Commissioner answered none of the questions and has refused all of JRC's requests to meet with him despite the fact that JRC has been an NYSED approved school for approximately thirty years.

92.     It was no surprise to the JRC parents or JRC officials when NYSED released the Review Team's June 9, 2006 negative report on JRC titled "Observations and Findings of Out-of-State Program Visitation Judge Rotenberg Educational Center (the "June 9, 2006 Report") to the media (with a press release) and to the other state agencies and school districts who send children to JRC before JRC had been given any chance to respond to it.  A true and accurate copy of the June 9, 2006 Report is attached to the Exhibits Binder as Exhibit 49.  Tellingly, the June 9, 2006 Report never stated that JRC's treatment program, and specifically its use of aversive techniques such as the GED and GED-4, failed to effectively treat the dangerous, disruptive, or otherwise maladaptive behavior of JRC students.  NYSED also did not dispute the substantial educational and developmental progress that students have made since coming to JRC.

93.     Unlike IEPs, which focus upon actual individuals and their specific needs, the June 9, 2006 Report made no attempt to address the particular circumstances of any JRC student.  Instead, it proffered outright false statements about JRC's treatment program which were designed to falsely impugn JRC's reputation with the public and serve as a false basis for passing Emergency Regulations to prohibit JRC's treatment.  The list of false statements is too lengthy to repeat but some of the most glaring and damaging examples are the following:

94.     The Review Team concluded in the June 9, 2006 Report that JRC's School Lunch and School Breakfast Program do not meet the minimum standards set by the United States Department of Agriculture ("USDA").  Had the Review Team raised this issue with JRC, the Review Team would have learned that the USDA, through the MA DOE, conducted a School Food Service Administrative Review of JRC on May 21-22, 2004 and found, after reviewing the same food program evaluated by the Review Team, that JRC is in compliance with the standards set by Federal and State regulations.  A true and accurate copy of the MA DOE Report is attached to the Exhibits Binder as Exhibit 13.

95.     The Review Team completely disregarded the fact that JRC treatment plans for each New York student are individually created, approved, and monitored through a collaborative process that includes JRC's consulting physicians, psychiatrists, neurologists, psychologists, clinicians, court-appointed lawyers, court-funded experts, parents, independent experts, and that the treatment plans are finally approved by a Massachusetts Probate judge.

96.     The Review Team also completely ignored the history of life-threatening and other serious problematic behaviors that all of these students suffered prior to their admissions to JRC and their lack of education and failed treatments, including the long list of drugs at heavy dosages, psychiatric hospitalizations, psychotherapy, ineffective positive behavioral supports, etc., all of which are well documented in the students' pre-JRC treatment records.

97.     The Review Team failed to communicate with a single JRC parent to investigate the parents' observations and experience with their child's disorder and special education needs, with prior treatments received by their child, and with their child's safety and progress at JRC to determine how they viewed JRC's services.

98.     Finally, the Review Team's actions at JRC confirmed that their mission was to find support for banning aversive treatments, even at the risk of the safety of the individual New York students.  For example, during the visit, the Review Team interviewed alone T.D., a JRC student from New York.  T.D. allegedly reported to the Review Team that she was "depressed" and "thinking about killing herself everyday."  Not one member of the Review Team alerted JRC that T.D. was threatening to commit suicide.  JRC did not learn of this incident until seven weeks later when NYSED release the biased June 9, 2006 Report to the media.

99.     Had the Review Team been truly interested in T.D.'s progress or in the efficacy of JRC's program, then the Review Team would have immediately informed JRC of T.D.'s statement and asked JRC to respond to their concern.  Had the Review Team asked anyone on T.D.'s treatment team at JRC, the Review Team would have learned that T.D. was admitted to JRC in January, 2005 after multiple unsuccessful psychiatric hospitalizations and suffering from an untreatable behavior disorder which was causing her to violently attack people.  She was receiving no education in New York and on five different medications, including anti-psychotic medications.  On September 28, 2005, JRC received court approval for a behavioral treatment plan, including the GED device.  To date, she has received only 5 applications of the GED device which is a total of 10 seconds of treatment.  Her aggressive behaviors immediately dropped to zero levels, she has been successfully taken off of all medications, and she has since advanced four grade levels in math and two grade levels in reading.  While she still occasionally exhibits attention-seeking behaviors, such as making a suicidal statement, T.D. is doing extremely well and her affect is much improved since her admission to JRC.  She has also graduated to JRC's transitional program and is enjoying her success with a part-time, paid job at

JRC.  T.D.'s parents are overjoyed with her progress.  Accordingly, either the Review Team knew that T.D. was merely engaging in one of her well-documented attention seeking behaviors which, therefore, should not have been included in their report as purported evidence of depression or suicidal ideation at JRC, or the Review Team acted in a reckless and unethical manner by not reporting to JRC that they observed a student at risk for suicide.  Either way, this incident speaks volumes about the lack of objectivity and competence of the Review Team to make findings and conclusions about the JRC treatment program and the approximately 140 New York students served by JRC, 70 of whom receive treatment with aversives.

100.    The Review Team's negative findings were in direct contradiction to the November 17, 2005 Final Report, dated just seven months earlier, and contradict the findings and conclusions of JRC's unprecedented treatment success with the New York students, as documented by the Massachusetts Probate Courts, the local New York school districts that place the students at JRC, and the direct observations of the parents and families of the New York students, none of whom were consulted by NYSED or the Review Team.

### 3.    NYSED proposes to ban all aversives.

101.    On May 1, 2006, Dr. Cort issued a revised report (the "May 1, 2006 Report") to the Board of Regents requesting that the Board adopt regulations, now on an emergency basis, banning the use of aversive treatment with a provision for child-specific exceptions.  The May 1, 2006 Report gave no explanation as to why adoption on an emergency basis was necessary. Pursuant to the child-specific exception, the use of aversive treatment was to be limited to "those behaviors of greatest concern as identified on the student's IEP."  *See* the May 1, 2006 Report at 19, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 14.  The

proposed regulations in the May 1, 2006 Report explicitly recognized that a child-specific exception should be provided "to use behavioral interventions to reduce or modify a student's behaviors when the facts indicate that failure to do so would hinder the student's right to a free, appropriate public education." *Id.* at 17.

102.    The Board met on May 22-23, 2006 to discuss the May 1, 2006 Report.  Neither JRC nor the parents of JRC students from New York, including the plaintiff parents (the "Parents"), were afforded the opportunity to address the Board about the proposed Emergency Regulations contained in the May 1, 2006 Report and their adverse, and potentially life-threatening, effects on JRC students from New York.

103.    On June 6, 2006, Dr. Cort issued a second revised report (the "June 6, 2006 Report") to the Board seeking that the Board adopt regulations that put even further restrictions on the use of behavioral aversive procedures.  The June 6, 2006 Report now referenced the biased findings of the Review Team as a basis for the Board's adoption of the even more restrictive Emergency Regulations.  Dr. Cort sought emergency adoption of the new proposed regulations stating that "such action is necessary for the preservation of public health and safety in order to minimize the risk of physical injury and/or emotional harm to students who are subject to aversive behavioral interventions that inflict pain or discomfort."  *See* the June 6, 2006 Report at 4, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 15.

104.    The June 6, 2006 Report provides no individual evaluation or analysis of the approximately 70 New York students with severe behavior disorders who were receiving court-approved aversive procedures at JRC pursuant to their IEPs and no assessment of how the new proposed restrictions on their current treatment would affect them.  The education and treatment

needs of these New York students attending JRC were clearly ignored by NYSED and made irrelevant to NYSED's process of adopting emergency regulations allegedly for their benefit. NYSED also ignored the November 17, 2006 Final Report which specifically evaluated the "health and safety" of the New York students at JRC and found no health and safety concerns. NYSED proposed to eliminate treatment which is part of their IEPs and critical to the students receiving a free appropriate public education ("FAPE"). This was done by NYSED without evaluating the specific needs of any of the 140 New York students at JRC and without even talking to any of the parents and school districts responsible for these children, and without consulting with any of JRC's clinicians.

105.    On June 12, 2006, NYSED issued a corrective action notice (the "Corrective Action Notice") and the June 9, 2006 Report to JRC. A true and accurate copy of the Corrective Action Notice is attached to the Exhibits Binder as Exhibit 16. NYSED released the June 9, 2006 Report to the media at the same time it was released to JRC and before giving JRC a chance to respond. NYSED also sent the June 9, 2006 Report to other state agencies that send children to JRC, a step that NYSED had never taken with any of its other site visit reports to JRC.

106.    The proposed emergency regulations in the June 6, 2006 Report (which were ultimately adopted in total by the Board as described below) banned the use of aversive treatment with a provision for child-specific exceptions. The Emergency Regulations require that New York school districts "submit an application to the commissioner [of NYSED]" whenever "considering whether a child-specific exception to the prohibition of the use of aversive behavioral interventions…is warranted [.]" 8 N.Y.C.R.R. § 200.22(e). Even with a

child-specific exception, the use of aversive treatment is limited to "those self-injurious or aggressive behaviors identified for such interventions on the student's IEP." *Id.*, § 200.22(f)(2)(vi).  The Emergency Regulations effectively eliminate critical treatment for destructive, disruptive, non-compliant, and other problematic behaviors that seriously interfere with a student receiving a free appropriate public education, and are currently identified for treatment in most of the JRC student's IEPs.  The Emergency Regulations also state that a school may be removed from the "approved list" if it fails to comply with the regulations. *See id.*, § 200.7(a)(3)(iv).  The Emergency Regulations also require a set of administrative steps and approvals involving the local school districts, an independent panel of experts (the "Panel") yet to be created, and the IEP process.  These measures are likely to be difficult to obtain on a timely basis to avoid the interruption of needed treatment in critical cases when changes need to be made quickly in the behaviors that are chosen for treatment or the needed treatment procedures.

