```
 1   UNITED STATES DISTRICT COURT

 2   NORTHERN DISTRICT OF NEW YORK

 3   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 4   JEANETTE ALLEYNE, et al.,

 5                        Plaintiffs,

 6      -versus-                              06-CV-994

 7                                    (ORAL ARGUMENT)

 8   NEW YORK STATE EDUCATION DEPARTMENT, et al.,

 9                        Defendants.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

11            TRANSCRIPT OF PROCEEDINGS held in and for the

12   United States District Court, Northern District of New

13   York, at the James T. Foley United States Courthouse,

14   445 Broadway, Albany, NY  12207, on TUESDAY, JULY 21, 2009,

15   before the HON. GARY L. SHARPE, United States District Court

16   Judge.

17

18   APPEARANCES:

19   FOR THE PLAINTIFFS:
     O'CONNELL & ARONOWITZ
20   BY:  JEFFREY J. SHERRIN, ESQ.

21   ECKERT, SEAMANS LAW FIRM
     BY:  MICHAEL P. FLAMMIA, ESQ. and CHARLOTTE BEDNAR, ESQ.
22
     MEREDITH H. SAVITT, ESQ.
23

24   FOR THE DEFENDANTS:
     HON. ANDREW M. CUOMO, New York State Attorney General
25   BY:  KELLY L. MUNKWITZ, Assistant Attorney General
```

Alleyne v. New York State Ed. Dept, et al.

1                    (Court commenced at 1:02 PM.)

2          THE CLERK:  The date is Tuesday, July 21, 2009, at

3    1:00 PM.  In the matter of Jeanette Alleyne, et al., versus

4    the New York State Education Department, et al., case number

5    06-CV-994.  We are here for a motion hearing.  Could we have

6    appearances for the record, please?

7          MS. MUNKWITZ:  Kelly Munkwitz from the Attorney

8    General's office for the defendants.

9          THE COURT:  Good afternoon.

10          MS. MUNKWITZ:  Good afternoon, your Honor.

11          MR. FLAMMIA:  Michael Flammia for the plaintiffs,

12    your Honor.

13          THE COURT:  Good afternoon.

14          MS. SAVITT:  Meredith Savitt for the plaintiffs.

15          THE COURT:  Good afternoon.

16          MR. SHERRIN:  Jeffrey Sherrin, O'Connell &

17    Aronowitz, for the plaintiffs.

18          THE COURT:  Good afternoon.

19          MR. SHERRIN:  How are you, Judge?

20          THE COURT:  I'm good.  We are here with what I'll

21    refer to as the State defendants' motion for summary

22    judgment.  They seek summary judgment on all claims filed by

23    the plaintiffs or, alternatively, to dissolve the

24    preliminary injunction.  There are no cross-motions pending

25    before the Court by the plaintiffs at this time.

THERESA J. CASAL, RPR, CRR
UNITED STATES DISTRICT COURT - NDNY

Alleyne v. New York State Ed. Dept, et al.

1                In summary, the claims that remain are federal

2      statutory claims -- IDEA, FAPE, free appropriate public

3      education claim -- in Count 1; there's referenced what I

4      refer to as a global IDEA claim in claim 6; and a

5      Rehabilitation Act claim in claim 3.  And then, generically,

6      there are federal and state constitutional claims.  There's

7      a substantive due process claim, which is claim 2; a

8      procedural due process claim, claim 5; and equal protection

9      claim, claim 4.

10               It's a fair characterization to say that the

11     surviving issues in these claims generally encompass IDEA

12     claims and nonIDEA claims.  It's clear that as to the

13     nonIDEA claims, they're governed by the normal summary

14     judgment standard, which I have shared with the parties as a

15     Court Exhibit and which I now incorporate into the record of

16     these proceedings.  It's also clear that as to the IDEA

17     claims, the State has filed its motion under that

18     traditional summary judgment standard, not that which often

19     applies to IDEA claims.

20               Let me share with the parties that alternative

21     IDEA standard which is not incorporated in the exhibit,

22     which is, essentially, as follows:  Generally, when a party

23     moves for summary judgment in an IDEA claim, the normal

24     inquiry as to whether there are any issues of fact or

25     credibility does not apply.  That's New Paltz Central School

Alleyne v. New York State Ed. Dept, et al.

1    District, 307 Fed Supp 2d 394, 2004, Northern District

2    opinion.  Instead, the inquiry is whether the administrative

3    record, together with any additional evidence, establishes

4    that there has been compliance with the IDEA.  The District

5    Court must engage in an independent review of the

6    administrative record and make a determination based on a

7    preponderance of the evidence.  That's Gagliardo, Second

8    Circuit's opinion at 489 F.3d 105.

9            Here, however, a full record of adjudicative

10   proceedings at the administrative level has not been

11   provided.  Plaintiffs have not cross-moved for summary

12   judgment, and both parties argue the defendants' motion

13   under the normal Rule 56 standard.  The Court may apply a

14   normal summary judgment standard to IDEA claims if the

15   parties so elect.  That's Doe, 133 F.3d 384, Sixth Circuit,

16   1998.  However, it's unclear here exactly how the parties

17   expect this action to proceed if summary judgment is denied,

18   in part or in whole, or what will be gained through a trial.

19           As I've already indicated, as to the nonIDEA

20   claims, the Court addresses the defendants' motion under the

21   normal summary judgment standard which I have supplied in

22   the Court Exhibit.  What I propose to do here this afternoon

23   is go through a number of the issues that are before me,

24   probably in a give and take exchange back and forth.  As

25   opposed to hearing from the State in toto on its motion and

Alleyne v. New York State Ed. Dept, et al.

1    the plaintiffs in opposition to that motion, I would prefer

2    to do it piecemeal, so if you can follow me, I would be

3    happy to hear from ya, I will issue an order and we will see

4    where this leads us.  I intend to dispose of as much of the

5    motion as I feel I can based upon the review I have given

6    the motion papers before assuming the bench this afternoon.

7    As to those I do not feel I can rule on, I will reserve and

8    render an opinion accordingly.

9           Let's take up an easy one, the issue of mootness.

10   As the State points out, summary judgment on the claims of

11   13 student plaintiffs who no longer attend JRC or receive

12   aversives are now moot.  The plaintiffs do not oppose.

13   Thus, as to these 13 students, they no longer have any

14   personal stake in the litigation, there's no reasonable

15   expectation that they will require aversives and their

16   claims are dismissed.  That's Spencer v. Kemma, 523 US 1,

17   Supreme Court's 1998 decision.  So the record is clear, the

18   Court discerns from its review of the papers that those

19   student plaintiffs are as follows:  DB-2, NB, CC, KD, AD,

20   TE, SF, CJ, PP, MP, ES, CS, and JT.

21          Let me turn then to various issues that have been

22   raised by the State as they may impact one or another of

23   these claims and begin with the State's exhaustion claim.

24   It is the State's position in its summary judgment motion

25   that all remaining claims must be dismissed because the

Alleyne v. New York State Ed. Dept, et al.

