**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JEANETTE ALLEYNE,** et al.,

                    **Plaintiffs,**            **1:06-cv-994**
                                          **(GLS)**

     **v.**

**NEW YORK STATE EDUCATION**
**DEPARTMENT; RICHARD P. MILLS,** in
his capacity as Commissioner of
Education of the New York State
Education Department; **NEW YORK**
**STATE BOARD OF REGENTS,**

                    **Defendants.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **FOR THE PLAINTIFFS:** | |
| Eckert, Seamans Law Firm | MICHAEL P. FLAMMIA, ESQ. |
| Two International Place | KENNETH Y. LEE, ESQ. |
| 16th Floor | DEVORAH A. LEVINE, ESQ. |
| Boston, MA 02110 | |
| | |
| O'Connell, Aronowitz Law Firm | PETER DANZIGER, ESQ. |
| 54 State Street | JEFFREY J. SHERRIN, ESQ. |
| 9th Floor | |
| Albany, NY 12207-2501 | |
| | |
| Office of Meredith H. Savitt | MEREDITH H. SAVITT, ESQ. |
| 636 Delaware Avenue | |
| Delmar, NY 12054 | |

**FOR THE DEFENDANTS:**

HON. ANDREW M. CUOMO                 KELLY L. MUNKWITZ
New York State Attorney General      DAVID L. COCHRAN
The Capitol                          JAMES B. MCGOWAN
Albany, NY 12224                     Assistant Attorneys General

**Gary L. Sharpe**
**District Court Judge**


## <u>MEMORANDUM-DECISION AND ORDER</u>

## I. <u>Introduction</u>

Plaintiffs parents and guardians of disabled students attending the

Judge Rotenburg Educational Center (JRC) allege that defendants New

York State Education Department (NYSED), New York State Board of

Regents (NYSBR), and New York State Education Commissioner Richard

P. Mills violated their statutory and constitutional rights.  The gravamen of

the complaint is that defendants arbitrarily denied the student plaintiffs a

free appropriate public education (FAPE) in violation of the IDEA[1] when

they passed emergency regulations that eliminated or restricted aversive

treatments that had been authorized for the student plaintiffs.  Pending is

defendants' motion for summary judgment, or, in the alternative, for an

order dissolving the preliminary injunction issued in this matter.  For the

_____

[1]Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.*

2

reasons that follow, the motion for summary judgment is granted in part

and denied in part, and the motion to dissolve the preliminary injunction is

denied.

## II.  <u>Facts</u>[2]

Plaintiffs are a group of approximately forty New York students with

severe behavioral problems who attend JRC, and their parents and

guardians.[3]  (*See* Pls. SMF ¶ 67, Dkt No. 237:1.)  Located in

Massachusetts, JRC is a not-for-profit school that provides residential,

special education, and behavioral services for individuals who suffer severe

behavioral disorders.  (*See id.* at ¶ 68.)

In addressing students' problematic behaviors, JRC first employs

positive intervention methods such as rewards and token fines.  These

methods are successful with about 60% of JRC students.  (*See id.* at ¶ 71.)

If unsuccessful, JRC may employ aversive interventions.  (*See id.* at ¶ 72.)

Aversive methods include contingent food programs, the use of helmets on

---

[2]The facts are derived from the parties' 7.1 statements of material facts and the record on this matter.  The court notes that defendants have inexplicably failed to respond to plaintiffs' additional statements of material facts.  Thus, the court has deemed such additional statements admitted where supported by the record.

[3]Discovery in this matter has been limited to ten representative student plaintiffs chosen by the parties.  The court elected this process in an effort to reduce discovery expenses and expedite the suit.  Obviously, expediting the litigation was but a dream born from the best intentions.

some children, mechanical restraints, and the application of electric skin shocks through a graduated electronic decelerator (GED).  (*See* Defs. SMF ¶ 5, Dkt. No. 233:1.)  The GED may cause blisters or dark marks which clear up within a few days.  (*See id.* at ¶ 8.)  Before aversives are used on a student, such use must be approved by supervising personnel, the student's parent or guardian, two committees, the school district, an independent board certified physician, and a Massachusetts probate court judge.  (*See* Pls. SMF ¶ 74, Dkt No. 237:1.)  Individualized education programs (IEPs) containing aversives are generally proposed by JRC and transmitted to the child's parents and the committee on special education (CSE) for approval.  (*See* Defs. SMF ¶ 13, Dkt. No. 233:1.)  As of June 23, 2006, most of the students were receiving aversives for aggressive, destructive, health dangerous, major disruptive, and non-compliant behaviors.  (*See id.* at ¶ 11.)