107.    On June 15, 2006, JRC provided NYSED with a preliminary response to NYSED's Corrective Action Notice and Findings.  A true and accurate copy of JRC's June 15, 2006 response is attached to the Exhibits Binder as Exhibit 17.  Subsequently, JRC provided NYSED with a point-by-point response to NYSED's Corrective Action Notice and Findings.  A true and accurate copy of JRC's point-by-point response to NYSED's Corrective Action Notice and Findings is attached to the Exhibits Binder as Exhibit 50.

108.    On June 20, 2006, the Board approved the Emergency Regulations.  A true and accurate copy of the Emergency Regulations is attached to the Exhibits Binder as Exhibit 18.  On June 23, 2006, NYSED submitted a Notice of Emergency Adoption and Proposed Rule Making with the New York State Department of State (the "Notice").  A true and accurate copy of the

Notice is attached to the Exhibits Binder as Exhibit 19.  The Notice states that the

implementation of the Emergency Regulations is necessary for the preservation of "public

health" and "public welfare."  *Id.* at 1, § 5.  The Statement of Facts and Circumstances which

Necessitate Emergency Action (the "NYSED Statement") states as the basis for the emergency

that "[a]versive behavioral interventions have the potential to affect the health and safety of

children."  The NYSED Statement further explains that "[e]mergency action to adopt the

proposed rule is necessary for the preservation of the public health and safety in order to

minimize the risk of physical injury and/or emotional harm to students who are subject to

aversive interventions[.]"  *See* the NYSED Statement, a true and accurate copy of which is

attached to the Exhibits Binder as Exhibit 20, pp. 1-2.

109.    The Emergency Regulations were allegedly supported, in part, by eight

documents specifically cited by NYSED in the NYSED Statement.  *See* NYSED Statement,

pp. 2-5.  Only three of these documents, however, contain any substantial report on or discussion

of the use and effectiveness of aversive treatment.

110.    Nowhere in any of the documents cited by NYSED is there authority for the

proposition of limiting the use of aversives to only aggressive and self-injurious behaviors as

found in the Emergency Regulations.  The study by Dorothea C. Lerman and Christina M.

Vorndran entitled *On the Status of Knowledge For Using Punishment: Implications For

Treatment Behavior Disorders* ("Lerman and Vorndran paper") contains the most substantial

discussion of effectiveness of aversive treatment out of all the cited documents.  The Lerman and

Vorndran paper was cited to support the standard in the Emergency Regulations to "behaviors of

greatest concern."  In fact, the Lerman and Vorndran paper does not support this.  It recommends

considering restricting the use of punishing procedures to one or two problem behaviors *if and only if* habituation to the skin shock device (loss of effectiveness due to possible overuse) occurs. *See* Dorothea C. Lerman and Christina M. Vorndran, *On the Status of Knowledge for Using Punishment: Implications for Treating Behavior Disorders*, 35 J. APPLIED BEHAV. ANALYSIS 431, 450 (2002) a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 51. The Lerman and Vorndran paper does not recommend limiting the use of punishment to aggression or self-abuse, or to any restricted group of behaviors if habituation is <u>not</u> a concern as is almost always the case at JRC. The Lerman and Vorndran paper, in fact, acknowledges the benefits of contingent shock therapy and discusses research results demonstrating how it immediately and substantially suppresses problem behaviors. *See id*., pp. 435, 448.

111. NYSED submitted the Emergency Regulations to the New York Secretary of State on or about June 23, 2006. The Emergency Regulations first became available to the public on the VESID website on the afternoon of June 23, 2006.

**D.     The Emergency Regulations Prohibit Safe, Effective, and Court-Approved Treatment and are Vague, Ambiguous, and Riddled with Inconsistencies.**

112. The Emergency Regulations prohibit treatment that is incorporated into New York students' IEPs, is court-approved, and has proven to be safe, effective, and necessary for the students to receive a free appropriate public education. As shown by the examples below, the Emergency Regulations are also vague, unclear, incomplete, and riddled with inconsistencies that make their implementation impossible.

113. The Emergency Regulations limit treatment with aversive behavioral interventions to "self-injurious" or "aggressive" behaviors. However, these behavior categories

are never defined, leaving schools such as JRC without any meaningful or practical guidance about when aversives can—or cannot—be used.

114.    At no time has any NYSED representative or consultant ever asked JRC clinicians about the implications that the Emergency Regulations (including its prohibition on using aversives to treat property destruction, major disruptive behaviors, or non-compliance) will have on the overall treatment and welfare of JRC students.  The Emergency Regulations prohibit the use of restraint in combination with another aversive procedure.  They also prohibit the use of automated aversive conditioning devices.  Both methods are critical to a student receiving free appropriate public education.  Automated aversive conditioning devices are specifically recommended in the Lerman and Vorndran paper that NYSED relied upon in promulgating the Emergency Regulations.  *See id.*, p. 445) ("Electronic devices that detect occurrences of problem behavior and either alert caregivers or deliver consequences automatically might circumvent the problems of delayed punishment.").

115.    Using aversive techniques while a student is being restrained is necessary, for example, when restraints are required to safely administer an aversive, such as skin shock.  For example, if a student suddenly becomes severely aggressive towards another JRC student or staff member, the staff member must first physically remove the aggressor from the victim.  Basic principles of behavioral psychology require that JRC staff administer the skin shock treatment as soon after the aggression starts as possible.  The Emergency Regulations, however, prohibit the staff member from administering the skin shock treatment at the same time as he or she is restraining the aggressor, thus mandating that the staff member delay the administration of the skin shock until the restraint is no longer necessary.  This delay, which could last tens of

minutes, violates the basic principle that aversive consequences should be administered as immediately after a targeted behavior as possible.

116.     Even the eventual delayed delivery of skin shock is now problematic.  Staff members who have been restraining the student must, just before administering the aversive, suddenly let go of the student simultaneously.  In practice, this means that: (1) staff members must clear the room in anticipation of problems; and (2) as soon as the restraint is released, the student may often try to remove the aversive and/or attack the staff.

117.     Also, if a student requires one or more skin shock applications for engaging in multiple or unusually severe aggressive and/or self-injurious behaviors, placing the student in restraint during the application prevents the student from trying to remove or defeat the device while the skin shocks are applied.  Moreover, if students engage in severe self injury, such as cutting themselves or poking their eyes, restraints may be necessary to protect the student's health while applying aversives.  If JRC cannot use restraint in conjunction with the skin shock, then students can and will defeat the treatment by engaging in aggressive or self-injurious behavior that requires restraints, which thereby make applying the skin shock treatment during the time of restraint impossible.

118.     Some students who are being treated with the GED or GED-4 are placed in transport restraint during their trips to and from JRC school buildings and on other outings. Transport is the most dangerous environment in which students may exhibit problematic behaviors without effective treatment.  The Emergency Regulations prohibit the use of the GED or GED-4 during the transport period because the students are in restraints during that time.  This

inability to control potentially dangerous behavior creates a major safety hazard for other students and staff.

119.   In addition, automated conditioning devices allow JRC to administer a skin shock promptly, minimizing the opportunity for the student to defeat the device by removing it or the need for restraint to keep him safe.  Automated conditioning devices are used only when positive reinforcement and other treatment have been unsuccessful.

120.   The Emergency Regulations require that:

> Whenever possible, the use of aversive behavioral interventions shall apply the lowest intensity for the shortest duration and period of time that is effective to treat the problem behavior and employ strategies that increase the effectiveness of mild levels of aversive behavioral interventions.  In the event the aversive behavioral intervention fails to result in a suppression or reduction of the behavior over time, alternative procedures shall be considered that do not include increasing the magnitude of the aversive behavioral intervention."

8 N.Y.C.R.R. § 200.7(a)(3)(iv).  However, NYSED has not explained what constitutes the "lowest intensity" and "shortest duration" or who makes that determination.  These ambiguities may prohibit JRC from increasing the intensity of the treatment if the lowest intensity is ineffective or for those who have adapted to the lowest intensity.  This would impede a student's treatment.  Such a dilemma can be equated with prohibiting a physician from increasing a dosage of medication when a lower dosage has been ineffective.  Furthermore, the ultimate decision as to what constitutes "the lowest intensity for the shortest duration and period of time that is effective" must be made by the treating clinician with intimate knowledge of the students' current condition.

121.    The Emergency Regulations require that "[t]he magnitude, frequency and duration of any administration of aversive stimulus from … [any aversive conditioning] device must have been shown to be safe and effective in clinical peer-reviewed studies."  *Id.*, §200.22(f)(viii).  This conflicts with the IDEA, which requires that IEPs include "a statement of the special education and related services, based on peer-reviewed research *to the extent practicable*, to be provided to the child[.]"  20 U.S.C. § 1414(d)(1)(A)(IV) (emphasis added).  FDA regulations also do not require "clinical peer reviewed studies" and that term is open to varied interpretations.  There is no exception in the Emergency Regulations for devices such as the GED and GED-4, which have a record of safety and effectiveness spanning over fifteen years of continuous use at JRC and are court-approved and in the students' IEPs.