1  plaintiffs failed to exhaust.  The initial questions I have

2  for the State in this regard have to do with whether

3  exhaustion is, in fact, required on the state of this

4  record.  And the first question is where the claims are

5  aimed at wrongdoing, it's inherent in the program, namely

6  inherent in the regulations themselves, don't the plaintiffs

7  challenge the regulations as having denied them a FAPE and

8  isn't that an exception to the exhaustion requirement?

9         MS. MUNKWITZ:  Your Honor, the plaintiffs have

10  individual claims and the plaintiffs have, as the Court

11  pointed out, global claims.  And to the extent there's a

12  global claim that challenges the regulations themselves,

13  then no, I do not take the position that exhaustion is

14  necessary.  And that is addressed in a separate part of my

15  brief, the global claim.

16         But to the extent the complaint can be construed

17  to be individual claims, that these individual plaintiffs

18  were denied a FAPE, then yes, exhaustion is required, for a

19  couple of reasons.  As the Court pointed out, generally, in

20  IDEA cases, there is a different standard.  We don't have

21  that standard here, that standard is not available to me

22  because there is no administrative record on any of these

23  students.  The question as to whether to take, for example,

24  GR, whether GR was denied a FAPE needs to be decided at the

25  administrative level.

Alleyne v. New York State Ed. Dept, et al.

1          Now, there is no federal right to aversives.

2    There is no requirement that children undergo pain in order

3    to be educated.  There's no federal mandate to that.  What

4    there is a federal mandate for is a free appropriate public

5    education.

6          THE COURT:  Haven't these particular students,

7    the remaining individual plaintiffs in the case, in light

8    of my mootness ruling, aren't they authorized aversives in

9    their IEP?

10         MS. MUNKWITZ:  The IEPs that were in place at the

11   time that this motion -- or action was started, some of them

12   were, some of them weren't.  And we went through.  It's a

13   fluid thing.  Some of these students are getting aversives,

14   some of them aren't.  But there has been a finding at the

15   administrative level that aversives are necessary to the

16   students' achievement of FAPE.  The students are -- whether

17   there's alternatives to aversives, and again, it's aversives

18   to three categories, not in total, each of these students

19   will be entitled to aversives for destructive or for

20   self-injurious and aggressive behavior.  The question is are

21   they denied FAPE for being denied aversives for those lesser

22   categories, and there's no administrative finding to that.

23   There's been no administrative hearings.  Actually, I take

24   that back.  There have been administrative hearings, but

25   they have not been incorporated into this lawsuit.  Some of

Alleyne v. New York State Ed. Dept, et al.

1   these plaintiffs are out there challenging the CSEs.  There

2   are a number of CSEs who are now recommending against

3   aversives.  But this lawsuit is being used to keep the

4   aversives in place.  So the --

5          THE COURT:  But add to those students that are

6   authorized aversives, meaning the plaintiffs in this case,

7   those who remain who are authorized aversives, are they

8   required to exhaust when there's a regulation in place that

9   would preclude the use of aversives?

10         MS. MUNKWITZ:  Yes, your Honor.  And, again,

11  because the federal right is not to aversives.  The federal

12  right is to FAPE.  And those CSEs have not made the

13  determination that FAPE cannot be achieved in the absence of

14  aversives.

15         THE COURT:  But they've already ruled they're

16  entitled to aversives as part of their IEP, haven't they?

17         MS. MUNKWITZ:  They put aversives on the IEP at

18  JRC's bidding.  JRC tells the students --

19         THE COURT:  I don't care who's bidding.  The point

20  is there is an IEP in place that authorizes aversives that

21  would be outlawed by this regulation, aren't there?

22         MS. MUNKWITZ:  Some of them, there are.

23         THE COURT:  And therefore, are they required to

24  exhaust before they bring this lawsuit or is that an

25  exception?  That's what I'm pointing to.  Is it an exception

Alleyne v. New York State Ed. Dept, et al.

1    to the exhaustion requirement?

2              MS. MUNKWITZ:  I do not believe it's an exception

3    to the exhaustion because one of the purposes of the

4    exhaustion requirement is to provide the Federal Court with

5    an administrative record.  We don't have an administrative

6    record here.  By not letting them -- or not mandating that

7    they exhaust, they have to come to Federal Court and have a

8    Federal Court say, in the first instance, what is and is not

9    FAPE, and the Federal Court sees fit not to do that.  The

10   Federal Government defers to the State to determine the

11   standards that make up FAPE for each individual student and

12   that is by bagging the requirement and usurping the State's

13   authority to dictate what those standards are.  So, absent a

14   finding from an administrative -- absent an administrative

15   record for this Court to look at, there's really no ability

16   for this Court to determine FAPE as intended by the IDEA.

17             THE COURT:  Do the State hearing officers,

18   presuming an administrative process in which you have

19   findings from State hearing officers, do they have any

20   authority to overturn the regulations that have been passed

21   here?

22             MS. MUNKWITZ:  They do not, your Honor.  But what

23   they have is is the opportunity -- they bring in teachers,

24   they bring in psychologists probably in this case.  They

25   make a record of where the student -- how the student is

Alleyne v. New York State Ed. Dept, et al.

1   doing, what the student needs, what the student is getting,

2   how the student has progressed.  They would take a look at

3   that three-month period of time when the regulations were in

4   effect and they would look at that and say is there a

5   requirement here that this student have aversives in order

6   to achieve FAPE?  They would have that administrative

7   record.  Now, at the end of the day, can students get

8   aversives under the regulations?  Yes.  Can students get

9   aversives under the regulations for the full range of

10  behaviors?  No.  But whether that violates the right to FAPE

11  is something that needs to be determined administratively so

12  this Court has an adequate record.

13          THE COURT:  Thank you.  Is there anything that the

14  plaintiffs want to add to the state of the record insofar as

15  the exhaustion issue is concerned?  I have read and digested

16  the plaintiffs' position in that regard and I understand

17  what you've written, but I want to provide you with the

18  opportunity to say anything for purposes of this record that

19  you care to that's in addition to or different than what

20  you've already said.

21          MR. FLAMMIA:  Your Honor, I would just be

22  repeating our brief, which is that it's the CSE, the

23  Committee on Special Education that decides, in the first

24  instance, what this child needs to get a FAPE, and in the

25  case of these children, it was decided that they needed

Alleyne v. New York State Ed. Dept, et al.

1    aversives in all five of the categories of behaviors:

2    Aggressive, self-injurious, dangerous, obstructive,

3    destructive.   And it was NYSED that pulled out some of those

4    aversives and we quoted some of the IHO decisions where the

5    IHO officer said I would like to put the aversives back in,

6    but I cannot because of the new regulations.   So, there is

7    an element -- it clearly falls under the exception of the

8    exhaustive administrative remedies on futility because

9    there's nothing a parent could accomplish in administrative

10   process to put those aversives back in because it would

11   violate a regulation.   IHO officers have said this kid is

12   hurting, education is hurting because the aversives were

13   taken out by the NYSED and I can't do anything about it.   In

14   fact, it referenced this case and said it's currently being

15   decided by a Federal Court.   There is futility.   It does

16   apply generally to a policy, the regulations that we feel

17   violate the law, which is another exception, and it's also a

18   violation of the IDEA, and services in the IEP are not being

19   provided and prohibited from being provided.