NYSED is charged with overseeing the education and well-being of New York students.  (*See* Pls. SMF ¶ 76, Dkt No. 237:1.)  NYSED has conducted numerous visits, inspections, and reviews of JRC, and has approved JRC as an out-of-state school for decades.  (*See id.* at ¶¶ 77-79.)  During this time, no concerns were raised about the health and safety of

4

JRC students or the use of aversives.  (*See id.* at ¶¶ 82-83.)  However, in early 2006, a parent of a former JRC student sued NYSED, claiming, inter alia, that JRC mistreated the student.[4]  (*See id.* at ¶ 84.)  The suit was followed by sensation-seeking newspaper articles highly critical of NYSED. Shortly thereafter, NYSED proposed a complete ban on the use of aversives, and decided to conduct another review of JRC due to the lawsuit, despite having reviewed JRC in Fall 2005.  (*See id.* at ¶¶ 80-81, 85.)  While the group NYSED selected to conduct this "re-review" was experienced in educational matters, some members of the team were not familiar with aversive techniques and at least one member of the team was opposed to aversives under all circumstances.  (*See id.* at ¶¶ 87-88.)  In June 2006, NYSED released a report that was critical of JRC and its methods.  (*See id.* at ¶ 89.)  Plaintiffs contend that this report "was littered with flaws and false statements" because it omitted information as to the effectiveness of JRC's program and relied upon conjecture, innuendo, and falsehoods.  (*Id.* at ¶ 90.)

Upon NYSED's recommendation, NYSBR adopted "emergency"

---

[4]NYSED later defeated the parent's lawsuit.  (*See* Pls. SMF ¶ 86, Dkt No. 237:1.)

regulations in June 2006 that limited the use of aversives,[5] effective June 23, 2006.  (*See* Defs. SMF ¶ 17, Dkt. No. 233:1.)  Defendants contend that the regulations were the product of considerable research and review. (*See id.* at ¶ 21.)  The emergency regulations prohibited the use of aversive interventions to reduce or eliminate maladaptive behaviors, except as provided through a child-specific exception that applied when the child's CSE developed an IEP that included aversives.  (*See id.* at ¶ 19.)  After the regulations went into effect on an emergency basis, NYSED held three public hearings from August 8 to August 15, 2006.  (*See id.* at ¶ 25.) NYSED also opened up a public comment period on the proposed

_____

[5]New York's regulations define aversives as:

an intervention that is intended to induce pain or discomfort to a student for the purpose of eliminating or reducing maladaptive behaviors, including such interventions as:

(i) contingent application of noxious, painful, intrusive stimuli or activities; strangling, shoving, deep muscle squeezes or other similar stimuli;

(ii) any form of noxious, painful or intrusive spray, inhalant or tastes;

(iii) contingent food programs that include the denial or delay of the provision of meals or intentionally altering staple food or drink in order to make it distasteful;

(iv) movement limitation used as a punishment, including but not limited to helmets and mechanical restraint devices; or

(v) other stimuli or actions similar to the interventions described in subparagraphs (i) through (iv) of this paragraph.

The term does not include such interventions as voice control, limited to loud, firm commands; time-limited ignoring of a specific behavior; token fines as part of a token economy system; brief physical prompts to interrupt or prevent a specific behavior; interventions medically necessary for the treatment or protection of the student; or other similar interventions.

8 N.Y. COMP. CODES R. & REGS. § 19.5(b)(2).

regulations that lasted from July 12, 2006, to August 28, 2006.  (*See id.* at

¶ 27.)  Through these channels, NYSED received voluminous comments

from the public, including some plaintiffs.  (*See id.* at ¶¶ 26, 28-29.)  While

plaintiffs opposed the regulations due to their limitation on the use of

aversives, most of the public commentary opposed the regulations

because they allowed the use of aversives at all.  (*See id.* at ¶ 30.)

NYSED prepared an assessment of the public comments, and revisions

were correspondingly made to the regulations before they were presented

for permanent adoption.  (*See id.* at ¶¶ 31, 34.)  Under the finalized

regulations adopted in January 2007, the use of aversives is only permitted

for students who had aversives on their IEP as of June 30, 2009, and who

obtain a child-specific exception from a committee appointed by the

Commissioner or his designee.  *See* 8 N.Y. COMP. CODES R. & REGS. §

200.22(e).  The use of aversives under this exception is limited to self-

injurious and/or aggressive behaviors.  (*See id.*)  The United States

Department of Education (USDOE) reviewed the final regulations and

found that they "can be implemented consistent with the IDEA."  (*See*

Delorenzo Decl., Ex. A, Dkt. No. 161:3.)

Plaintiffs commenced the present action on August 16, 2006, and

asserted claims for: (1) a "global" violation of the IDEA; (2) the denial of a

FAPE under the IDEA; (3) a violation of the Rehabilitation Act, 29 U.S.C. §

701, *et seq.*; (4) violations of the Equal Protection Clause of the New York

and United States Constitutions; (5) procedural due process violations

under the New York and United States Constitutions; and (6) substantive

due process violations under the New York and United States

Constitutions.  (*See generally* Am. Compl., Dkt. No. 126.)  Plaintiffs

additionally sought an order permanently enjoining defendants from

enforcing the emergency regulations or revoking JRC's New York approval,

and a declaration that the emergency regulations are invalid.  (*See id.*)  In

conjunction with their complaint, plaintiffs also filed an ex parte motion for

preliminary injunctive relief, seeking to enjoin enforcement of the

regulations, which JRC had been complying with since June 23, 2006.