122.    The drafters of the Emergency Regulations know that although numerous published studies use a shock device with similar parameters as the GED and GED-4, JRC is unable to cite any current peer-reviewed publications that report on the actual use of the GED or GED-4 devices themselves.  JRC has been manufacturing the GED and GED-4 devices since 1992 but JRC does not sell or lend the devices, despite receiving many such requests.  It would not be possible for anyone to use the devices as part of their research.  In addition, JRC is a residential school, not a research facility, so it would not be possible to do such research at JRC.  Even if JRC were to try to immediately publish such a paper, there is insufficient time between now and the August 15 deadline for JRC's submission of its policies to NYSED to get such a paper written, accepted by a journal, and published.  Furthermore, demanding that JRC conduct such a study has these problems: (1) JRC's funds are all allocated for the provision of treatment and education services; (2) any research study by JRC would need to be approved by MA DMR;

and (3) for a study to qualify as having adequate "controls," it would be necessary to withhold treatment from certain students or for certain behaviors, a practice that poses ethical dilemmas.

123.     On June 28, 2006, JRC requested further clarification from NYSED, that the Emergency Regulations' statement about "clinical peer-reviewed studies" does not prohibit using the GED and GED-4 devices.  Rather than responding with a definitive answer, NYSED notified JRC on June 29, 2006 that JRC must provide its policies and procedures by August 15, 2006.  At that time "NYSED will determine if JRC's use of aversive conditioning devices meets the standard established in regulations and determine the extent of any necessary corrective actions and corresponding timelines."  Essentially, NYSED stated that it would not review whether it deems the GED or GED-4 to be safe and effective until as long as two months after the Emergency Regulations are in effect.  A true and accurate copy of the June 29, 2006 letter is attached to the Exhibits Binder as Exhibit 21.

124.     The Emergency Regulations do not allow for fading out the use of the GED in the treatment of destructive, disruptive, and non-compliant behavior by students who had been using the GED.  Fading refers to gradually reducing the use of aversives, rather than ending them abruptly and risking a greater chance for a reversion of the targeted behavior.

125.     There are also substantial questions about the practical implementation of the Emergency Regulations.  Many New York school district officials are unaware of the Emergency Regulations, how they are to be implemented, and their role in the implementation.  The JRC parents and students cannot be assured of the cooperation of NYSED and the New York school districts in implementing the Emergency Regulations, including the prompt requesting of the Panel to review a student's program and determine if a child-specific exception is warranted, the

prompt decision by the Committee on Special Education ("CSE") accepting or rejecting the Panel's recommendation, and the prompt convening of IEP meetings to ensure that students timely receive critical treatment that keeps them safe and enables their free appropriate public education.  Also, the Emergency Regulations fail to allocate responsibility for convening CSE meetings and for overall implementation of the Emergency Regulations.

126.    The Emergency Regulations require that "if a particular device or service, including an intervention, accommodation or other program modification is needed to address the student's behavior that impedes his or her learning or that of others, the IEP shall so indicate."  8 N.Y.C.R.R. § 220.22(b)(1).  Congress, however, recognized that requiring IEPs to be rigidly specific and detailed "would be overly-prescriptive, impose considerable unnecessary administrative burden, and quite possibly be seen as encouraging disputes and litigation about rather small and unimportant changes in instruction."  64 FED. REG. 12406, 12552 (Mar. 12, 1999).  Certain school districts have also taken the position that NYSED does not require methodologies to be added to IEPs and consider behavior modification treatment to be a methodology.  As such, those school districts will not include this information in a student's IEP.  Thus, a CSE team may agree that treatment with aversive techniques is necessary but may exclude it from the IEP, preventing the student from receiving necessary aversive techniques.

127.    To obtain a child-specific exception under the Emergency Regulations, a New York School District must first submit an application to the Panel created by the Commissioner on or before October 1, 2006.  *See* 8 N.Y.C.R.R. § 200.22(e)(2).  The application form created by NYSED on August 29, 2006 requires the approval of the superintendent of a student's school district or the New York City Regional Superintendent as well as a physician from the school

district, approvals which are not required in the Emergency Regulations and which will likely result in additional delays in, and present additional barriers to, a student obtaining approval for critical and lifesaving treatment.  Also, to date, the Panel has not even been created.  *See* June 22, 2006 Memorandum from James P. Lorenzo, VESID's Statewide Coordinator for Special Education, p. 2, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 52.

128.     According to the Emergency Regulations, the Panel is to be chosen by the Commissioner of NYSED and comprised of professionals with "appropriate clinical and behavioral expertise."  *Id*.  However, the regulations do not require the members of the Panel have any experience—positive or even neutral—in the use of aversives, or that they be unbiased with regard to the controversy between the anti-aversive Positive Behavior Support movement, on the one hand, and the use of supplemental aversives on the other.  The Emergency Regulations also fail to explain what constitutes "appropriate clinical and behavioral expertise."  As a result, there is no assurance that the Panel will be competent to review the applications or impartial.

129.     On or about June 27, 2006, NYSED informed the Probate and Family Court in Bristol County, Massachusetts of the Emergency Regulations and specifically of the "general prohibition on the use of behavioral therapies, unless a waiver is granted on a child-specific basis by the local school district's Committee on Special Education, based upon a recommendation by a State panel of independent experts."  A true and accurate copy of the June 27, 2006 letter to the Probate and Family Court in Bristol County, Massachusetts is attached to the Exhibits Binder as Exhibit 22.  NYSED, however, failed to explain that the effective date of the child-specific

exception provision is October 1, 2006, not June 23, 2006.  NYSED further suggested that the

Panel must approve the use of aversive treatment before the CSE will grant the child-specific

exception.  This misstated the Emergency Regulations, which only require the CSE to consider

the Panel's recommendations.  *See* 8 N.Y.C.R.R. § 220.22(e)(6).

130.     On June 29, 2006, in a letter misdated July 30, 2006, NYSED responded to JRC's

June 15, 2006 letter reiterating their prior biased and contrived position without any additional

evidence or direct response to JRC's June 15, 2006 detailed letter.  A true and accurate copy of

the July 30, 2006 letter is attached to the Exhibits Binder as Exhibit 23.

### E.     The Emergency Regulations Threaten the Education and Treatment of the Students, Exposing them to Immediate and Irreparable Harm

#### 1.     C.C.

131.     C.C. is a 19 year old female from New York who suffers from Pervasive

Developmental Disorder (Not Otherwise Specified), Disruptive Behavior Disorder (Not

Otherwise Specified), Mental Retardation (Severity Unspecified), Smith-Magenis Syndrome,

and a severe behavior disorder that causes her to engage in severe problematic behavior.

132.     C.C. has a long history of engaging in aggressive and self-injurious behaviors such

as biting and hitting others, throwing objects at others, biting herself, inserting objects in her ears,

hitting herself, banging her head and other body parts against objects, and breaking windows with

her hand or arm.  She also engages in destructive, disruptive, and non-compliant behaviors such as

banging, throwing, breaking, and ripping objects or furniture, yelling and screaming, exposing

herself, and refusing to take medication.  C.C.'s pattern of inserting items in her ears has resulted

in repeated infections and the perforation of her left ear drum.  C.C. has moderate to severe

hearing loss in both ears.  She has also sustained severe scarring as a result of her frequent self-biting.

133.    C.C.'s treatment prior to her admission to JRC included psychiatric hospitalization, residential treatment, special day schools, as well as the prescription of medications including heavy dosages of Seroquel, Klonopin, Depakote, Zyprexa Zydis, Clonadine, Risperdal, and Neurontin.

134.    These treatments were not successful in treating C.C.'s aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors.  As C.C.'s behaviors frequently caused injuries to herself and others, she was often in mechanical restraints.  C.C.'s destructive, disruptive, and non-compliant behaviors, many of which were antecedents to her aggressive and self-injurious behaviors, hindered her making any academic or social progress.  C.C. was also suffering serious side effects from the medications, including impaired vision and such significant weight gain that she nearly became diabetic.  C.C.'s teachers prior to her JRC admission reported that C.C.'s behavior limited her ability to concentrate and acquire new skills.

135.    Since C.C.'s prior placements and treatment did not meet her needs, her local school district in New York, the New York City Board of Education, referred her to JRC for special education and behavior modification treatment, including treatment with the GED device and other supplemental aversive interventions.  C.C. was admitted to JRC on May 3, 2004.

136.    C.C.'s IEP specifies JRC as the recommended placement for C.C.  The IEP states that C.C.'s social/emotional development continues to need improving and that her behavior interferes with academic progress in a regular education classroom.  The IEP provides for "court authorized Level III interventions to include the GED (Graduated Electronic Decelerator) and

Movement Limitation to treat [C.C.'s] major inappropriate behaviors including aggression, destruction, major disruptive, health dangerous, and noncompliant behaviors."   *See* C.C.'s IEP, p. 4, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 24.

137.    After admission to JRC, C.C. was tried on a positive-only behavior modification treatment plan, and that was not effective enough to stop her severe problematic behaviors and permit her to progress academically and socially.  JRC then sought and received permission from the Massachusetts Probate Court to add aversives, including the GED device, to C.C.'s behavior modification treatment plan.  JRC added aversives to her treatment plan on or about September 9, 2004, and they had an immediate and dramatic effect on her aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors.  All of C.C.'s severe problematic behaviors dramatically decreased, preventing C.C. from doing further and permanent damage to herself and others and allowing her to progress academically and socially.  As documented in her IEP, "[s]ince the implementation of Level III interventions, C.C. has made remarkable behavioral progress.  She has shown the ability to maintain her major inappropriate behaviors at low frequencies."  *Id.*  True and accurate copies of C.C.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 25, 26 and 27 respectively.