20          So, for all those reasons, Judge, we say

21   exhaustion does not apply.

22          THE COURT:   I'm prepared to rule on the exhaustion

23   issue, and I do so as follows:   As I've said, the defendants

24   contend that all claims in the complaint must be dismissed

25   for failure to exhaust administrative remedies, with the

Alleyne v. New York State Ed. Dept, et al.

1    exception, I point out, of the plaintiffs' sixth claim,

2    which alleges that the regulations are inconsistent with the

3    IDEA.  As the defendants recognize in their papers, the

4    claim falls within the systemic exception to the exhaustion

5    requirement set forth in Coleman, 503 Fed 3d 198, the Second

6    Circuit's 2007 decision.  Administrative remedies for

7    purported violations of the IDEA consist of mediation or an

8    impartial hearing before an independent officer or appeal to

9    a State review officer.  That's the Education Law in New

10   York, 4404(1)(a) and 2.

11          Generally, a party seeking judicial review under

12   the IDEA must have first resorted to these channels or else

13   the Court is deprived of jurisdiction.  That's the Second

14   Circuit's decision in Handberry, 446 F.3d 335.  Failure to

15   exhaust administrative remedies also bars nonIDEA claims

16   where the relief sought under those claims is available

17   under the IDEA.  That's the Circuit's decision in Cave, 514

18   F.3d at 240.  However, exhaustion is not required where the

19   plaintiff demonstrates, one, an agency has failed to provide

20   services specified in the child's individualized educational

21   program, IEP; an agency has abridged or denied a handicapped

22   child's procedural rights, for example, failure to implement

23   required procedures concerning least restrictive environment

24   or convening of meetings; three, an agency has adopted a

25   policy or pursued a practice of general applicability that

Alleyne v. New York State Ed. Dept, et al.

1  is contrary to the law; four, where it would be otherwise

2  futile to use the due process procedures, for example, where

3  the hearing officer lacks the authority to grant the relief

4  sought; or, five, an emergency situation exists.  The Court

5  cites as its authority for the proposition the Congressional

6  Record, 131 Cong.Rec. 21392-93, 1985.  The House Report,

7  Number 296 of the 99th Congress, First Session, 7, 1985.

8  The Supreme Court's decision in Honig, 484 US 305; the

9  Second Circuit's decisions in Taylor, 313 F.3d 768; and

10 Heldman, 962 Fed 2d 148.

11      Here, the plaintiffs did not pursue administrative

12 remedies prior to commencing this action.  Those facts are

13 conceded.  Nonetheless, they clearly satisfy a number of

14 exceptions to the exhaustion requirement.  First, their

15 claims are aimed at wrongdoing that is inherent in the

16 program itself as the regulations themselves are challenged

17 as having resulted in the denial of a FAPE.  That's JS, 386

18 F.3d 107, Second Circuit, 2004.  The Court also cites King,

19 918 Fed Supp 772, a Southern District, 1996 decision.

20      Furthermore, the agency has failed to provide

21 services specified in the student plaintiffs' IEP as the

22 regulations have resulted in the deprivation of aversive

23 interventions set forth in those individual programs.

24 Heldman, 962 Fed 2d at 159, n.11.

25      Finally, it would be futile to require plaintiffs

Alleyne v. New York State Ed. Dept, et al.

1    to pursue their administrative remedies.  As they point out

2    in their papers and argue here, administrative hearing

3    officers have no authority to overturn regulations or

4    establish State educational policy.  Again, I cite Heldman

5    at 159.  As such, the Court declines to dismiss the

6    plaintiffs' IDEA claims and the other claims for failure to

7    exhaust administrative remedies and, instead, turns to the

8    merits of those claims.

9         The Court also points out on the exhaustion issue,

10   it rejects defendants' contention that a CSE must determine

11   aversives are necessary to a FAPE before the exceptions to

12   exhaustion may be relied upon.  Requiring a CSE or

13   administrative finding of the denial of a FAPE before

14   permitting an exception to the exhaustion requirement would

15   make any such exception useless.  In any event, the CSEs'

16   approval of JRC's proposed IEPs with aversives included

17   indicates that the CSEs did feel aversives were necessary to

18   a FAPE, despite the defendants' characterization of this

19   approval as a mere rubber stamp.  Furthermore, numerous IHOs

20   have reinstated aversives to student plaintiffs' IEPs since

21   the Court's preliminary injunction went into effect.

22   Defendants' contention that the plaintiffs must prove the

23   regulations deny them a FAPE before they may rely on the

24   futility exception to exhaustion appears to the Court to put

25   the cart before the horse.

Alleyne v. New York State Ed. Dept, et al.

1          Let me turn to the IDEA claims.  As a general

2   matter, the State defendants argue that the IDEA claims must

3   be dismissed because the emergency regulations are

4   consistent with the IDEA and did not deprive the student

5   plaintiffs of a FAPE.  That's the general summary of the

6   argument.  There are two main components to the argument.

7   The first is that the student progress reports indicate that

8   they made, quote, academic, closed quote, progress, while

9   the regulations were in place.  And two, the regulations

10  represent an informed educational policy choice between two

11  conflicting schools of thought about the use of aversives

12  which is entitled to deference by this Court.

13          It appears to me, given my review of the papers,

14  that as to the first aspect of that argument, namely the

15  student progress reports indicate they made academic

16  progress, the State appears to rest its argument on the view

17  that behavioral progress is irrelevant to a FAPE.  Am I

18  right?

19          MS. MUNKWITZ:  No, your Honor.  Behavioral

20  progress can be relevant to FAPE, but it is not, in and of

21  itself, make a FAPE.  And there's several cases cited in my

22  brief where children had emotional issues and the emotional

23  issues were not being dealt with in the way the parent

24  wanted, but the child was making academic progress.  And at

25  the end of the day, the IDEA is in place to open the door

Alleyne v. New York State Ed. Dept, et al.

1   for education and if the student is getting an education, he

2   or she may have other issues, may have medical issues, may

3   have behavioral issues, may have issues with other

4   disabilities, but as long as they are making progress

5   academically, the IDEA does not put the -- does not require

6   services.  Related services have to be read together with

7   education.  Related services to achieve educational benefit.

8   And if the students are achieving educational benefit, then

9   the related services are satisfactory.

10         THE COURT:  Let me just ferret out what you're

11  tellin' me to make sure I absolutely understood it.  I

12  thought your citation in your papers to the Circuit's JD

13  opinion, which interpreted the Vermont regulations, was

14  designed to suggest that -- and I am just gonna parrot what

15  you just told me and then you tell me if I'm wrong in

16  parroting it incorrectly, because I want to make sure what

17  the State's position is here, 'cause I know what mine is.

18  And my question is do we have a bone of contention here or

19  don't we.

20         Are ya telling me that if you look at any one of

21  these plaintiffs and you fairly evaluate their academic

22  progress, whatever that means, to "fairly evaluate," and I

23  know you're gonna get differing views depending on who you

24  ask, but I suppose since the litigation is pending before

25  me, ultimately that's a question for me, but let's presume

Alleyne v. New York State Ed. Dept, et al.