(*See* Dkt. No. 7.)  The court granted this motion on September 8, 2006,

and enjoined NYSED from enforcing the regulations against plaintiffs.[6]

(*See* Dkt. No. 46.)

On February 13, 2009, defendants filed a motion for summary

_____

[6]The Order was subsequently modified to encompass additional plaintiffs and
amendments to the regulations.  (*See* Dkt. Nos. 53, 89.)

judgment under FED. R. CIV. P. 56, seeking dismissal of plaintiffs' action, or, alternatively, an order dissolving the court's preliminary injunction.  (*See* Dkt. No. 233.)  On July 21, 2009, the court held a hearing on the motion. (*See* Dkt. No. 249.)  During this hearing the court: (1) dismissed as moot the claims of thirteen student plaintiffs who no longer attend JRC;[7] and (2) rejected defendants' contention that the remaining plaintiffs' claims must be dismissed for failure to exhaust administrative remedies.  (*See id.*) Pending before the court is the remainder of defendants' motion.

### III.  Standard of Review

In general, when a party moves for summary judgment in an IDEA action, the normal inquiry as to whether there are any issues of fact or credibility does not apply.  *See New Paltz Cent. Sch. Dist. v. St. Pierre*, 307 F. Supp.2d 394, 397 (N.D.N.Y. 2004).  Instead, the inquiry is "whether the administrative record, together with any additional evidence, establishes that there has been compliance with [the] IDEA's processes."  *Id.* (internal quotation marks and citation omitted).  "[T]he district court must engage in an independent review of the administrative record and make a

---

[7]These student plaintiffs were DB2, NB, CC, KD, AD, TE, SF, CJ, PP, MP, ES, CS, and JT.

determination based on a 'preponderance of the evidence.'" *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (internal citation omitted).  Here, however, a full administrative record is absent, and the parties have argued the motion under the normal summary judgment standard.  *See Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 387 (6th Cir. 1998) (indicating that parties may elect for review under normal summary judgment standard in IDEA action).   Accordingly, the court will proceed under the traditional standard for summary judgment.  As this standard is well established, it will not be repeated here.  For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle*, 499 F. Supp.2d 192, 194-95 (N.D.N.Y. 2007).

## IV.  Discussion

### A.    "Global" IDEA Claim

Initially, the court addresses plaintiffs' sixth cause of action, which seeks to have the emergency regulations struck down on the grounds that they are arbitrary, capricious, inconsistent with the purposes of the IDEA, and the by-product of a flawed and biased process.  Defendants contend that this claim must be dismissed because the regulations represent an

informed educational policy choice between two conflicting schools of

thought on the use of aversives, and that such choice is entitled to

deference.  Upon review of the law, the parties' briefs, and the record, the

court is constrained to agree with defendants' arguments.

"The IDEA was enacted to assist states in providing special

education and related services to children with disabilities ...."  *Taylor v. Vt.*

*Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002) (citing 20 U.S.C. §

1411(a)(1)).  A state is eligible for federal funds under the IDEA if it has

policies and procedures in effect to ensure, among other things, that

disabled children within the state are provided access to a FAPE.  *See id.*

at 776-77 (quoting 20 U.S.C. § 20 U.S.C. § 1412).  The Act defines a FAPE

as:

> special education and related services that --
> (A) have been provided at public expense, under public
> supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school or
> secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education
> program required under section 1414(d) of this title.

20 U.S.C. § 1401(9); *see also* 34 C.F.R. § 300.17.

As the IDEA's definition of a FAPE makes clear, "[t]he Act does not

11

usurp the state's traditional role in setting educational policy." *Taylor*, 313 F.3d at 777.  Indeed, "[t]he statute incorporates state substantive standards as the governing federal rule if they are consistent with the federal scheme and meet the minimum requirements set forth by the IDEA." *Id.* (internal quotation marks and citations omitted).  Thus, it must be remembered "that [the] IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy" and "that the judiciary generally lacks the specialized knowledge and experience necessary to resolve [such] persistent and difficult [issues]." *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191-92 (2d Cir. 2005) (internal quotation marks and citations omitted).  "Nevertheless, [the court's] review must be searching, and ... must recognize that even when educational authorities act with the best intentions they may sometimes fall short of their obligations under the IDEA, and courts must then act to ensure compliance with Congress's directives." *P. v. Newington Bd. of Educ.*, 546 F.3d 111, 120-21 (2d Cir. 2008).