138.    C.C. was successfully tapered off of all medications and she is no longer at risk of suffering the side effects associated with anti-psychotic medications.  She also no longer requires the constant use of restraint.

139.    C.C. has made significant progress in her academic work, including money skills and telling time.  Additionally, C.C. is improving her classroom behavior, such as her attention

to tasks, independence in learning, and participation in group lessons.  C.C. has also been able to benefit from her training on the use of an FM Hearing Unit that magnifies sound to improve her hearing ability.  She has also improved in her social and daily living skills.  She is enjoying and participating in group lessons and activities in her classroom, and completing chores and self-care activities at her residence.  The decline in C.C.'s problematic behaviors has also enabled her to go on numerous field trips and enjoy visits with her family.

140.    C.C.'s family is very pleased with the educational progress C.C. has made at JRC, her family wants her to continue to progress, and her family continues to support her treatment at JRC with the GED for all of her serious problematic behaviors, including destructive, major disruptive and non-compliant behaviors.

141.    According to the Emergency Regulations, JRC can now only treat C.C.'s aggressive and self-injurious behaviors with aversives, including the GED.  With the implementation of the Emergency Regulations and the termination of GED treatment of C.C.'s destructive, disruptive and noncompliant behaviors, C.C.'s destructive, disruptive, and noncompliant behaviors have returned to unacceptably high frequencies.  Also, many of C.C.'s destructive, disruptive, and non-compliant behaviors have a history of being antecedents to aggressive and self-injurious behaviors and by not treating the antecedents, C.C. will likely engage in more aggressive and self-injurious behaviors placing her and those around her in danger of severe injury.  This increase in behaviors has led to a decrease in C.C.'s performance in her classroom, which will directly lead to little or no academic or social progress.  With the changes in these regulations it is highly probable, in the near future, that it will no longer be safe for C.C. to access the community or visit with her family.

### 2.     T.D.

142.     T.D. is a 20 year old female from New York who suffers from Mild Mental Retardation, Intermittent Explosive Disorder, and a severe behavior disorder that causes her to engage in severe problematic behavior.

143.     T.D. has a long history of engaging in aggressive and self-injurious behavior such as hitting, kicking, grabbing, and throwing objects at others, bullying and intimidating others, attempting suicide, and eating inedible objects.  She also engages in destructive, disruptive, and non-compliant behaviors such as destroying others' property, shouting and swearing at others, and making sexual comments and gestures.  On one occasion, T.D. was taken to the hospital in an ambulance following a behavioral outburst at home, and while en route, the ambulance had to pull over due to her highly agitated state.  The police were called, and T.D. required handcuffs for the duration of the ride.  T.D. was discharged from a prior placement after an incident in which she walked away from her counselor, exited the lobby of her worksite, and stood in front of a moving bus in the driveway.  The bus was able to stop in time, but T.D. had to be physically removed from the driveway so that the bus could leave.

144.     T.D.'s treatment prior to her admission to JRC included psychiatric hospitalization, day and residential treatment programs, and the prescription of medications including heavy dosages of Effexor, Depakote, Zyprexa, Abilify, Wellbutrin, and Topamax.

145.     These treatments were not successful in treating T.D.'s aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors.  As T.D.'s behaviors frequently caused injuries to herself and others, she was often in mechanical restraints.  T.D.'s destructive,

disruptive, and non-compliant behaviors, many of which were antecedents to her aggressive and self-injurious behaviors, hindered her ability to make academic and social progress.

146.    Since T.D.'s prior placements and treatment did not meet her academic and social needs, her local school district in New York, Onteora School District, referred her to JRC for special education and behavior modification treatment, including treatment with the GED and GED-4 devices.  T.D. was admitted to JRC on January 18, 2005.

147.    T.D.'s IEP specifies JRC as her recommended placement.  The IEP provides for a "[b]ehavior intervention plan to address…aggressive, destructive, health dangerous, major disruptive, non-compliant, inappropriate verbal and educationally and socially interfering behaviors."  *See* T.D.'s IEP, p. 1, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 28.  The IEP states that "as a result of her continued difficulties despite several interventions, court authorization for supplementary interventions, specifically Graduated Electronic Decelerator (GED), will be sought next quarter with guardian consent to most effectively address…[T.D.'s] dangerous and disruptive behaviors which have not responded to psychotropic medications or comprehensive behavioral interventions."  *Id.*, p. 4

148.    After admission to JRC, T.D. was tried on a positive-only behavior modification treatment plan, and that was not effective enough to stop her severe problematic behaviors and permit her to progress academically and socially.  JRC then sought and received permission from the Massachusetts Probate Court to add aversives, including the GED and GED-4 devices, to T.D.'s behavior modification treatment plan.  JRC added aversives to her treatment plan on or about September 28, 2005, and they had an immediate and dramatic effect on her aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors.  All of T.D.'s severe

problematic behaviors dramatically decreased, preventing T.D. from doing further and permanent damage to herself and others and allowing her to progress academically and socially. True and accurate copies of T.D.'s most recent treatment plan as well as findings of fact and order from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 29, 30 and 31 respectively.

       149.    T.D. was successfully tapered off of all medications and she is no longer at risk of suffering the side effects associated with anti-psychotic medications.  She also no longer requires the constant use of restraint.

       150.    T.D. has made significant progress in her academic work, including improving her spelling skills by almost a half grade level, her math computation skills by two grade levels, and her mathematical fluency by more than five grade levels.  She has demonstrated increased initiative in her academic program and has been able to spend more time working on her transitional and vocational goals.  She has also improved in her social and daily living skills by enjoying and participating in group lessons and activities in her classroom and completing chores and self-care activities at her residence.  Moreover, T.D. has earned an in-school job on JRC grounds, assisting staff in the school's "Big Reward Store," an arcade stocked with carnival type food and beverages, and loaded with fun activities for all ages such as video games, flat screen TVs, pool table, massage chairs, music, pin ball machines, and internet kiosks.  The decline in T.D.'s serious problematic behaviors has enabled her to go on numerous field trips and enjoy visits with her family.  She is also being faded from the GED device.  T.D. is now a much happier and productive person.

151.    T.D.'s family is very pleased with the educational progress T.D. has made at JRC, her family wants her to continue to progress, and her family continues to support her treatment at JRC with aversives for all of her serious problematic behaviors, including destructive, disruptive and non-compliant behaviors.

152.    According to the Emergency Regulations, JRC can now only treat T.D.'s aggressive and self-injurious behaviors with aversives, including the GED device.  If T.D. were to regress, JRC would need to be able to treat all of her behaviors, including her destructive, disruptive, and noncompliant behaviors, with GED immediately in order to keep her and those around her safe as well as allow her to progress academically and socially.

### 3.    M.D.

153.    M.D. is a 20 year old male from New York who suffers from Severe Mental Retardation, Autism, and a severe behavior disorder that causes him to engage in severe problematic behavior.

154.    M.D. has a long history of engaging in aggressive and self-injurious behavior such as hitting, scratching and biting himself, biting electrical wires, and dangerously and uncontrollably attacking others.  He also engages in destructive, disruptive, and non-compliant behaviors such as forcefully jumping up and down, throwing temper tantrums, throwing objects and ripping objects off of walls, and throwing items out of windows.  Historically, M.D. used his physical size (he is six feet tall and weighs over two-hundred pounds) to bite, hit, or grab others, and due to the intensity of his behavior, it would take at least five individuals to intervene and control his aggressive and/or self-injurious behaviors.  On one occasion, M.D.'s aggression was so severe that he was removed from a previous placement with police involvement and the use of

mechanical restraints.  On another occasion, M.D. picked up a 6'2," 280 lb. man by the neck inflicting spinal cord injury.  On a few occasions after uncontrollable aggressive episodes by M.D., he was removed from his previous placement by an ambulance and stayed overnight at a psychiatric hospital.

155.    M.D.'s treatment prior to his admission to JRC included psychiatric hospitalization, placement at day and residential treatment programs, and 1:1 paraprofessional staffing in New York, as well as the prescription of medications including heavy dosages of Haldol, Dexedrine, Orap, Thorazine, Risperdal, Depakote, Clonidine, Cogentin, Benedryl, Zoloft, and Luvox, as well a PRN of Trazadone.

156.    These treatments were not successful in treating M.D.'s aggressive, self-injurious, destructive, non-compliant, and disruptive behaviors.  As M.D. frequently caused serious injuries to himself and others, he was often in mechanical restraints.  M.S.'s destructive, disruptive, and non-compliant behaviors, many of which were antecedents to his aggressive and self-injurious behaviors, hindered his making any academic or social progress.  Moreover, M.D. suffered serious side effects from the medications, including tremors, drooling, increased sedation, and neuroleptic malignant syndrome.  In fact, when M.D. was admitted to JRC, he was in a coma brought on by the heavy dosages of Thorazine and other anti-psychotic medications with which he was treated.

157.    Since M.D.'s prior placements and treatment did not meet his needs, his local school district in New York, the West Islip Public School District, referred him to JRC for special education and behavior modification treatment, including treatment with the GED and GED-4 devices.  Prior to being accepted at JRC, several other placements were explored and

none of them were willing to accept M.D. due to the intensity of his aggressive behaviors.  M.D. was admitted to JRC on December 9, 2004.