1    that I find that the record reflects that a plaintiff has

2    made academic progress, but I also find that there is ample

3    evidence that there has been behavioral regression.  Is it

4    the State's position that then the behavioral regression is

5    irrelevant to a FAPE as long as the record demonstrates

6    academic progress?

7              MS. MUNKWITZ:  Not irrelevant, your Honor, but

8    it's not controlling.  The controlling question under the

9    IDEA is the educational progress.  And the IDEA is not in

10   place to ensure that students with psychological problems or

11   emotional problems -- it's not in place to provide those

12   students with care solely for that psychological problem.

13   It is in place to ensure that that student's disability does

14   not get in the way of his education.  And in order for the

15   IDEA to be triggered, there needs to be the education

16   component.  Related services can't be read -- it can't be

17   read in its own right.  By the statute's wording, it's

18   related services to benefit education.

19             So, no, it is not irrelevant, your Honor, but I do

20   not believe that it is at all controlling.  What controls is

21   the academic progress.

22             THE COURT:  But aren't we mincing words there?

23   Maybe not, I don't know.  I still don't know what you just

24   told me.  It's circuitous logic.  Let me try it one

25   different way.

Alleyne v. New York State Ed. Dept, et al.

1          If the record clearly demonstrates behavioral

2    regression, can that constitute the basis for the denial of

3    a FAPE, in the State's view?

4          MS. MUNKWITZ:  In the absence of academic

5    regression, no.

6          THE COURT:  All right.  So, then, the inverse of

7    that, which is the way I think I parsed it the first time,

8    is that if there's academic progress, then behavioral

9    regression cannot constitute the denial of a FAPE in the

10   State's view?

11         MS. MUNKWITZ:  Correct.

12         THE COURT:  And what's your authority for that?

13         MS. MUNKWITZ:  I've cited a couple of cases, I

14   believe, in the reply brief.  One of them being JD versus

15   Pawlet School District, 224 F.3d 60.

16         THE COURT:  Wasn't the Circuit, in JD,

17   interpreting Vermont regulations that said as much?  The

18   Vermont regulations said that paramount was the academic

19   progress and behavioral aspects had no play in the

20   educational component.  Those were the regulations that were

21   before the Circuit in JD, were they not?

22         MS. MUNKWITZ:  They were, your Honor.

23         THE COURT:  And those regulations are now defunct,

24   Vermont has rescinded them.

25         MS. MUNKWITZ:  Okay.  I didn't hear that, your

Alleyne v. New York State Ed. Dept, et al.

1    Honor.

2            THE COURT:  I am not askin' ya to accede to a

3    proposition you're not at all certain of.  But let me take

4    you back to New York State.  Does New York State have any

5    such regulation in place that supports your view of what the

6    FAPE requires?  Does New York say, in any regulation you can

7    point me to, that behavioral aspects of an education are

8    irrelevant to a FAPE?

9            MS. MUNKWITZ:  No, your Honor.  But what the --

10   what New York says and what the IDEA says is supportive

11   services -- the term "related services" means transportation

12   and such developmental, corrective and other supportive

13   services as may be required to assist a child with a

14   disability to benefit from a special education.  And it

15   boils down to benefitting from a special education.  There

16   are cases out there where students -- blind student wants a

17   specific accommodation, but she's able to perform in the

18   classroom, she doesn't get that accommodation.  Even though

19   it would help her, even though it would benefit her, what we

20   look at at the end of the day is is the child academically

21   performing.  And in each of these cases, the plaintiffs are

22   academically performing.

23           THE COURT:  Of course, we are talking about

24   disabilities and behaviors that are different than eyesight.

25   We are talking about stabbing other people in the eye, we

Alleyne v. New York State Ed. Dept, et al.

1  are talking about substantial difficulties in one or more of

2  these students, are we not?

3       MS. MUNKWITZ:  There is one child who -- I haven't

4  seen anything demonstrating it in the record, but there was

5  one child who, apparently, in another school, stabbed a

6  child with a pencil.  There are isolated instances of

7  violence and, your Honor, these regulations will not affect

8  that aspect of those children's education or those

9  children's psychological services.  When these children

10  engage in aggressive behavior, they will have that

11  opportunity.

12       THE COURT:  I am not arguing it from that

13  standpoint, what the regulations permit or what they don't.

14  What I'm looking at are what are the components of a FAPE,

15  free appropriate public education, under the IDEA.  I know

16  your view is, as you've just articulated it, that the IDEA

17  looks to academic progress, and I'm suggesting perhaps it

18  looks to two issues:  Academic progress and behavioral

19  performance.  That may be a part of a free appropriate

20  public education, so I am just taking a contrary view.

21       MS. MUNKWITZ:  I don't dispute that it can be a

22  component, your Honor.  I fully accept the fact that

23  behavioral problems absolutely can be relevant to the

24  question of FAPE.  But the determination as to whether a

25  FAPE is warranted, according to the IDEA, needs to be

Alleyne v. New York State Ed. Dept, et al.

1    determined by the State educational authority and, in this

2    case, the State educational authority is New York State

3    Education Department.  And New York State Education

4    Department, like many other education departments in this

5    country, have determined that pain is not needed to educate

6    a child and these are standards that the IDEA provides New

7    York State with the authority to determine.

8           THE COURT:  I don't want to be obtuse and too

9    nuance on this issue, and I don't want to jump ahead of

10   myself either in the way I want to progress to the issues

11   raised in the motion, but you are at the heart of something

12   I discern from an overall perspective in terms of the

13   State's motion.  Those are two separate, discrete issues, in

14   my mind, that you just pointed to.  In other words, if you

15   look at the standard the Court is to apply in the normal

16   IDEA context, that that's the standard I read, it's

17   different than the summary judgment motion standard

18   incorporated in the Court Exhibit.  There's no question, in

19   my mind, that an issue that needs resolution is who defines

20   FAPE, what delegation of authority has been afforded the

21   states by Congress in the IDEA and what overall impact that

22   has on the question before us, which is the use of

23   aversives.  That's one issue.

24          But I'm raising a more nuance issue, and that's

25   this:  That in resolving that issue, which is the

Alleyne v. New York State Ed. Dept, et al.

1   penultimate issue in this case, has been since the first

2   conference I sat down with everybody and talked about

3   getting it before me in six months.  How idiotic I was.

4          MS. MUNKWITZ:  So long ago, I don't remember, your

5   Honor.

6          THE COURT:  Thank you, I appreciate your

7   graciousness in that regard.  You could have said you were

8   stupid, Judge, and I would have accepted the admonition.

9   While that's the penultimate issue, to me, your papers are

10  spread with the notion that in evaluating that, all I'm

11  authorized to look at is academic progress.  It's -- I'm not

12  sure I see it that way, nor am I certain, like I said, other

13  than the Circuit's JD decision, which interpreted, in my

14  view, Vermont regulations that are now defunct, there are

15  clearly other circuits that have interpreted the IDEA to say

16  that a free appropriate public education has at least two

17  components:  Academic progress and behavioral aspects of a

18  child's education, in my view.