Mindful of the above principles, the court finds that the regulations at issue here represent a permissible educational policy choice by defendants for a variety of reasons.  The regulations' limitation and gradual phasing out

12

of aversives is consistent with the IDEA's focus on positive behavioral

modification methods.  *See* 20 U.S.C. § 1400(c)(5)(F) ("Almost 30 years of

research and experience has demonstrated that the education of children

with disabilities can be made more effective by ... positive behavioral

interventions and supports ...."); § 1411(e)(2)(C)(iii) (allowing states to

reserve federal funding to assist local agencies in the provision of positive

behavioral interventions and supports, among other things); §

1414(d)(3)(B)(i) (indicating that an IEP team should "consider the use of

positive behavioral interventions and supports" for children whose behavior

impedes learning); § 1454(a)(3)(B)(iii)(I) (allowing states to use Federal

grants to train teachers in positive behavioral modification methods); §

1462(a)(6)(D) (permitting the Secretary of Education to enter into contracts

with entities that can provide positive behavioral support training); §

1465(b)(1)(B)-(C) (allowing Secretary to support activities which establish,

expand, or increase training for parents and teachers on positive

behavioral interventions and supports).  Given this emphasis on positive

behavioral modification techniques, numerous states other than New York

have enacted statutes or regulations which similarly limit or prohibit the use

of aversives in the educational setting.  *See, e.g.*, CAL. EDUC. CODE §§

49001, 56520(a)(3); 05-071 ME. CODE R. Ch. 33, § 5; MINN. R. 3525.2900; MONT. ADMIN. R. 10.16.3346; N.H. CODE ADMIN. R. ANN. EDUC. 1113.04-06, 1114.07-09; 22 PA. CODE § 14.133; 22 VA. ADMIN. CODE § 40-15-820; WASH. ADMIN. CODE 392-172A-03125, 392-172A-03130.  This prevailing disfavor for aversive techniques weighs strongly in favor of the validity of the regulations at issue here.

Plaintiffs have not addressed the above-cited statutes and regulations. Instead, they have submitted numerous expert opinions which dispute the regulations' legitimacy and indicate that aversives are a desirable and effective means of behavioral treatment.  (*See, e.g.*, Flammia Decl., Ex. 23, Mulick Dep. at 7-8, Dkt. No. 237:11 (filed under seal); Barrera Aff., Ex. 1 at 10, 23, Dkt. No. 237:7 (filed under seal); Mulick and Van Houten Affs., Ex. 1 at 8, 20, Dkt. Nos. 237:2, 237:4 (filed under seal); Israel Aff., Ex. 1 at 8-9, Dkt. No. 237:6 (filed under seal).)  Admittedly, these expert opinions are significantly more comprehensive than any expert opinion proffered by the defendants.  Indeed, defendants' own expert, Dr. Hagopian, conceded that "the position that punishment should not be used is more of a philosophical based type of position," and that it is inappropriate to completely ban aversives.  (Flammia Decl., Ex. 10,

Hagopian Dep. at 37-38, 130-32, 171-72, 261, Dkt. No. 237:10.)

It is readily apparent that the use and benefits of aversives in an educational setting is a divisive issue among educational professionals. This point is best illustrated by the deposition testimony of plaintiffs' expert, James A. Mulick, Ph.D.  While Dr. Mulick indicated that he believed the positive behavior movement to be "misleading" and inconsistent with professional standards, he conceded that there is a "tribal division[]" in the professional community between those who support aversives and those who do not.  (Mulick Dep. 281-82, Dkt. No. 250 (filed under seal).)  He further acknowledged that "by sheer way of numbers and success in marketing and support from government agencies, the positive behavior support people are becoming the standard face of behavior modification in schools, which is their target audience." (*Id.* at 283.)  Given this split in the professional community and the IDEA's clear preference for positive behavioral interventions, defendants were certainly entitled to limit and ultimately phase out the use of aversives as a matter of educational policy. *See Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982) (indicating that courts should not "substitute their own notions of sound educational policy for those of the school authorities

which they review").

It is also significant to note that the USDOE reviewed the finalized regulations and indicated their belief that "they can be implemented consistent with [the] IDEA." (Delorenzo Decl., Ex. A, Dkt. No. 161:3.) Plaintiffs contend that this review should be accorded limited weight because it was conducted pursuant to a mere "complies substantially" standard, which does not indicate "actual" compliance with the IDEA. *See D.D. v. N.Y. City Bd. of Educ.*, 465 F.3d 503, 512 (2d Cir. 2006). Be that as it may, USDOE's approval of the regulations is further evidence that they can be reconciled with the IDEA.