158.    M.D.'s IEP specifies JRC as the recommended placement for M.D.  The IEP states that M.D. "has a history of displaying intense aggression that have resulted in injury to staff, self-injurious behaviors and obsessive compulsive tendencies.  In the past, [M.D.'s] aggression towards staff usually occurred when staff tried to intervene to prevent his health dangerous behaviors (biting, scratching, pinching, slapping), or disruption of rituals/OCD rituals."  *See* M.D.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 32.  M.D.'s IEP provides for "Level III Interventions to include Movement Limitation Procedures and the Graduated Electronic Decelerator to help…[M.D.] manage his aggressive, destructive, health dangerous, major disruptive and noncompliant behaviors."  *Id.*

159.    After admission to JRC, M.D. was tried on a positive-only behavior modification treatment plan, and that was not effective enough to stop his severe problematic behaviors and permit him to progress academically and socially.  JRC then sought and received permission from the Massachusetts Probate Court to add aversives to M.D.'s behavior modification treatment plan, including the GED and GED-4 devices.  The GED device was tried first with M.D., and that was not effective enough to stop him from endangering others and causing harm to himself.  JRC replaced the GED with the GED-4 in his treatment plan on August 26, 2005, and the GED-4 had an immediate and dramatic effect on his aggressive and self-injurious destructive, disruptive, and non-compliant behaviors.  M.D.'s aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors dramatically decreased, preventing M.D. from doing further and permanent damage to himself and others and allowing him to progress

academically and socially.  True and accurate copies of M.D.'s most recent treatment plan as well as findings of fact and order from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 33, 34 and 35 respectively.

160.    M.D.'s IEP indicates that "[s]ince employment of court authorized Level III interventions, [M.D.] has made steady behavioral progress.  He has shown the ability to control his inappropriate behaviors which has allowed him to begin making progress in the classroom." *See* Exhibit 32, p. 2.

161.    M.D. was successfully tapered off of all medications and he is no longer at risk of suffering the side effects associated with anti-psychotic medications.  He also no longer required the constant use of restraint.

162.    M.D. has made significant progress in his academic work.  He loves to work on the computer.  Many times he would rather sit at his desk and work on his task than take the breaks which he earns.  M.D.'s vocabulary has improved and he has mastered the Basic Skills and Alphabet Skills computer programs.  He continues to work on Receptive Vocabulary, identifying hazard signs, learning to count, identifying numbers 1-20, and handwriting.  M.D. also participates in daily group lessons.  The decline in M.D.'s problematic behaviors has enabled him to go on numerous field trips to parks, restaurants, bowling alleys, and amusement centers.  M.D. has also enjoyed many visits with his family.  M.D. is now a much happier and productive person.

163.    M.D.'s family is very pleased with the educational progress M.D. has made at JRC, his family wants him to continue to progress, and his family continues to support his

treatment at JRC with aversives for all of his serious problematic behaviors, including

destructive, disruptive and non-compliant behaviors.

164.    According to the Emergency Regulations, JRC can now only treat M.D.'s

aggressive and self-injurious behaviors with aversives, including the GED-4.  Since the

implementation of the Emergency Regulations and the termination of GED-4 treatment of

M.D.'s destructive, disruptive and noncompliant behaviors, M.D.'s destructive, disruptive, and

noncompliant behaviors have returned to unacceptably high frequencies, necessitating the use of

physical and mechanical restraint.  Also, many of M.D.'s destructive, disruptive, and non-

compliant behaviors are antecedents to aggressive and self-injurious behaviors, and by not

treating the antecedents, M.D. is engaging in more aggressive and self-injurious behaviors

putting himself and those around him in danger of severe injury.  On July 3, 2006, M.D. refused

to follow staff's direction in the bathroom, a non-compliant behavior for which JRC could not

treat him.  This resulted in M.D. assaulting staff, climbing over the bathroom stall, and

destroying the toilet fixture.  Since the implementation of the Emergency Regulations, M.D. has

attacked staff on more than one occasion by grabbing and ripping out their hair.  In addition, not

being able to treat destructive behaviors with GED-4 in combination with restraint has led to

M.D. not only being physically restrained for safety purposes and continuing to struggle, putting

himself and others at risk, but also not receiving needed GED-4 treatment.  The increase in

behaviors is beginning to impact M.D.'s performance in the classroom and he will likely resort

back to making little to no academic or social progress.  It is no longer safe for M.D. to access

the community.

### 4.    T.J.

165.    T.J. is a 16 year old male from New York who suffers from Psychotic Disorder, Not Otherwise Specified, Moderate Mental Retardation, Pervasive Developmental Delay, and a severe behavior disorder that causes him to engage in severe problematic behaviors.

166.    T.J. has a long history of engaging in aggressive and self-injurious behavior such as hitting, kicking, and grabbing others, stabbing others with sharp objects, intentionally running in front of moving vehicles, and eating inedibles.  He also engages in destructive, disruptive, and non-compliant behaviors such as overturning furniture, shouting and swearing at others, and making inappropriate sexual and racial comments.  On one occasion, T.J. stabbed the assistant principal at his high school with a pencil.  On other occasions he hit a teacher, verbally threatened to stab a teacher, hit a bus monitor, struck a social worker in the face, and engaged in numerous physical altercations with other students.

167.    T.J.'s treatment prior to his admission to JRC included psychiatric hospitalization and placement with day and residential treatment programs as well as the prescription of medications including heavy dosages of Haldol, Clozaril, Depakote, Neurontin, Thorazine, Zyprexa, Seroquel, Clonidine, and Tenex.

168.    These treatments were not successful in treating T.J.'s aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors.  As T.J.'s behaviors caused injuries to himself and others, he was often in mechanical restraints.  T.J.'s destructive, disruptive, and non-compliant behaviors, many of which were antecedents to his aggressive and self-injurious behaviors, hindered his making any academic or social progress.  T.J. failed to make any academic progress because his severe problematic behaviors resulted in his constant removal

from educational placements.  Just prior to his admission to JRC, T.J. was at a residential facility where he required constant restraint to manage his aggressive, self-injurious, and sexually inappropriate behavior and made no academic or social progress.

169.    Since T.J.'s prior placements and treatment did not meet his needs, his local school district in New York, the New York City Department of Education, referred him to JRC for special education and behavior modification treatment, including treatment with the GED device and other supplemental aversive interventions.  T.J. was admitted to JRC on January 4, 2005.

170.    T.J.'s IEP specifies JRC as the recommended placement for T.J.  The IEP states that "[T.J.] requires a 24hr/12mth. residential service in a highly structured behavior modification program."  *See* T.J.'s IEP, p. 4, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 36.  The IEP provides for "court authorized Level III interventions to include the GED (Graduated Electronic Decelerator) and Movement Limitation to treat…[T.J.'s] major inappropriate behaviors including aggression, destruction, major disruptive, health dangerous, and non-compliant behaviors."  *Id.*

171.    After admission to JRC, T.J. was tried on a positive-only behavior modification treatment plan, and that was not effective enough to stop his severe problematic behaviors and permit him to progress academically and socially.  JRC then sought and received permission from the Massachusetts Probate Court to add aversives, including the GED device, to T.J.'s behavior modification treatment plan.  JRC added aversives to his treatment plan on or about November 10, 2005, and they had an immediate and dramatic effect on his aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors.  All of T.J.'s severe problematic

behaviors dramatically decreased, preventing T.J. from doing further and permanent damage to himself and others and allowing him to progress academically and socially.  True and accurate copies of T.J.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 37, 38 and 39 respectively.

172.    T.J. was successfully tapered off of all medications and he is no longer at risk of suffering the side effects associated with anti-psychotic medications.  He also no longer requires the constant use of restraint.

173.    T.J. has made significant progress in his academic work, including increasing his attention to tasks and exhibiting positive classroom behaviors such as raising his hand, sitting appropriately, and increasing independence.  He has also improved in his social and daily living skills, enjoying and participating in group lessons and activities in his classroom, and completing chores and self-care activities at his residence.  The decline in T.J.'s problematic behaviors has enabled him to go on numerous field trips and to enjoy visits with his family.  T.J. is now a much happier and more productive person.

174.    T.J.'s family is very pleased with the educational progress T.J. has made at JRC, his family wants him to continue to progress, and his family continues to support his treatment at JRC with aversives for all of his serious problematic behaviors, including destructive, disruptive and non-compliant behaviors.

175.    According to the Emergency Regulations, JRC can now only treat T.J.'s aggressive and self-injurious behaviors with aversives, including the GED.  Since the implementation of the Emergency Regulations and the termination of GED treatment of T.J.'s

destructive, major disruptive and noncompliant behaviors, T.J.'s destructive and disruptive behaviors have returned to unacceptably high frequencies.  Between November of 2005 and the implementation of the Emergency Regulations, T.J. did not engage in property destruction and had only engaged in 3 instances of disruptive behavior.  T.J. resided in one of the least restrictive residences available at JRC and was working on meeting the criteria to be faded from the GED.  Most of T.J.'s contracts were targeting either academics or minor, interfering behaviors.  In the days following the change, T.J. began destroying property and emitted 84 disruptive behaviors, some of which were antecedents to aggressive behavior such as attacking staff.  By not treating the antecedents, T.J. will likely engage in more aggressive behaviors putting T.J., and those around him, in danger of severe injury.  The increase in behaviors will eventually prevent T.J. from functioning in a classroom and will likely result in his making little or no academic or social progress.  In addition, it will likely not be safe for T.J. to access the community or visit with his family.  Finally, the Emergency Regulation interrupted a planned, gradual fading plan.  Because of this interruption, T.J. has experienced a regression that will likely require him to remain in residential treatment for a longer period of time.