19          I don't remember what you told me.  Do you agree

20  that New York State has no regulation that says behavioral

21  progress is irrelevant to a FAPE?

22          MS. MUNKWITZ:  No, I don't, your Honor.

23          THE COURT:  You do not agree with that?

24          MS. MUNKWITZ:  I am not aware of any New York

25  State regulation that says that it is irrelevant.

Alleyne v. New York State Ed. Dept, et al.

1           THE COURT:   Okay.

2           MS. MUNKWITZ:   I accept the fact that it is

3     relevant but, again, it's not the controlling.   Academic

4     progress would be the controlling issue, the controlling

5     inquiry.

6           THE COURT:   All right.   Thank you.   What do the

7     plaintiffs want to tell me about this issue, beyond, again,

8     anything you've already told me?   I want to give you the

9     opportunity to respond to what you're hearing here and add

10    anything you care to to the record.

11          MR. FLAMMIA:   Your Honor, very briefly.   This

12    argument is another example why these regulations are

13    illegal and so harmful to students.   They treat students as

14    a group, as opposed to looking at their individual needs

15    which is an absolute requirement of the IDEA, black letter

16    law.   You want to know when a child needs for FAPE.   You

17    look at the IEP and you will see, in many cases,

18    particularly in the case of our clients at JRC, you will see

19    a spectrum of services.   Education, behavioral, physical

20    therapy, speech therapy, and it is the combination of all of

21    those things, based upon an individual analysis of what that

22    child needs, to get access to education, that is the FAPE

23    and that is the law.

24          And it's not as the defense has clearly argued in

25    their brief that behavioral doesn't matter, it's all about

Alleyne v. New York State Ed. Dept, et al.

1   grades, and that just isn't the case for these severely

2   disabled individuals.  There are goals in these IEPs and

3   it's just as important for the special education of a child

4   as to how they do with math, English or spelling.  You only

5   get your FAPE if you get access to all of those services and

6   if you take out any one of those services, for instance, if

7   these regulations outlawed physical therapy, we'd have the

8   same problem we have here today.  It's needed to get access

9   to education.  If you have someone like we do with one of

10  the representative plaintiffs here that punched her eyes so

11  many times she caused herself to become blind, that has to

12  be dealt with.  Or if someone is ripping apart a classroom,

13  you have to deal with that behavior, and it opens the door

14  to special education.

15          Thank you, your Honor.

16          THE COURT:  Well, as I've already suggested, the

17  resolution of this is almost a sub issue.  In other words,

18  my resolution of the dispute about what constitutes the

19  components of a FAPE, while important to me and important to

20  the penultimate issue here, is not going to resolve any of

21  these claims.  But that's not gonna prevent me from taking

22  the opportunity now as opposed to having to write on it

23  later as to how I view this issue about the components of

24  what constitutes a FAPE and, therefore, I offer the parties

25  the following:

Alleyne v. New York State Ed. Dept, et al.

1   In essence, the defendants assert that each of the

2 representative student plaintiffs' progress reports indicate

3 academic progress was made while the regulations were in

4 force at JRC.  They contend that the regulations represent

5 an informed educational policy choice between two

6 conflicting schools of thought on the use of aversives and

7 that such choice is entitled to deference from the Court.

8 That's the second component of what I started with, but I'm

9 focused on the first component.

10   The main problem with the defendants' argument is

11 that they assert behavioral progress is not -- I don't want

12 to say irrelevant, which is the way I wrote it, but I'm not

13 sure how to characterize it.  I will simply leave the

14 State's characterization as it is, that it's not as critical

15 to a FAPE as the educational component.  It's the Court's

16 view that this argument is advanced in order to trivialize

17 the student plaintiffs' marked behavioral regression when

18 off aversives.  As I've already suggested, the primary

19 Circuit case supporting the defendants' proposition applies

20 now defunct Vermont regulations, which are obviously

21 inapplicable here.  As I said, that's the Circuits' JD

22 decision, at 224 F.3d 60.  Contrary to JD, other Circuits

23 interpreting other States' regulations have indicated that

24 behavioral interventions are a part of FAPE.  See, for

25 example, Mr. I, 480 F.3d 1, First Circuit, 2007, stating the

Alleyne v. New York State Ed. Dept, et al.

1    IDEA entitles qualifying children to services that target

2    all of their special needs, whether they be academic,

3    physical, emotional or social.  Alex R, 375 F.3d 603, the

4    Second Circuit's decision.  An IEP that fails to address

5    disability-related actions of violence and disruption in the

6    classroom is not reasonably calculated to enable that child

7    to receive educational benefits.  Weixel, 287 F.3d 138, a

8    Second Circuit, 2002 decision.  The scope of IDEA's concerns

9    is not limited to students with learning disabilities, but

10   instead applies broadly to students who need special

11   education and related services.

12           Additionally, both the United States and the New

13   York Education Departments have opined that academic

14   achievement is not the sole measure of an emotionally

15   disturbed student's qualification for special education and

16   related services.  See Application of a Student Suspected of

17   Having a Disability, Appeal Number 08-100 at 17-18, which is

18   available at 188 PLI/NY 349.  See also Letter to Clarke,

19   48 IDELR 77, March 8, 2007, which is available at

20   www.ed.gov/policy/speced/guid/idea/letters/2007, for the

21   sake of brevity, et seq.  As such, the Court does not adopt

22   what it perceives to be the defendants' contention that the

23   regulations do not deny the student plaintiffs a FAPE

24   regardless of their behavioral regression.  In other words,

25   the Court sees the issue of what constitutes a FAPE as a

Alleyne v. New York State Ed. Dept, et al.

1    joinder of those two issues.  Again, I decline, at this

2    point, to rule on the penultimate question, however, for

3    which that is a component but I do next want to turn to the

4    Rehabilitation Act claim.  Again, progressing as I can to

5    dispose of those issues that I can.

6            The State argues that Section 504 of the

7    Rehabilitation Act does not permit personal capacity suits

8    as, therefore, the Rehabilitation Act claim must be

9    dismissed as against Commissioner Mills.  I have read the

10   papers, read the complaint, I have read all of those things

11   and I am led to ask the burning question:  Does the

12   complaint allege a personal capacity suit against Mr. Mills?

13           MR. FLAMMIA:  It does not, your Honor.

14           THE COURT:  That takes care of that issue.  In

15   other words, to the extent one might read it as such, the

16   plaintiffs have resolved the issue that it does not.  In any

17   event, I would dismiss it if it did.

18           Let me then turn to the plaintiffs on the

19   Rehabilitation Act claim and pose some questions to the

20   plaintiffs in this regard.  I will leave Miss Munkwitz alone

21   for a bit and turn to this side.

22           MS. MUNKWITZ:  I appreciate that, Judge.

23           THE COURT:  My questions are this:  I think you

24   concede, given my review of the papers, that in order to

25   maintain a Rehabilitation Act claim, you have to demonstrate

Alleyne v. New York State Ed. Dept, et al.