A review of the record and the state register[8] further reveals that the emergency regulations were promulgated after consideration of numerous articles on behavioral interventions, unsolicited public commentary, and consultations with educational experts. (*See* Cort Decl. ¶ 9, Dkt. No. 233:10; Geary Decl. ¶ 3, Dkt. No. 233:13.) As such, it is clear that the emergency regulations were made on an informed basis, contrary to plaintiffs' characterization. Additionally, the court cannot agree with

―――――――――――――――

[8]*See* NYS Register, July 12, 2006 at 10-15, *available at* http://www.dos.state.ny.us/info/register/2006/jul12/pdfs/rules.pdf.

16

plaintiffs' contention that passage of the regulations on an "emergency" basis was uncalled for.[9]  During the relevant time period, defendants were facing a suit alleging aversive abuse at JRC and subsequent news articles criticizing their failure to intervene.  While the defendants' regulatory response may have been an unfortunate reaction to a suit subsequently dismissed and news articles designed to sell papers, it was nonetheless their obligation to expeditiously protect New York students.  Finally, the record reveals that the finalized regulations were adopted after three public hearings and a public comment period, during which there was a substantial outcry for the complete prohibition of aversives.  (*See* Delorenzo Decl., Ex. D, Dkt. No. 36; Defs. SMF ¶¶ 25-31, 34, Dkt. No. 233:1.)  Contrary to plaintiffs' contention, there is evidence that this public commentary was a driving force in passing the final regulations.  (*See* Geary Decl. ¶ 5, Dkt. No. 233:13.)

In summary, the court finds that the regulations represent an

---

[9]Nor does the fact that the defendants failed to consider the individual circumstances of each student plaintiff before promulgating the regulations render the regulations fatally defective.  The cases and sections of the IDEA invoked by plaintiffs, requiring individualized consideration of a student's unique circumstances, clearly relate to the development of an IEP, not the promulgation of regulations.  *See* 20 U.S.C. § 1400(d)(1)(A); *Rowley*, 458 U.S. at 181-82; *P.*, 546 F.3d at 122; *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363 (2d Cir. 2006).  If defendants were required to consider the individual circumstances of every individual student before enacting educational regulations, it would be virtually impossible to adopt such regulations.

informed, rational choice between two opposing schools of thought on the use of aversives.  Whether it was the best choice, or one that the court would have made, is irrelevant.  The court, with its limited educational expertise, is not the final arbiter in the realm of behavioral modification.  As the regulations are neither arbitrary nor capricious, and are consistent with the purposes of the IDEA, plaintiffs' facial attack must be rejected.

## B.   Denial of FAPE IDEA Claim

Plaintiffs' remaining IDEA claim alleges that the regulations, as applied to them, have resulted in the denial of a FAPE.  As the court indicated above, defendants' sole argument for dismissal of this claim— that plaintiffs have failed to exhaust their administrative remedies—was rejected during oral argument.  In the context of this argument, defendants also tersely contended that plaintiffs were not denied a FAPE because their progress reports evidenced academic progress rather than regression during the period from June 23, 2006, to September 8, 2006, when JRC was complying with the regulations.  However, as the court intimated during the hearing on this motion, academic progress is not the sole measure of a FAPE.  *See, e.g.*, *Mr. I. v. Me. Sch. Admin. Dist. No. 55*, 480 F.3d 1, 12 (1st Cir. 2007) ("[T]he IDEA entitles qualifying children to

18

services that target all of their special needs, whether they be academic,

physical, emotional, or social." (internal quotation marks, citations, and

emphasis omitted)); *Alex R. v. Forrestville Valley Cmty. Unit Sch. Dist. #*

*221*, 375 F.3d 603, 613 (7th Cir. 2004) ("An IEP that fails to address

disability-related actions of violence and disruption in the classroom is not

reasonably calculated to enable that child to receive educational benefits."

(internal quotation marks omitted)); *Frank G.*, 459 F.3d at 363 ("In

developing a particular child's IEP, a [CSE] is required to consider four

factors: (1) academic achievement and learning characteristics, (2) *social*

*development*, (3) physical development, and (4) *managerial or behavioral*

*needs*." (emphasis added, internal quotation marks and citations omitted));

*Weixel v. Bd. of Educ. of the City of N.Y.*, 287 F.3d 138, 150 (2d Cir. 2002)

("The scope of [the] IDEA's coverage is not limited to students with

'learning disabilities,' but instead applies broadly to students who need

'special education and related services.'" (citation omitted)); *see also*

*Application of a Student Suspected of Having a Disability*, Appeal No. 08-

100 at 17-18, *available at*, 188 PLI/NY 349; *Letter to Clarke*, 48 IDELR 77

(OSEP, Mar. 8, 2007), *available at*

http://www.ed.gov/policy/speced/guid/idea/letters/2007-1/clarke030807disa

bility1q2007.pdf.  Thus, the court must reject defendants' contention that so long as "a student is making academic progress, related services that address a student's social and/or behavioral issues may be denied even if problematic behaviors continue."  (Defs. Reply at 3, Dkt. No. 240.)  Beyond this mistaken premise, defendants have not addressed the substance of plaintiffs' FAPE claims with sufficient specificity to render a ruling on such claims appropriate here.  As such, further administrative proceedings or hearings may be necessary.  Thus, for these reasons and those which the court will discuss in its conclusion, defendants' motion for summary judgment on these claims is denied.