### 5.    *C.J.*

176.    C.J. is a 19 year old female from New York who suffers from Mood Disorder NOS, Intermittent Explosive Disorder, and a severe behavior disorder that causes her to engage in severe problematic behavior.

177.    C.J. has a long history of engaging in aggressive and self-injurious behaviors such as biting, hitting, choking, pushing, and kicking others, attempts and threats to harm herself, cutting herself, inducing vomiting, refusing to eat, and touching electrical outlets.  She also engages in

destructive, disruptive, and non-compliant behaviors such as banging and throwing objects, setting fires, shouting and swearing at others, stealing, and engaging in sexually inappropriate behavior. On one occasion, C.J. intentionally broke a window and cut herself with the broken glass.

178.    C.J.'s treatment prior to her admission to JRC included psychiatric hospitalization, day and residential treatment programs, years of individual and group counseling, and the prescription of medications including Abilify, Depakote, Strattera, Dexedrine, Nortriptyline, Ritalin, and Seroquel.

179.    These treatments were not successful in treating C.J.'s aggressive, self-injurious, destructive, disruptive and non-compliant behaviors.  As C.J.'s severe problematic behaviors frequently caused injuries to herself and others, she was often in mechanical restraints.  C.J.'s destructive, disruptive, and non-compliant behaviors, many of which were antecedents to her aggressive and self-injurious behaviors, hindered her making any academic or social progress. C.J.'s serious problematic behaviors led to her being suspended from school multiple times.

180.    Since C.J.'s prior placements and treatment did not meet her needs, her local school district in New York, the Middletown Enlarged City School District, referred her to JRC for special education and behavior modification treatment, including treatment with the GED device.  C.J. was admitted to JRC on December 30, 2004.

181.    C.J.'s IEP specifies JRC as the recommended placement for C.J.  The IEP states that "[C.J.] displays significant disruptive and high risk behavior in all settings" and that she "requires a 24 hour/12 month residential service [with] highly structured behavior modification." *See* C.J.'s IEP, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 40. The IEP provides for "court authorized Level III interventions to include Movement Limitation

Procedures and the Graduated Electronic Decelerator to help [C.J.] manage her aggressive, health dangerous, destructive behaviors, major disruptive and noncompliant behaviors." *Id.*

182.    After admission to JRC, C.J. was tried on a positive-only behavior modification treatment plan, and that was not effective enough to stop her dangerous and inappropriate behaviors and permit her to progress academically and socially.  JRC then sought and received permission from the Massachusetts Probate Court to add aversives, including the GED device, to C.J.'s behavior modification treatment plan.  JRC added aversives to her treatment plan on or about June 23, 2005, and they had an immediate and dramatic effect on her aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors.  All of C.J.'s problematic behaviors dramatically decreased, preventing C.J. from doing further and permanent damage to herself and others and allowing her to progress academically and socially.  True and accurate copies of C.J.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 41, 42 and 43 respectively.

183.    C.J. was successfully tapered off of all medications and she is no longer at risk of suffering the side effects associated with anti-psychotic medications.  She also no longer required the constant use of restraint.

184.    C.J. has made significant progress in her academic work, including improved participation in group activities and attention to task.  C.J. has made improvements in several academic areas, including: spelling, in which she increased from a third grade to a twelfth grade level; math fluency, in which she increased from a second grade to a fourth grade level; and math computation, in which she increased a half grade level from early to mid-fifth grade level.  She

has also improved in her social and daily living skills, enjoying and participating in group lessons and activities in her classroom, and completing chores and self-care activities at her residence.  The decline in C.J.'s serious problematic behaviors has enabled her to go on numerous field trips and to enjoy visits with her family.  C.J. is now a much happier and more productive person.

185.    C.J.'s family is very pleased with the educational progress C.J. has made at JRC, her family wants her to continue to progress, and her family continues to support her treatment at JRC with aversives for all of her serious problematic behaviors, including destructive, disruptive and non-compliant behaviors.

186.    According to the Emergency Regulations, JRC can now only treat C.J.'s aggressive and self-injurious behaviors with aversives, including the GED.  Since the implementation of the Emergency Regulations and the termination of GED treatment of C.J.'s destructive, disruptive and noncompliant behaviors, C.J.'s destructive, disruptive, and noncompliant behaviors have returned to unacceptably high frequencies, necessitating moving C.J. to a more restrictive residence, placing her in emergency transport restraints to and from school, and moving her to a more restrictive classroom.  Between the implementation of treatment with the GED in June of 2005 and implementation of the Emergency Regulations, C.J. engaged in 3 noncompliant, 15 major disruptive and 3 destroying behaviors.  In the 5 weeks following the implementation of the Emergency Regulations, C.J. engaged in 1694 noncompliant, 1817 disruptive, and 1135 destroying behaviors, most notably disrobing in class several times per day and refusing to sit down on the bus to and from school.  Also, many of C.J.'s destructive, disruptive and non-compliant behaviors are antecedents to aggressive

behaviors such as attacking other students and staff.  By not treating the antecedents, C.J. is

engaging in more aggressive and self-injurious behaviors putting C.J., and those around her, in

danger of severe injury.  The increase in behaviors will likely continue to impede C.J.'s

academic functioning in a classroom and is likely to result is loss of social progress.  It is no

longer safe for C.J. to access the community or visit with her family away from JRC.  In fact,

because of the observed increase in problem behaviors, a home visit for the July 4th weekend was

cancelled.  Finally, prior to the implementation of the Emergency Regulations, C.J. was making

excellent progress in reducing the frequency of her inappropriate verbal behavior.  If JRC

observed continued success, a gradual fading plan would have been implemented.  However,

because of the observed regression in her behavior, any plans to fade C.J. have been postponed

indefinitely.

### 6.    *S.S.*

187.    S.S. is a 13 year old female from New York who suffers from moderate mental

retardation, autism, and a severe behavior disorder that causes her to engage in severe

problematic behaviors.

188.    S.S. has a long history of engaging in aggressive and self-injurious behavior,

including hitting her head so often and with such force that she detached both of her retinas.  She

slaps her face and hits her head with her fists, against walls, on the floor, as well as against

various other objects.  S.S. slams her body into walls and furniture, drops herself forcefully to the

ground, and attacks people by hitting, scratching, biting, pulling hair and pushing them.  She also

engages in destructive, disruptive, and non-compliant behavior, such as screaming, forcefully

stomping feet, and throwing or ripping objects.

189.    S.S.'s treatment prior to her admission to JRC included placements in New York with day schools and residential treatment programs, the use of a helmet with face guard, weighted and padded gloves, and physical restraint to protect her head and face.  S.S. was also placed on heavy dosages of potent medications, including Abilify, Risperdal, Prozac, and Depakote.

190.    These treatments were not successful in treating S.S.'s aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors, and she had completely detached both of her retinas by the time she was admitted to JRC.  S.S.'s destructive, disruptive, and non-compliant behaviors, many of which were antecedents to her aggressive and self-injurious behaviors, hindered her making any academic progress.  Just prior to her admission to JRC, S.S.'s day consisted almost entirely of staff trying unsuccessfully to keep S.S.'s hands away from her face.  She was unsuccessful in completing any academics.  Moreover, she was suffering serious side effects from the anti-psychotic medications, including tremors, anxiety, insomnia, increased sedation, and gastro-intestinal disturbance.  S.S. was very sad and in dire physical condition when she was admitted to JRC.  She was also in physical restraints, medically required to wear a helmet with face guard, and making no progress academically or socially.

191.    Since S.S.'s prior placements and treatment did not meet her needs, her local school district in New York, East Williston Union Free School District, referred her to JRC for special education and behavior modification treatment, including treatment with the GED and GED-4 devices.  S.S. was admitted to JRC on March 7, 2005.

192.    S.S.'s IEP specifies JRC as the recommended placement for S.S.  The IEP states that S.S. "is unable to control her behaviors across all settings" and "requires a residential

placement offering a 24 hour/12 month behavior modification program." *See* S.S.'s IEP, p. 3, a true and accurate copy of which is attached to the Exhibits Binder as Exhibit 44. The IEP provides for "Level III Interventions to include Movement Limitation Procedures and the Graduated Electronic Decelerator to treat…[S.S.'s] major problematic behaviors to include aggression, health dangerous, destructive behaviors, major disruptive and non compliant behaviors." *Id.*

193. After admission to JRC, S.S. was tried on a positive-only behavior modification treatment plan, and that was not effective enough to stop her severe problematic behaviors. JRC then sought and received permission from the Massachusetts Probate Court to add aversives, including the GED and GED-4 devices, to S.S.'s behavior modification treatment plan. The GED device was tried first with S.S., and that was not effective enough to stop her from hitting her head and causing harm to herself. JRC replaced the GED with the GED-4 in her treatment plan on October 27, 2005, and the GED-4 had an immediate and dramatic effect on her aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors. The behaviors dramatically decreased, preventing S.S. from doing further and permanent damage to her eyes and allowing her to progress academically and socially. S.S. has made such progress with her JRC treatment plan that she has been able to have four major eye surgeries and doctors have been able to reattach both of her retinas. True and accurate copies of S.S.'s most recent treatment plan as well as findings of fact and decree from the Massachusetts Probate Court are attached to the Exhibits Binder as Exhibits 46, 47 and 48 respectively.