1  something more than simply the denial of a FAPE.  You have

2  to demonstrate bad faith, which I think you recognize

3  because I think your arguments in that regard are that the

4  State accepted allegations of mistreatment by JRC as a fact,

5  in 2006, without conducting an investigation.  But then you

6  do say they did conduct an investigation, but the plaintiffs

7  were unhappy with the investigation that was conducted and

8  didn't have the requisite experts in place to conduct that

9  investigation, et cetera, et cetera.  I am paraphrasing your

10  paper response.

11       But my question is:  You concede, do you not, that

12  a Rehabilitation Act claim requires more than just the

13  denial of a FAPE?  If all we had were the denial of a FAPE,

14  that wouldn't constitute a claim under the Rehabilitation

15  Act, would it?

16       MR. FLAMMIA:  Yes, your Honor, that is correct.

17  And I would focus the Court's attention on gross

18  misjudgment.  It is one of the severest acts of government

19  gross misconduct to ban a treatment or restrict it so much

20  that it's not effective without ever having looked at the

21  individual needs of the people that are receiving it.  You

22  could ban chemotherapy, you could ban physical -- anything,

23  and say you're being reasonable if you close your eyes to

24  the only group of people that need it.

25       The people -- I talked about student SS, who is a

Alleyne v. New York State Ed. Dept, et al.

1    representative plaintiff, who punched herself in the eye so

2    many times she made herself blind.  There was nothing New

3    York could do for her until she went to JRC and was on

4    aversives, nothing.

5           Another representative plaintiff student, JR; she

6    came to JRC from New York on so much antipsychotic

7    medication that the JRC psychologist had to take her to a

8    cardiologist because her levels were so high she was at risk

9    for a heart attack at any moment.  Seven-year-old girl.

10   That's the only solution that New York has to treat this

11   level of severe behavioral disorders.

12          Now, those two young girls are doing fantastic

13   right now, Judge.  They're -- it took a long time,

14   particularly with JR, who was on that level of antipsychotic

15   medication, and I would see this, your Honor, when I would

16   visit the school, long before I knew any of this would

17   happen.  They would walk her around, her eyes closed, a

18   little seven-year-old girl on so much medication they could

19   barely -- they had to hold her up.  It is the ultimate act

20   of gross misjudgment to ban a treatment, or restrict a

21   treatment without ever looking at the people that depend on

22   this, and see why they're on it, why they need it.  They

23   never looked at it.  The individual needs of these kids were

24   never studied.  The parents were never talked to, clinicians

25   never talked to.

Alleyne v. New York State Ed. Dept, et al.

1          The things government can do and has done over the

2    course of history by turning a blind eye to a group of

3    people, a small, fragile, unprotected group of people,

4    should never be condoned, and your Honor, I believe is

5    exactly the kind of claim that at least deserves a trial

6    under the Rehabilitation Act.

7          Thank you, your Honor.

8          THE COURT:  What would the State like to add to

9    the record of these proceedings?

10         MS. MUNKWITZ:  Just that it's certainly an

11   impassioned plea on behalf of the children.  Mr. Flammia

12   doesn't cite to any authority that requires State agencies

13   to speak to any and all individuals who would be affected by

14   this.  For example, right now the FDA is considering banning

15   the use of acetaminophen with other products.  There's

16   probably millions of people in this country who rely on

17   those products every day for severe pain.  I know of no

18   requirement and it would be just impossible for the FDA to

19   speak to those people prior to implementing any regulation,

20   so I would just say that absent some authority that requires

21   State governments to speak to individuals before they act,

22   there is no gross misjudgment here.

23         MR. FLAMMIA:  Your Honor, if I may be heard.  In

24   that case, there was at least some evidence someone was

25   harmed by the drug.  In this case, there's none.  The

Alleyne v. New York State Ed. Dept, et al.

1  officials were asked, in deposition, "Did you ever find any

2  harm from the use of these aversives"?   "No, none."

3          Thank you, your Honor.

4          THE COURT:   I understand the competing arguments

5  here and I don't resolve the Rehabilitation Act.   In other

6  words, I decline to do that.   But I'm happy to have the

7  parties ascension to the fact that it does require something

8  different than the denial of FAPE.   And I understand the

9  issue that has to be decided in that regard and I decline to

10  rule on the dimensions of the claim further, in light of the

11  arguments of the parties.

12          Let me just point out, it's clear -- let me throw

13  this out, for what it's worth.   The Court clearly

14  understands the divergent opinion in the country about the

15  use of aversives.   I don't think the plaintiffs would

16  contest that point.   While I agree that I understand the

17  importance of the opinion to the plaintiffs in this case,

18  the use of aversives is not an uncontroversial topic

19  certainly.

20          Let me turn to the constitutional claims.   The

21  State argues in it's motion that the claims are barred by

22  sovereign immunity and that the claims, in any event, have

23  no merit, so there's a substantive argument as to each of

24  the constitutional claims, but then there are some overall

25  arguments to the claims in general.   So, let me begin with

Alleyne v. New York State Ed. Dept, et al.

1   the sovereign immunity claims.

2           And let me ask the plaintiffs:  Isn't it clear

3   that sovereign immunity bars State constitutional claims

4   against State employees in their official capacity,

5   regardless of the relief that's sought in those claims?  How

6   do the plaintiffs respond to that?

7           MR. FLAMMIA:  In their official capacity, your

8   Honor?

9           THE COURT:  Right.

10          MR. FLAMMIA:  Well, we would simply argue that to

11  the extent they're acting on behalf of the State in

12  imposing, condoning illegal conduct that's affecting the

13  plaintiffs, certainly that's how the State acts and those

14  are the people whose actions are the subject of our claims.

15          THE COURT:  And aren't they entitled to sovereign

16  immunity under governing law?  In other words, you're

17  precluded from suing on State constitutional claims.

18          MR. FLAMMIA:  On State constitutional claims.

19          THE COURT:  Right.

20          MR. FLAMMIA:  Yes, your Honor.

21          THE COURT:  Let me ask ya again in that regard, I

22  see a repartee there in the motion and the response as to

23  how we characterize your federal claims, but there is no

24  vehicle to bring federal constitutional claims, is there,

25  other than 1983?

Alleyne v. New York State Ed. Dept, et al.

1          MR. FLAMMIA:  Your Honor, I believe we cited the

2   cases in our brief that direct actions under the

3   constitution are recognizable, that, you know, there's

4   limits maybe to what you -- you can't get monetary damages

5   certainly, but conduct by a State official that's violative

6   of the federal constitution is subject to redress in this

7   court.

8          THE COURT:  Naturally, the State recognizes,

9   doesn't it, that as to this issue of sovereign immunity, it

10  would not bar suit against Mills in his official capacity to

11  the extent plaintiffs seek prospective injunctive and

12  declaratory relief.  It would bar suit against the State

13  Education Department and the other defendant.  Does the

14  State recognize that?

15         MS. MUNKWITZ:  Yes, your Honor.

16         THE COURT:  All right.  All right.  The

17  plaintiffs, on the substantive due process claim, argue that

18  the right to a public education is fundamental and,

19  therefore, strict scrutiny is applied to the regulations

20  that are at issue here.  This is in their substantive due

21  process claim.  Isn't the law exactly the opposite, that

22  while public education is a right, it's not a fundamental

23  right that would subject the regulations to strict scrutiny?