## C.   **Rehabilitation Act Claim**

Next, defendants contend that plaintiffs' claim under the Rehabilitation Act fails against Commissioner Mills because Section 504 does not allow for a state official to be sued in his personal capacity.  It is also asserted that this claim must fail on the merits.  But because Commissioner Mills is not being sued in his personal capacity, the court focuses on defendants' latter argument.

Section 504 of the Rehabilitation Act provides that "[n]o qualified individual with a disability ... shall, solely by reason of her or his disability,

be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...."  29 U.S.C. § 794.  In order to state a claim under the Rehabilitation Act, a plaintiff must demonstrate (1) that he or she is a disabled person under the Act, (2) who has been excluded from benefits of a federally funded program or special service, (3) solely because of his or her disability.  *See Mrs. C. v. Wheaton*, 916 F.2d 69, 74 (2d Cir. 1990).  In the context of an IDEA action, something more than the mere denial of a FAPE must be shown in order to establish a violation of Section 504.  *See Wenger v. Canastota Cent. Sch. Dist.*, 979 F. Supp. 147, 152 (N.D.N.Y. 1997).  As such, plaintiffs must also demonstrate bad faith or gross misjudgment to establish a Rehabilitation Act claim.  *See id.*

Here, the court's finding that the regulations represent a permissible educational policy choice by the defendants precludes any finding that such regulations were enacted in bad faith or with gross misjudgment. Even were this not the case, plaintiffs' arguments in support of their Rehabilitation Act claim lack merit.  Plaintiffs contend that defendants improperly accepted allegations of mistreatment by JRC as fact in early 2006 without investigating their merits.  With their next breath, however,

21

plaintiffs object to just such an investigation, asserting that defendants' "re-reviewed" JRC to avoid negative media attention arising from the 2006 allegations.  Clearly, plaintiffs cannot have it both ways, and their attempt to do so must be rejected.

Plaintiffs also attack the personnel who engaged in the "re-review" because they lacked experience with aversives.  While this assertion finds some evidentiary support, it cannot give rise to an inference of bad faith, as it is clear that the members of the re-review team were extremely knowledgeable about educational matters in general.

Finally, to the extent it is asserted that defendants failed to support their criticism of JRC's use of aversives, and distorted scientific literature to support the regulations, the court finds plaintiffs' arguments without merit.  Despite plaintiffs' fervent attempts to present aversives as uncontroversial, it is evident that this is not the case.  Rather, there is clearly abundant support for the limitation, if not prohibition, of aversives.  (*See, e.g.*, Mulick Dep. 281-83, Dkt. No. 250 (filed under seal); Delorenzo Decl., Ex. D, Dkt. No. 36.)  As such, the court cannot find that the regulations were enacted in bad faith or with gross misjudgment, and therefore, plaintiffs' Rehabilitation Act claims must be dismissed.

### D.   State and Federal Constitutional Claims

Finally, defendants seek dismissal of plaintiffs' equal protection, procedural due process, and substantive due process claims under the New York and United States Constitutions, on grounds that such claims are barred by sovereign immunity and are without merit.

### 1.   Sovereign Immunity

Sovereign immunity bars state constitutional claims against the state, its agencies, or against its employees in their official capacity, regardless of the relief sought.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105-06 (1984) (finding sovereign immunity bars federal courts from adjudicating state claims against the state); *Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 604 (2d Cir. 1988); *Diamond v. Pataki*, No. 03 Civ. 4642, 2007 WL 485962, at *7 (S.D.N.Y. Feb. 14, 2007).  As such, plaintiffs' state constitutional claims are dismissed.

The court has construed plaintiffs' federal constitutional claims to arise under 42 U.S.C. § 1983, despite plaintiffs' protestation, as no other statutory vehicle for such claims is proffered.[10]  Because the state and its

---

[10]Contrary to plaintiffs' contention at oral argument, a constitutional claim may not be brought directly under the United States Constitution where a statutory vehicle for the assertion of such a claim exists.  *See Paulk v. Bd. of Trs. of City Univ. of N.Y.*, 654 F.2d 856, 865 (2d Cir. 1981); *Koumantaros v. City Univ. of N.Y.*, No. 03 Civ. 10170, 2007 WL 840115, at *5

agencies are immune from suit under § 1983, *see Howlett v. Rose*, 496

U.S. 356, 365 (1990), plaintiffs' federal constitutional claims must be

dismissed as against NYSED and NYSBR.  However, to the extent

plaintiffs seek prospective injunctive and declaratory relief from ongoing

violations of federal law against Commissioner Mills in his official capacity,

the federal constitutional claims are not barred by sovereign immunity.  *See*

*Ex parte Young*, 209 U.S. 123 (1908); *Santiago v. N.Y. State Dep't Corr.*

*Servs.*, 945 F.2d 25, 32 (2d Cir. 1991) (holding *Ex parte Young* applies only

to state official, not state or state agency).  As such, the court turns to the

merits of these claims.