194.    S.S. was successfully tapered off of all medications and she is no longer at risk of suffering the side effects associated with anti-psychotic medications.  She also no longer requires any use of physical restraint or helmet.

195.    S.S. has made significant progress in her academic work, including increasing her attention to task and task completion.  S.S. works on self instructional tasks.  She is currently working on identifying colors, shapes, and objects.  S.S. consistently works on these tasks for a three minute period without stopping.  S.S. consistently works on labeling objects to help increase her verbal communication.  In addition, now that she has regained her vision, S.S. is able to participate in physical education class.  She has improved her social and daily living skills as well.  S.S. joyfully engages in rewards such as watching movies with her peers.  She can brush her teeth with minimal verbal prompts, go to the bathroom on her own, and bath herself with minimal physical and verbal prompts.  Moreover, the decline in S.S.'s problematic behaviors has enabled her to go on numerous field trips to restaurants, museums and bowling alleys, and to enjoy visits with her parents and family.  S.S. is now a very happy and productive child.

196.    S.S.'s family is very pleased with the educational progress S.S. has made at JRC, her family wants her to continue to progress, and her family continues to support her treatment at JRC with aversives for all of her serious problematic behaviors, including destructive, disruptive and non-compliant behaviors.

197.    According to the Emergency Regulations, JRC can now only treat S.S.'s aggressive and self-injurious behaviors with aversives, the GED-4.  Since the implementation of the Emergency Regulations and the termination of GED-4 treatment of S.S.'s destructive,

disruptive and noncompliant behaviors, S.S.'s noncompliant behaviors have returned to unacceptably high frequencies, impeding on her academic progress and social interactions significantly.  Also, some of S.S.'s non-compliant behaviors, such as refusing to follow staff direction and refusing physical prompting, are antecedents to aggressive and self-injurious behaviors and by not treating the antecedents, S.S. is at a high risk of engaging in more aggressive and self-injurious behaviors putting herself, and those around her in danger of severe injury.  In addition, although S.S. has not yet engaged in major disruptive or destructive behaviors there is a significant history that predicts that when she does a chain of dangerous behaviors will follow, thus placing herself in serious harm.  The increase in behaviors is preventing S.S. from functioning in a classroom and it is likely that she will resort back to making little or no academic or social progress.  It will no longer be safe for S.S. to access the community.

### 7.    *The Additional Student Plaintiffs*

198.    The Additional Student Plaintiffs are from New York who suffer from mental retardation and/or mental illness as well as a severe behavior disorder that causes them to engage in dangerous and inappropriate behaviors.

199.    The Additional Student Plaintiffs are currently receiving behavior modification treatment and special education at JRC, in Canton, Massachusetts, which was very effective prior to the adoption of the Emergency Regulations

200.    The Additional Plaintiffs have long histories of engaging in aggressive and self-injurious behavior as well as destructive, disruptive and non-compliant behaviors.

201.    Prior to their admission to JRC, the Additional Student Plaintiffs were tried on many different types of alternative treatments such as special education, placement with day and residential treatment programs, psychiatric hospitalization, counseling, restraint, paraprofessional support, home instruction, behavior modification treatment using positive-only treatment procedures (often called "Positive Behavior Support") and the prescriptions of large dosages of antipsychotic medications.

202.    These treatments were not successful in treating the Additional Student Plaintiffs' aggressive, self-injurious, destructive, disruptive and non-compliant behaviors.  Also, their destructive, disruptive, and non-compliant behaviors, many of which were antecedents to their aggressive and self-injurious behaviors, hindered their making any academic progress.

203.    Since the Additional Student Plaintiffs' prior placements and treatment did not meet their needs, their local school districts referred them to JRC for special education and behavior modification treatment, including treatment with the GED and GED-4 devices.

204.    The Additional Student Plaintiffs' IEPs specify JRC as the recommended placement for the Additional Student Plaintiffs.  Their IEP provides for aversives, including the GED and GED-4 devices, to treat the Additional Student Plaintiffs' major inappropriate behaviors including aggression, destruction, major disruptive, health dangerous, and noncompliant behaviors.

205.    After admission to JRC, the Additional Plaintiff Students were tried on a positive-only behavior modification treatment plan, and that was not effective enough to stop their severe problematic behaviors.  JRC then sought and received permission from the Massachusetts Probate Court to add aversives, including the GED and/or GED-4 devices, to the Additional

Plaintiff Students' behavior modification treatment plans.  JRC added aversives to their treatment plans and they had an immediate and dramatic effect on their aggressive, self-injurious, destructive, disruptive and non-compliant behaviors.  All of the Additional Student Plaintiffs' problematic behaviors dramatically decreased, preventing them from doing further and permanent damage to themselves and others.

206.    The Additional Student Plaintiffs are no longer on, and no longer at risk of suffering the side effects associated with, anti-psychotic medications.

207.    While at JRC, the Additional Student Plaintiffs made progress in their academic work prior to the adoption of the Emergency Regulations.

208.    The decline in their problematic behaviors enabled them to partake in field trips to sporting events, the movies, shopping centers, restaurants, amusement centers, parks, museums and the aquarium as well as to enjoy visits with their family.  Prior to the implementation of the Emergency Regulations, and with the use of aversives to treat all of their problematic behaviors, the Additional Student Plaintiffs were much happier and more productive individuals.

209.    Prior to the implementation of the Emergency Regulations, the Additional Student Plaintiffs' serious problematic behaviors were successfully reduced to extremely low levels and they were able to learn and be educated pursuant to their IEPs.  They were able to work with teachers in classrooms and learn replacement behaviors to take the place of their aggressive and self-injurious behaviors and potentially eliminate the future need for any intrusive treatment.

210.    The Additional Parent Plaintiffs are very pleased with the educational and social progress the Additional Student Plaintiffs have made at JRC, want them to continue to progress,

and support their treatment at JRC with aversives for all of their serious problematic behaviors, including destructive, disruptive and non-compliant behavior.

211.    Since the implementation of the Emergency Regulations and the termination of GED and GED-4 treatment of the Additional Student Plaintiffs' destructive, disruptive and non-compliant behaviors, the Additional Student Plaintiffs have exhibited increased frequencies of destructive, disruptive and non-compliant behaviors that are impacting their academic and social progress, as well as their quality of life.  Also, many of their destructive, disruptive, and non-compliant behaviors are antecedents to aggressive and self-injurious behaviors and by not treating the antecedents, or by losing the chance to learn replacement behaviors, the Additional Student Plaintiffs have engaged in more aggressive and self-injurious behaviors.  It is or will likely no longer be safe for the Additional Student Plaintiffs to access the community or visit with their families.  If the Additional Student Plaintiffs continue to regress, the Additional Student Plaintiffs will have to spend most of school time out of the regular classroom and in restraint and will make little to no academic or social progress.   If JRC cannot keep the Additional Student Plaintiffs safe, JRC would have to refer them back to New York, where they would likely end up in a psychiatric hospital and under the sedative and destructive influences of anti-psychotic medication.

212.    JRC's behavior modification treatment program, which uses aversive techniques, including the GED and GED-4 devices, to treat all of the Additional Student Plaintiffs' problematic behaviors, is the only effective treatment for their aggressive, self-injurious, destructive, disruptive, and non-compliant behaviors and their only chance to achieve academic success.

## VI.    COUNTS

### AS AND FOR A FIRST CLAIM FOR RELIEF
**On Behalf of the Parents Individually and as Next Friends of the Students
(For Violations of the Individuals with Disabilities Education Act ("IDEA"))**

213.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 212 as though each were separately and specifically set forth herein.

214.    The IDEA guarantees that "[a] free appropriate education is available to all children with disabilities."  20 U.S.C. § 1412(a)(1)(A).  Under the IDEA, the Students are children with disabilities.  *See id.*, § 1401(3).

215.    Under the IDEA and New York law, IEPs identify the services that disabled or special education students are to receive.  The IEPs of the Students all provide for Level III aversives, including the GED devices, to treat their severe problematic behaviors.

216.    By their actions set forth above, the Defendants are denying the Students free and appropriate public education by prohibiting treatment provided for in their IEPs.

217.    By their actions set forth above, the Defendants have also violated the due process rights under the IDEA and New York law, including the right of parents to participate meaningfully in the IEP process.

218.    By their actions set forth above, the Defendants have denied the Students a FAPE by denying funding for education provided to them at JRC.

219.    As a result, Plaintiffs have suffered and are suffering irreparable harm, and are entitled to injunctive relief.

### AS AND FOR A SECOND CLAIM FOR RELIEF
**On Behalf of the Parents Individually and as Next Friends of the Students
(For Violations of Substantive Due Process Rights)**

220.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 219 as though each were separately and specifically set forth herein.

221.    The Constitutions of the United States and New York, as well as New York law, provide the Petitions with rights concerning their education, habilitation, and treatment.

222.    By their actions set forth above, Defendants are violating the Students' rights to education, habilitation, and treatment by depriving them of education and treatment afforded by federal and New York law, and set forth on their IEPs.

223.    By their actions, Defendants have acted in a manner devoid of sound professional judgment by, *inter alia*, failing to consider the harm and other consequences of their actions.

224.    By their actions, Defendants have unlawfully deprived the Plaintiffs of safe and effective psychological treatment that is necessary for their health, well-being, and educational advancement.

225.    As a result, Plaintiffs have suffered and are suffering irreparable harm, and are entitled to injunctive relief.

**AS AND FOR A THIRD CLAIM FOR RELIEF**
**On Behalf of the Parents Individually and as Next Friends of the Students**
**(For Violations of the Rehabilitation Act)**

226.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 225 as though each were separately and specifically set forth herein.