24  Hasn't the Supreme Court and this Circuit ruled that public

25  education is not a fundamental right?

Alleyne v. New York State Ed. Dept, et al.

1          MR. FLAMMIA:  Your Honor, our argument is that if

2     these regulations are allowed to stay in place, then most of

3     these plaintiffs are gonna be back on drugs, and there is a

4     liberty interest involved in being forced onto drugs.  Now,

5     you could say, well, they're not being forced.  But they're

6     children, they can't consent.  And this is an unusual

7     circumstance, your Honor, where we believe we can prove in

8     trial that if they lose the right to these aversives, they

9     will be back on massive dosages of antipsychotic medication.

10    There is argument there that NYSED says something about

11    treatment that causes pain.  Can you imagine the pain of a

12    child punching her eye until she's blind or the pain that

13    medication causes to poison, to rot their insides away?  I

14    can't think of a greater liberty interest in this case and I

15    can't think of a more needy group of individuals than these

16    children not to be forced to do this.  And that's exactly

17    what's gonna happen; they will be on drugs, lots of 'em.

18          THE COURT:  But that's not the essence of this

19    lawsuit.  This lawsuit has to do with whether the State is

20    authorized to pass the regulations under the IDEA.  And the

21    ramifications of that, as you've just described them, while

22    cogent, poignant, something I well understand, as I've said

23    to the parties all along in this litigation, it's that very

24    issue that caused me to issue the preliminary injunction in

25    the first place, to protect at least these named plaintiffs

Alleyne v. New York State Ed. Dept, et al.

1    until this litigation was resolved in a legal manner, those

2    are all beyond the scope of what you sued for here.  Those

3    are not the fundamental rights or the fundamental property

4    interests that are at the heart of your complaint.  They

5    aren't even in your complaint.

6           What's in your complaint is the denial of a free

7    appropriate public education.  And if I were to find the

8    State -- to go back to the penultimate issue -- is tasked

9    with the responsibility of determining the parameters of

10   that, in terms of the use of aversives, then that is the

11   death knell of any substantive due process claim and, more

12   than likely, procedural due process claim, and I'm not sure

13   what the basis of the equal protection claim is in the first

14   place.  And if those claims go out -- there is a reason I

15   started where I did and I might as well take it up at this

16   point.  The way in which this issue has been posed to me by

17   motion for summary judgment, where I'm not being called upon

18   to evaluate that penultimate issue, under the standard that

19   poses that question in a routine way under the IDEA, in

20   other words where a Court is called upon to make that

21   decision, so with that in mind, let me play "what if" with

22   the parties, and you'll understand why I asked the question

23   I did at the outset.

24          As is clear at this juncture, certain issues are

25   going to -- certain issues are gone at this point, I ruled

Alleyne v. New York State Ed. Dept, et al.

1   on 'em.  Certain issues are certainly giving you a flavor of

2   how I feel about 'em.  But if -- when, at the end of the

3   day, all is said and done, if the constitutional claims are

4   gone and the only claims that are left are those that are

5   under the IDEA, is there a jury trial in this case?  What's

6   the next step in this process?  In other words, what more am

7   I gonna have?  An evidentiary hearing?  Am I gonna have --

8   are you even entitled to a jury trial, if the only claims

9   that survive are those as to whether or not these student

10  plaintiffs have been denied a FAPE?  Do you get a jury trial

11  on that?

12          MR. FLAMMIA:  Your Honor, we haven't asked for

13  one.

14          THE COURT:  Do you get any kind of trial on that?

15          MR. FLAMMIA:  Well, we would agree, your Honor,

16  that the facts are so overwhelming in terms of the denial of

17  FAPE and the violation of the IDEA by eliminating a form of

18  treatment that's accepted in the peer review journals, even

19  NYSED's own expert thinks aversives are necessary.  Yeah, we

20  believe the evidence is so overwhelming that these

21  regulations cannot be allowed to stand in the face of the

22  IDEA.

23          THE COURT:  What more would you submit to me in

24  some subsequent proceeding beyond what you've already

25  submitted?  Deposition transcripts?  Affidavits, expert

Alleyne v. New York State Ed. Dept, et al.

1   opinions, et cetera, et cetera?  What else is there that you

2   would submit in support of your argument that the students

3   here were denied a FAPE that you've not already submitted?

4           MR. FLAMMIA:  Well, your Honor, we have certainly

5   given your Honor substantial evidence.  You know, 40 pages,

6   you can't fit it all in.  Your Honor could hear from these

7   parents, could sit next to you and tell your Honor the story

8   of their child and how New York left them with nothing, in a

9   psychiatric hospital, getting no education, drooling all

10  over themselves, massively overweight from medication,

11  getting absolutely no education, and then how they placed

12  their child at JRC and how the aversives completely changed

13  their child's lives from a life of nothing to a life of

14  everything, hope and potential, and give your Honor more of

15  the records from these treatment facilities, the Anderson

16  School, one of the best schools and does great work, no

17  doubt about it, and Malmar (phonetic) and other reports that

18  say we can't help this kid, he needs aversives, needs

19  structure.  There is a great deal of other evidence of

20  similar things we have already given your Honor.  And more

21  of it is about these experts that were used by the

22  defendants to perpetrate this scheme to stop aversives.  How

23  little they know about aversives, how little they

24  understand, how little they did when they came to JRC.  All

25  the things they didn't look at.  There's a mountain of

Alleyne v. New York State Ed. Dept, et al.

1    evidence, your Honor, about what was done here, how it was

2    done and how it was done to these children.  And that's what

3    we would present to you.

4            MS. MUNKWITZ:  Your Honor, may I be heard on that?

5            THE COURT:  You may, but just a second.  Is it

6    your position, then, even if the constitutional claims

7    should survive that you have waived a jury trial here?

8            MR. FLAMMIA:  Yes.  We have not asked for a jury

9    trial.

10           THE COURT:  I could not remember whether a jury

11   trial was demanded.

12           MR. FLAMMIA:  It was not, your Honor.

13           THE COURT:  So everybody has decided to leave this

14   totally in the Second Circuit and the Supreme Court.

15   Please, be heard.

16           MS. MUNKWITZ:  Your Honor, on the summary judgment

17   motion, a nonmovant has the obligation to come forward to

18   bear the proof.  And anything that the plaintiffs had to

19   support their claim should be before this Court right now.

20   Mr. Flammia talks about the experts that came out.

21   That's -- has nothing to do with this case, has to do with

22   whether these students are achieving FAPE and has nothing to

23   do with the State's authority to implement these regulations

24   to begin with.  If there is evidence before this Court that

25   these students are being denied a FAPE, or if the plaintiffs

Alleyne v. New York State Ed. Dept, et al.

1    have evidence that these plaintiffs have been denied FAPE,

2    it should be before your Honor right now.  Summary judgment

3    is to dispose of these claims and not maybe we will have

4    more evidence afterwards.

5            THE COURT:  It is.  But also let me say where the

6    clock ticks one way, it ticks the other as well.