**2.     Substantive Due Process**

"[T]he Due Process Clause of the Fourteenth Amendment embodies

a substantive component that protects against certain government actions

regardless of the ... procedures used to implement them."  *Immediato v.*

*Rye Neck School Dist.*, 73 F.3d 454, 460 (2d Cir. 1996) (internal quotation

marks and citation omitted).  "In assessing whether a government

regulation impinges on a substantive due process right, the first step is to

determine whether the asserted right is 'fundamental.'"  *Leebaert v.*

———————————

(S.D.N.Y. Mar. 19, 2007).

*Harrington*, 332 F.3d 134, 140 (2d Cir. 2003) (emphasis omitted).  "Rights are fundamental when they are implicit in the concept of ordered liberty, or deeply rooted in this Nation's history and tradition." *Immediato*, 73 F.3d at 460-61 (internal quotation marks and citations omitted).  "Where the right infringed is fundamental, strict scrutiny is applied to the challenged governmental regulation."  *Leebaert*, 332 F.3d at 140 (citation omitted). However, "[w]here the claimed right is not fundamental, the governmental regulation need only be reasonably related to a legitimate state objective" to survive constitutional review.  *Immediato*, 73 F.3d at 454.

Contrary to plaintiffs' contention, the right to public education is not fundamental.  *See Handberry v. Thompson*, 446 F.3d 335, 352-53 (2d Cir. 2006); *see also San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 35 (1973)*; Manbeck v. Katonah-Lewisboro Sch. Dist.*, 435 F. Supp.2d 273, 276 n.2 (S.D.N.Y. 2006), *aff'd*, 264 Fed. Appx. 61 (2d Cir. 2008).  Thus, despite defendants' inexplicable failure to address the relation between the regulations and a government interest, plaintiffs' substantive due process claim fails.  "Education is unquestionably a legitimate state interest." *Immediato*, 73 F.3d at 462.  This interest clearly extends to the academic, emotional, and physical well being of students in the educational setting.

Furthermore, the regulations' limitation and ultimate prohibition of aversives is rationally related to these state interests, as defendants could have reasonably concluded that the potential harm of aversives in education outweighs their potential benefits.  As such, plaintiffs' substantive due process claim is dismissed.

### 3.    Procedural Due Process

Analysis of a procedural due process claim is composed of two prongs.  *Narumanchi v. Bd. of Trs. of Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988).  First, the court must discern "whether the plaintiff has a property or liberty interest protected by the Constitution."  *Id.*  If such an interest exists, "[the] court must then consider whether the government deprived the plaintiff of that interest without due process."  *Id.*  Thus, under this second step of the analysis, the court must ask "what process was due to the plaintiff, and ... whether that constitutional minimum was provided in the case under review."  *Id.*  This involves a weighing of the private interest to be affected, the risk of erroneous deprivation, the value of additional safeguards, and the governmental burden such additional safeguards would impose.

Here, plaintiffs contend that they were deprived of their interest in

education without due process because the regulations limiting aversives were passed on an emergency basis, and public hearings were only held subsequently.  The court cannot agree.  While both New York law and the IDEA create a property interest in education, *see Handberry*, 446 F.3d at 353, it is far from clear that this interest—which does not rise to the level of a fundamental right—extends to aversives.  Assuming it does, the court notes that a post-deprivation hearing is sufficient to satisfy due process where a valid governmental interest militates toward immediate action. *See, e.g.*, *Ezekwo v. N.Y. City Health & Hosps. Corp.*, 940 F.2d 775, 783-84 (2d Cir. 1991).  Here, defendants were faced with allegations of abuse at JRC, and a report which gave concern about JRC's use of aversives.  As such, it was certainly reasonable to assume that immediate action was necessary at the time the emergency regulations were enacted, even if hindsight reveals that this was not the case.  Additionally, in the months following the passage of the emergency regulations, notices were provided, public hearings were held, comments were accepted, and an assessment of public comment was published—all in compliance with New York's Administrative Procedure Act.  These subsequent procedures actually resulted in final regulations which were more restrictive regarding the use

27

of aversives than the emergency regulations were.  As such, it would

appear that additional procedures prior to the promulgation of the

emergency regulations would have been of little value to the plaintiffs.[11]

Accordingly, plaintiffs' procedural due process claim is dismissed.

## 4.   Equal Protection

In order to adequately present an equal protection claim under the

Fourteenth Amendment, plaintiffs must prove that "(1) compared with

others similarly situated, [they were] selectively treated; and (2) that such

selective treatment was based on impermissible considerations such as

race, religion, [disability,] intent to inhibit or punish the exercise of

constitutional rights, or malicious or bad faith intent to injure a person."

*LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir.1980).  Plaintiffs fail to

satisfy either prong of this analysis.  First, the emergency regulations apply

to all New York state students with disabilities.  Thus, plaintiffs have not

been subjected to selective treatment.  Further, there is no indication that

the regulations were the result of disability-based discrimination or an intent

to cause plaintiffs injury, constitutional or otherwise.  Accordingly, plaintiffs'

---

[11]Again, the court rejects plaintiffs' contention that consideration of each individual plaintiff's circumstances was required before the regulations were promulgated.  Such a requirement would obviously make the passage of any educational regulation virtually impossible.

equal protection claims are dismissed.

**E.     Preliminary Injunction**

Lastly, defendants contend that the preliminary injunction should be dissolved, as plaintiffs have suffered no academic harm from the regulations.  It is further asserted that the preliminary injunction should be dissolved because JRC is incapable of administering aversives responsibly, as evidenced by the fact that in August 2007, JRC staff improperly administered multiple GED shocks to two students upon the phone directives of other JRC students who were masquerading as JRC staff.

A preliminary injunction "is an equitable remedy ... issued to maintain the status quo until there can be a hearing on the merits."  *Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 256 (2d Cir. 1984) (italics omitted).  The decision whether to modify or vacate a preliminary injunction is committed to the inherent discretion of the district court.  *See id.* at 256-57.  "The test of that discretion is measured by whether the requested [vacatur] effectuates or thwarts the purpose behind the injunction."  *Id.* at 257 (citing *Chrysler Corp. v. United States*, 316 U.S. 556, 562 (1942)).  "Thus, a district court may modify or vacate a preliminary injunction when

... necessary to preserve the status quo." *Museum Boutique Intercontinental, Ltd. v. Picasso*, 880 F. Supp. 153, 161 (S.D.N.Y. 1995) (citing *Sierra Club*, 732 F.2d at 257).

Defendants have not satisfied this standard.  Vacating the preliminary injunction in this case would not maintain the status quo.  Rather, such action would destroy it.  The court has already rejected the contention that plaintiffs' academic progress establishes beyond reproach that the regulations have not denied the plaintiffs a FAPE.  Further, while the incident in August 2007 was unfortunate, there is no evidence that similar episodes have occurred before or since.  JRC continues to be approved by Massachusetts agencies and NYSED, and has taken remedial measures to preclude the recurrence of such incidents.  As such, the court declines to dissolve the preliminary injunction.

## V. Conclusion

Recognizing that equity and the law are not always synonymous, the court has nonetheless struggled with its perception of the equities in this case.  On the one hand, the underlying facts—albeit unique to each individual plaintiff—demonstrate the plight of parents and guardians as they struggle for the education, love, and affection of the severely disabled

30

whose best interests have been entrusted to their care.  Typically strapped

financially, they must rely on the public generosity reflected in the IDEA to

provide their disabled children with a free and appropriate public education.

On the other hand, Congress has substantially left the reasonable

parameters of that education to state education officials, not federal judges.

Certainly, there is a national debate regarding the efficacy of aversives.

New York, as it is authorized to do, has resolved that debate with

regulations that are reasonable and within its province to enact.

Undoubtedly, plaintiffs will find it unfair that a national debate and a state

regulatory decision override their personal beliefs regarding the best

interests of their disabled children.  Recognizing this dichotomy, the court

has ruled as it believes it is legally obligated to.

These observations are offered in hopes that they might facilitate

rational conversations between the parties as they digest the ramifications

of the court's rulings and calculate the course ahead.  The individual FAPE

claims have survived.  While the court has no specific expertise in the

enforcement options available under the current regulations, it has resolved

certain fundamental issues regarding individual claims.[12]  Thus, it has ruled

that the failure to exhaust administrative remedies does not bar those

claims and a FAPE encompasses behavioral, not just academic, progress.

With these observations in mind, the court affords the attorneys thirty

(30) days to digest this opinion, consult with their respective clients, and file

a joint letter containing a proposal for the resolution of the individual FAPE

claims.

Accordingly, and for the reasons stated herein, it is hereby

**ORDERED** that defendants' motion for summary judgment is

**GRANTED** as to all claims, with the sole exception of plaintiffs' denial of

FAPE claims; and it is further

**ORDERED** that defendants' motion to dissolve the preliminary

injunction is **DENIED**; and it is further

**ORDERED** that on or before **March 26, 2010**, the parties shall file a

joint letter containing a proposal for the resolution of the individual FAPE

claims; and it is further

**ORDERED** that the Clerk of the Court provide copies of this

---

[12]The regulations appear to permit the use of aversives for individuals whose IEPs called for aversives as of June 30, 2009, and who obtain a child-specific exception from a designated committee.

Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

February 24, 2010
Albany, New York

United States District Court Judge