227.    All New York students—including disabled children—are entitled to a free appropriate public education under the state Constitution.  *See* NY Const. art. XI, § 1.  The State must also ensure that each child is provided with an educational program appropriate to his or her needs.

228.    The Rehabilitation Act, 29 U.S.C. § 701, *et seq*., protects disabled individuals from discrimination in public services.  NYSED and the Board are recipients of federal financial assistance.

229.    Unlike most children, the Students are disabled due to their cognitive, psychological and psychiatric impairments that require treatment with aversives to control their behaviors and enable their education.

230.    By their actions set forth above, the Defendants have discriminated against the Students on the basis of their disability in violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, as amended by the Civil Rights Restoration Act of 1987.

231.    As a result, Plaintiffs have suffered and are suffering irreparable harm, and are entitled to injunctive relief.

**AS AND FOR A FOURTH CLAIM FOR RELIEF**
**On Behalf of the Parents Individually and as Next Friends of the Students**
**(For Violations of Equal Protection Rights)**

232.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 231 as though each were separately and specifically set forth herein.

233.    The Fourteenth Amendment to the United States Constitution and the New York State Constitution provide that "[n]o person shall be denied the equal protection of the laws." NY Const. Art. I § 11.

234.    The Students and Parents are all New York residents.  All New York students have a right to free public education under the New York Constitution.  *See id*., Art. XI, § 1.

235.    By their actions set forth above, the Defendants have violated the Equal Protection rights of the Students by impermissibly treating them differently than other New York

students and other New York students who are disabled.  The Defendants have also acted arbitrarily, capriciously, unreasonably, and in bad faith.

236.    As a result, Plaintiffs have suffered and are suffering irreparable harm, and are entitled to injunctive relief.

### AS AND FOR A FIFTH CLAIM FOR RELIEF
**On Behalf of the Parents Individually and as Next Friends of the Students**
**(For Violations of Procedural Due Process Rights)**

237.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 236 as though each were separately and specifically set forth herein.

238.    The Due Process Clause of both the United States Constitution and the New York State Constitution state that no person "shall be deprived of life, liberty or property without due process of law."  U.S. Const. Amend. XIV; N.Y. Const. Art. I, § 6.

239.    By their actions set forth above, Defendants have failed and continue to fail to provide the Parents and Students with notice and an opportunity to be heard regarding the Defendants' ban and/or restrictions on the use of aversives.  The enactment and implementation of the Emergency Regulations by Defendants are violations of the Due Process Clauses of the Fourteenth Amendment of the United States Constitution and Article I, § 6 of the New York State Constitution.

240.    As a result, Plaintiffs have suffered and are suffering irreparable harm, and are entitled to injunctive relief.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
### On Behalf of Plaintiffs
### (For Violations of the State Administrative Procedure Act)

241.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 240 as though each were separately and specifically set forth herein.

242.    By their actions set forth above, Defendants promulgated and adopted "emergency" regulations in violation of the State Administrative Procedure Act.  *See* N.Y. A.P.A. Law § 202.

243.    The State Administrative Procedure Act sets forth detailed requirements for every "emergency" rule or regulation that, by definition, bypasses the normal legislative process.  *See id.*, § 202(6).  The Defendants have failed to comply with these conditions.  They have not established that any "emergency" exists nor fully set forth the requisites bases necessary to justify their "emergency" regulations and to make them effective immediately.  *See id.*, § 202(6)(d)(iv).

244.    As a result, Plaintiffs have suffered and are suffering irreparable harm, and are entitled to injunctive relief.

## AS AND FOR A SEVENTH CLAIM FOR RELIEF
### On Behalf of Plaintiffs
### (Arbitrary, Capricious and Unreasonable Actions)

245.    Plaintiffs repeat and reallege the allegations in Paragraphs 1 through 244 as though each were separately and specifically set forth herein.

246.    By reason of the foregoing, the Emergency Regulations are arbitrary, capricious and unreasonable including that they:

    a.   are unlawful, *ultra vires*, and in excess of Defendants' statutory authority;

b. are contrary to the legislative intent, exceed the Defendants' authority under the IDEA, N.Y. EDUC. LAW § 4400, *et seq.*; and conflict with the regulatory framework for special education services for students with disabilities;

c. exceed Defendants' authority under the IDEA by effectively eliminating appropriate and clinically indicated treatment from a Student's IEP without any individualized determination regarding the appropriateness of the treatment or potential for harm and without any notice to the Students' parents or guardians who are deemed critical partners in the education of their children and members of the CSE;

d. violate the IDEA's procedural and substantive requirements;

e. violate the Students' substantive rights to due process under the Constitutions of the United States and New York, as well as New York law;

f. discriminate against the Students on the basis of their disability in violation of Section 504 of the Rehabilitation Act of 1973;

g. violate the Students' equal protection rights under the Fourteenth Amendment of the United States Constitution and New York State Constitution by impermissibly treating them differently than other New York students and other New York students who are disabled;

h. violate the Parents and Students' procedural rights to due process under the Constitutions of the United States and New York, as well as New York law;

i. make generalized findings and enforce generalized treatment options without considering the individual needs and treatment history of each individual student;

j.  limit the availability of behavioral modification techniques involving the use of physical aversives, including the GED and GED-4 devices, which are legal, have beneficial results and are available to clinicians, within the scope of their practice, to treat individuals on a case-by-case basis as they deem it clinically indicated and appropriate;

k.  ban JRC's of use critical Court-approved "aversive" treatment for the Students' (as well as the numerous other New York State students at JRC) severely destructive, disruptive, non-compliant, and other problematic behaviors;

l.  are not supported by the peer-reviewed research;

m.  preclude treatment that has been found to be appropriate on an individualized basis without any finding that the treatment is harmful;

n.  regulate a residential facility which is licensed in another state, is operating in full compliance with that State's statutory, regulatory and common laws, and where each individual student's treatment plan is subjected to rigorous procedural safeguards, including an in-depth judicial approval process whereby each student is represented by counsel and independent (*i.e.*, non-JRC) clinical evaluations are reviewed;

o.  subject the Students to inadequate treatments that have failed them in the past and jeopardize their progress at JRC, both educationally and behaviorally;

p.  subject JRC to inconsistent obligations and put it at risk of regulatory enforcement action;

q.  require JRC to certify compliance with illegal and/or harmful rules, on threat of loss of approval; and

r.  require the recommendation of the Panel which has not been created.

247.  By virtue of the foregoing, the Defendants have and are proceeding without or in excess of jurisdiction, and the Defendants' "emergency" regulations are arbitrary and capricious and an abuse of discretion.

248.  Accordingly, Plaintiffs are entitled to a declaration that the "emergency" regulations are unlawful, *ultra vires*, invalid and unenforceable for lack of statutory authorization, null and void and arbitrary and capricious.

249.  By their actions, the Defendants' practices and/or policies are unlawful, *ultra vires*, in excess of Defendant's statutory authority and arbitrary and capricious.

250.  As a result, Plaintiffs have suffered and are suffering irreparable harm, and are entitled to injunctive relief.

251.  Petitioners have no adequate remedy at law.

### VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

1)  Preliminarily and permanently enjoining the Defendants, together with their employees, agents, and all persons acting in concert with or on behalf of them, directly or indirectly, from:

a)    Implementing and enforcing the Emergency Regulations; and

b)    Terminating or revoking JRC's approval from the out-of-state registries to receive public funds.

2)      Declaring invalid the Emergency Regulations on the grounds that they violate the Individuals with Disabilities Education Act, as well as New York Education Law and Regulations;

3)      Declaring invalid the Emergency Regulations on the grounds that they violate the Plaintiffs' substantive due process rights under federal and state law;

4)      Declaring invalid the Emergency Regulations on the grounds that they violate the Rehabilitation Act;

5)      Declaring invalid the Emergency Regulations on the grounds that they violate the Plaintiffs' equal protection rights under both the Fourteenth Amendment to the U.S. Constitution and the New York Constitution;

6)      Declaring invalid the Emergency Regulations on the grounds that they violate the Plaintiffs' constitutional procedural due process rights;

7)      Declaring invalid the Emergency Regulations on the grounds that they are in violation of the State Administrative Procedure Act;

8)      Declaring invalid the Emergency Regulations on the grounds that they are arbitrary, capricious and unreasonable;

9)      Granting Plaintiffs their attorneys' fees, together with interest and costs; and

10)     Granting such other and further relief as this Court may deem just and proper.

DATED:        September 1, 2006

Attorneys for Parent Plaintiffs,

By: /s Jeffrey J. Sherrin
Jeffrey J. Sherrin (Bar Roll No. 102601)
Peter Danziger (Bar Roll No. 101453)
Yvonne E. Marciano (Bar Roll No. 510021)
O'CONNELL AND ARONOWITZ, P.C.
54 State Street
Albany, New York 12207-2501
518.462.5601

Attorneys for the JUDGE ROTENBERG
EDUCATIONAL CENTER, INC.

By: /s Michael P. Flammia
Michael P. Flammia (admitted *Pro
Hac Vice*)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
1 International Place, 18th Floor
Boston, MA 02110
617.342.6800

Of Counsel:

Steven R. Kramer (Bar Roll No. 505074)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
81 Main Street, Suite 307
White Plains, New York 10601
914.949.2909

G:\DATA\ATTORNEY\YEM\JRC\Emergency Regulations\CP Amended (9.01.06).doc