7            MS. MUNKWITZ:  I understand.

8            THE COURT:  The State is also limited to the

9    arguments it's made, having elected to proceed by the

10   summary judgment standard and having argued that the only

11   thing relevant to a FAPE is academic progress.  The minute I

12   rule against the State on that issue, I deny their summary

13   judgment motion, and then it comes right back to the

14   question I ask:  Where does that leave us?

15           MS. MUNKWITZ:  I understand, your Honor.

16           THE COURT:  If this case is gonna survive in some

17   fashion post-decision by me, then what then do I do?  That's

18   what I'm asking the parties.  What do you say?  Mr. Flammia

19   says that perhaps he would produce a student for an

20   evidentiary hearing.  I'm not gonna hold anybody to this,

21   because you did not come here anticipating this was a

22   question I was gonna ask ya.

23           MS. MUNKWITZ:  No.

24           THE COURT:  I'm throwing this out so that it will

25   give you an opportunity to think about it and discuss it

Alleyne v. New York State Ed. Dept, et al.

1    with the clients once these proceedings are over.

2           MS. MUNKWITZ:  I appreciate that, your Honor.

3           THE COURT:  But what's your knee-jerk view on that

4    issue?  If something remains here because I deny, at least

5    in part, the motion for summary judgment, then what comes

6    next?  What do you think comes next?

7           MS. MUNKWITZ:  Your Honor, I actually asked myself

8    that question this morning, I asked myself that question --

9           THE COURT:  You were hoping nothing comes next.

10          MS. MUNKWITZ:  -- on my way down here, and that's

11   what I did, I put the eggs in that basket and said I can't

12   go any further.  Your Honor, there would also need to be

13   additional discovery in this matter because the only -- our

14   discovery was limited to ten plaintiffs, so I have -- the

15   State has not had the opportunity to depose any of these

16   parents and I think five of the plaintiffs are no longer --

17   or four of the plaintiffs, the ones we chose, are no longer

18   at JRC or are not under the age of 21.  If we go forward,

19   the defendants are at a disadvantage with respect to we

20   don't have -- we haven't had access to the records of any of

21   these children, we have had no discovery based on those

22   children whatsoever, the other 35.

23          THE COURT:  Um-hum.  Well, maybe, maybe not.  I am

24   not asking the parties to finally resolve that issue, in any

25   event.  I have simply thrown it out for your consideration,

Alleyne v. New York State Ed. Dept, et al.

1   'cause I thought about it.

2          What else would either party want to share with me

3   about the motion that's pending that I have not discussed at

4   this juncture?  Let me say in that regard as to the issues I

5   have not raised or ruled on, it is my intention to issue a

6   written decision.  To the extent I have already resolved

7   some issues, I will incorporate a summary of those in that

8   decision.  In other words, the docket and record of these

9   proceedings will suffice in that regard.  That's what my

10  intention is.  I suppose once I have done that, I will have

11  narrowed the issues for the parties, at least with some

12  degree of a decision, and that will facilitate a discussion

13  at that point as to what comes next, frankly, which is

14  something for you to digest and think about.  And I am not

15  resolving this.  I steadfastly said I wasn't gonna resolve

16  the penultimate question here, but, in my view, that

17  penultimate question is:  Who has the authority to define

18  the breadth and scope of a FAPE, and what deference do I

19  need to give to he or it that has that authority?  There is

20  a fundamental disagreement here between the parties in this

21  regard.  It is the plaintiffs' view that absent some

22  consideration of individuals, the Court cannot resolve what

23  constitutes a FAPE or doesn't.  It is the defendants' view

24  that they have been delegated the authority under the IDEA

25  and Congress to at least, in part, define what constitutes a

Alleyne v. New York State Ed. Dept, et al.

1   FAPE and what doesn't.  And then, of course, you have the

2   issue of aversives that play into that view.

3           Ultimately, I am gonna have to rule on that one

4   way or another and I have every intention of doin' that and

5   then we'll move on from there.  I've covered what I want to

6   cover.  What more would any of you like to cover, or have

7   you had enough?

8           MR. FLAMMIA:  I would just like to add one thing,

9   your Honor, on the issue of FAPE.  Obviously, we argue that

10  it is not completely up to the State to decide FAPE, and if

11  it were, we wouldn't have a federal law.  State immunity and

12  everything your Honor is talking about today, to say -- take

13  the position that it's completely up to the State as to what

14  a FAPE is, the IDEA disappears, and that's not what Congress

15  intended.

16          THE COURT:  Right.  And I spoke too broadly in

17  that regard, Mr. Flammia.  That's the danger of me sittin'

18  up here mouthing off.  You can take the words I said and

19  construe 'em more broadly than I intended, and I did not

20  intend to suggest that Congress had no role here.  There is

21  no question that Congress itself has said that each disabled

22  child in this arena is entitled to a free appropriate public

23  education.  And while Congress has offered some guidance as

24  to what constitutes a free appropriate public education, and

25  as various courts around the country have weighed in on that

Alleyne v. New York State Ed. Dept, et al.

1    issue as to, quote, unquote, what Congress obviously have

2    intended, as judges avoid best they can policy

3    determinations in that regard, where this ultimately flows

4    down to is not that Congress doesn't maintain the ultimate

5    control, they do.  The question is how much of that

6    definition have they delegated?  How does that delegation or

7    that ultimate definition come into play when you funnel it

8    down through and come to the issues of aversives?  Does a

9    State, employing whatever authority they have under the

10   IDEA, have the right to regulate aversives?  That's really

11   the issue here.  And ultimately, it is the penultimate

12   question that I must resolve.  That's a different way of

13   sayin' what I intended to say before, but I did not mean to

14   suggest that Congress had retained no play in that and that

15   it's incumbent upon me, as the interpreter of what Congress

16   intended, to do the best I can with that issue.

17          Anything further?

18          MR. FLAMMIA:  Certainly, it's with NYSED's

19   authority to change the regs.  I mean, you look at some of

20   the decisions of these IHO officers saying please, help me,

21   I've got this kid who's regressing, you know, this

22   regulation isn't working.

23          THE COURT:  Hope springs eternal, but...  That's

24   all I can do is shake my head.  Anything further you would

25   like to add?

Alleyne v. New York State Ed. Dept, et al.

1            MS. MUNKWITZ:  Nothing further, your Honor.  Thank

2    you.

3            THE COURT:  Thank you.

4                    (This matter adjourned at 2:14 PM.)

5                    - - - - -

6

7            C E R T I F I C A T I O N

8

9

10           I, THERESA J. CASAL, RPR, CRR, Official Court

11   Reporter in and for the United States District Court,

12   Northern District of New York, do hereby certify that I

13   attended at the time and place set forth in the heading

14   hereof; that I did make a stenographic record of the

15   proceedings held in this matter and caused the same to be

16   transcribed; that the foregoing is a true and correct

17   transcript of the same and whole thereof.

18

19

20

21           _____

22           THERESA J. CASAL, RPR, CRR

23           USDC Court Reporter - NDNY

24

25   DATED:


                THERESA J. CASAL, RPR, CRR
             UNITED STATES DISTRICT COURT - NDNY